UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA,


      -against-                           S2 20 Cr. 330 (AJN)


GHISLAINE MAXWELL,

                          Defendant.
-------------------------------------------------------------x




**SENTENCING MEMORANDUM ON BEHALF OF GHISLAINE MAXWELL**




Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
225 Broadway, Suite 715
New York, NY 10011
212-243-1100


Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
212-957-7600


Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
950 17th Street, Suite 1000
Denver, CO 80202
303-831-7364


*Attorneys for Ghislaine Maxwell*

On behalf of our client, Ghislaine Maxwell, we respectfully submit this memorandum in connection with sentencing, which is scheduled for June 28, 2022. As set forth below, we request that the Court grant Ms. Maxwell a significant variance below the advisory Sentencing Guidelines range of 292 - 365 months and below the 240-month sentence recommended by the Probation Department ("Probation").

Ghislaine Maxwell stands before the Court because of her association with Jeffrey Epstein decades ago in the 1990s and early 2000s. Never before that time and never again in the roughly 20-year period since the conduct underlying this case occurred has Ms. Maxwell ever been accused of a crime, much less a scheme to sexually abuse minors. The witnesses at trial testified about Ms. Maxwell's facilitation of Epstein's abuse, but Epstein was always the central figure: Epstein was the mastermind, Epstein was the principal abuser, and Epstein orchestrated the crimes for his personal gratification. Indeed, had Ghislaine Maxwell never had the profound misfortune of meeting Jeffrey Epstein over 30 years ago, she would not be here.

Epstein avoided a significant sentence when he was first prosecuted in Florida for these offenses and then evaded any further punishment by dying a month after his arrest and detention in New York. But this Court cannot sentence Ms. Maxwell as if she were a proxy for Epstein simply because Epstein is no longer here. Ms. Maxwell cannot and should not bear all the punishment for which Epstein should have been held responsible. Ms. Maxwell has already experienced hard time during detention under conditions far more onerous and punitive than any experienced by a typical pretrial detainee, and she is preparing to spend significantly more time behind bars. Her life has been ruined. Since Epstein's death, her life has been threatened and death

threats continue while she is incarcerated.[1] It would be a travesty of justice for her to face a sentence that would have been appropriate for Epstein.

In its Final Presentence Investigation Report ("PSR"), Probation recommended a sentence of 240 months' imprisonment, a slight downward variance from the sentence recommended by the advisory Guidelines. We have submitted objections directly to Probation which are amplified in an accompanying submission.[2] We respectfully submit that in light of the circumstances discussed below, including extraordinary punitive conditions of solitary confinement and the ongoing COVID-19 pandemic, a sentence below the 240 months recommended by Probation would be "sufficient, but not greater than necessary" to achieve the objectives of sentencing articulated in 18 U.S.C. § 3553(a).

**The Context of the Case**

This is not the first time the events in this case were investigated and resolved. This case is a revival of a prosecution commenced in the Southern District of Florida ("SDFL") against Epstein, which resulted in a state court conviction pursuant to a non-prosecution agreement. The plea and sentence were negotiated without notice to Epstein's victims. The "sweetheart" deal created an uproar among his victims and the public, which was fueled by and featured in on-going coverage in *The Miami Herald.* The public outcry led to removal of Alexander Acosta from his cabinet post as Secretary of Labor for his role as U.S. Attorney for SDFL overseeing the Epstein

---

[1] Most recently, an inmate in Ms. Maxwell's unit threatened to kill her, claiming that an additional 20 years' incarceration would be worth the money she'd receive for murdering Ms. Maxwell. *See* PSR ¶18.

[2] *See* PSR at 46-63 and the accompanying "Memorandum of Ghislaine Maxwell in Support of Her Objections to the Presentence Investigation Report," filed separately.

prosecution and to an investigation by the Justice Department's ("DOJ") Office of Professional Responsibility.

At the urging of civil attorneys representing Epstein's victims, the U.S. Attorney's Office for the Southern District of New York ("SDNY") took the extraordinary step of resurrecting the decade-old case against Epstein. SDNY's focus was always on righting the wrongs resulting from the Florida prosecution: Epstein was undercharged and under punished, Epstein never faced his accusers, and his accusers were denied justice. Epstein was the target and the focus of the prosecution until his death in the custody of the Bureau of Prisons ("BOP") in August 2019.

**Epstein's 2019 Arrest and Aftermath**

On July 6, 2019, Jeffrey Epstein was arrested in connection with an SDNY indictment. He was detained in the Metropolitan Correctional Center ("MCC") until his untimely death in custody on August 19, 2019. The highly publicized announcement of his arrest and detention came as a relief and vindication for women who had filed complaints against him. His capture and confinement quelled public outrage at Epstein's lenient Florida plea deal from October 2007 and the low sentence he received. Epstein's death approximately one month after his arrest eliminated any prospect of a trial, again shocking and disappointing his accusers. It also highlighted the failure of the U.S. government to ensure that an inmate in federal custody, in such a sensitive and high-profile case, could be kept safe and alive to face trial.

In the face of strong media and public uproar following Epstein's death, the government faced an urgency to appease the renewed distress of Epstein's accusers and to repair the tarnished reputations of the DOJ and BOP in whose custody Epstein died. There would be no trial for Epstein and no public vindication and justice for his accusers. The government now had a huge hole to fill: Epstein's empty chair. Although four women had been specifically named as co-

conspirators or accomplices of Epstein in connection with his controversial Florida plea deal, and although three of those same women were anonymously referenced in the 2019 SDNY indictment charging Epstein, the government chose not to prosecute any of them. Instead, the spotlight turned to Ghislaine Maxwell, with whom Epstein had had a relationship that was long since over and who was not named in the Florida "sweetheart" deal.

Ms. Maxwell did not appear in the 2019 SDNY indictment against Epstein, nor was she the subject of the 2007 SDFL grand jury presentation. Nevertheless, the government pivoted to Ms. Maxwell, who up to that point had never been the focus of any criminal prosecution for these events, and spent the next year investigating her. In doing so, SDNY had to reach back to events that were over 20 years old, a decade before the conduct that was the subject of the SDFL prosecution and the 2019 Epstein indictment. Almost a year to the day after Epstein's arrest, SDNY's Acting U.S. Attorney put the timing of Ms. Maxwell's prosecution and the extreme age of the charges against her in context:

> We were working hard on this investigation *this past year.* It's not easy to put together a case *that goes back that far,* but it was nothing other than we did the investigation and we were ready at this time to proceed.[3]

The entire focus of the accusations initially aimed at Epstein were now centered on one defendant alone – Ghislaine Maxwell – at a time when she was already being vilified in the press and the public domain. The media coverage was relentless and voluminous: dozens of broadcast documentaries, tens of streamed videos and podcasts, and publication of some 50 books and thousands of superficially written articles. The tsunami of one-sided, overwhelmingly negative coverage about Ms. Maxwell that followed the arrest and death of Epstein presented Ms. Maxwell as a caricature of evil, a depiction that has inevitably shaped the public's opinion of her. And the

---

[3] https://www.youtube.com/watch?v=E7J4ReLHvqg, at 8:06 -8:23 (emphasis added)

government added to the demonization of Ms. Maxwell by calling her a "villain" on the day of her arrest.[4]

But in sentencing Ms. Maxwell, the Court cannot be influenced by this inexorable drumbeat of public condemnation calling for her to be locked away for good. The Court cannot heal the wounds caused by Epstein by heaping on Ms. Maxwell's shoulders the pain of every one of his victims, the outrage of society, the public scorn of the community, and then driving her out of the community forever. While that may assuage the public and give the perception that "justice was done," that is not justice. That is scapegoating. Ms. Maxwell must be sentenced on the record before the Court and not these external pressures.

**Ghislaine Maxwell's Arrest and Detention**

At dawn on July 2, 2020, a team of more than a dozen FBI agents arrested Ms. Maxwell at the New Hampshire home where she had taken refuge after Epstein's death to escape the upsurge of highly intrusive media coverage that had engulfed her and her family. She had relocated alone, separating from her family to safeguard her husband and two young stepchildren and to secure the personal safety of her family and herself. At that time, Ms. Maxwell was the target of numerous death threats and threats of violence and was being hunted by the press. One media outlet even offered a $10,000 bounty for information about her whereabouts. Tragically, this experience was not new for Ms. Maxwell. Decades earlier, when Ms. Maxwell was just a child and her father was a Member of Parliament, U.K. authorities found a "hit list" of potential kidnapping/assassination targets in a safehouse used by the Irish Republican Army. Ms. Maxwell's name was first on the list. This unnerving experience has haunted her, heightening her vigilance and concerns about the welfare and safety of her young stepchildren, who were being hounded by the media at school and

---

[4] https://www.youtube.com/watch?v=E7J4ReLHvqg, at 2:09-2:15.

at the beach; and her husband, who was besieged by media coverage and had lost his employment and professional relationships.  Ms. Maxwell was also worried for herself, having legitimate reason to fear for her own life.

Despite having the benefits of foreign citizenship, Ms. Maxwell, a naturalized American citizen, remained in the United States consistently after Epstein's death, never evading the authorities.  At the time of her arrest, Ms. Maxwell was not considering flight – even though, given her French and British nationalities, she could have taken refuge in these and other countries at any time.  Law enforcement had been discreetly keeping tabs on her throughout the course of its investigation.[5]  Her lawyers had been in contact with prosecutors in the months preceding her arrest and would have arranged for her self-surrender.  Ms. Maxwell's presence in New Hampshire was driven solely by the need to protect herself and her family from threats of physical harm and from the unprecedented and escalating press and public vilification she had to endure since Epstein's death.

On July 6, 2020, exactly a year to the day after Epstein's arrest, Ms. Maxwell was ordered detained in the Metropolitan Detention Center ("MDC") based on the government's assertion that she posed "an extreme risk of flight" and that "no condition or combination of conditions will reasonably assure the appearance of the defendant as required."[6]  Each of four bail applications were denied on the elusive claim of flight risk, despite the unprecedented financial collateral and restrictions proposed to secure a hefty bond for an almost 60-year-old woman who, the government conceded, posed no danger to the community, and who had never attempted to flee the United States. For the next 22 months she was exposed to discriminatory and punitive solitary

---

[5] https://www.youtube.com/watch?v=E7J4ReLHvqg, at 2:31- 2:39.

[6] 20 Cr. 330, Dkt. 4, at 2.

confinement, isolated from all other inmates, and subjected to abnormally rigorous conditions. On April 20, 2022, almost four months after trial, she was abruptly placed in general population, and the charade of her pretrial detention was revealed: Her unusual detention was intended to help redeem DOJ and BOP reputations tarnished by Epstein's untimely death in custody and to ensure that Epstein's accusers would have their day in court. Ms. Maxwell's pre-sentence detention was tantamount to pre-sentence punishment.

Nor will Ms. Maxwell's disproportionate pre-sentence punishment end now that she is in general population.  Just recently, Ms. Maxwell was the target of a credible death threat from a fellow inmate.  On information and belief, one of the female inmates in Ms. Maxwell's housing unit told at least three other inmates that she had been offered money to murder Ms. Maxwell and that she planned to strangle her in her sleep.  The inmate who made the threat has been moved to the SHU, presumably to protect Ms. Maxwell.[7]  This incident reflects the brutal reality that there are numerous prison inmates who would not hesitate to kill Ms. Maxwell – whether for money, fame, or simple "street cred."  Ms. Maxwell has effectively traded the stress of flashlight checks every 15  minutes in the middle of the night while in isolation for the equivalent stress of having to sleep with one eye open - for as long as she is housed with other inmates.  Ms. Maxwell will have live with this threat every day that she is housed in the MDC and every day that she is incarcerated in the prison where she is designated.

**The Offense Conduct**

Having ruled on extensive pre- and post-trial motions and having presided over the jury trial and the post-trial hearing regarding Juror 50, the Court is fully familiar with the record in

---

[7] *See* PSR ¶18.

this case.[8]

**The Presentence Investigation Report**

On June 9, 2022, Probation filed its final PSR recommending a below-guidelines sentence

of 240 months' imprisonment, followed by a five-year term of supervised release. *See* PSR at 65.

> Regarding a sentencing recommendation, Probation has identified several mitigating factors. Maxwell is 61 years old, and a guidelines sentence may be tantamount to a lifetime term of imprisonment. The defendant has a reported history of philanthropy, charitable work, and helping others namely her work with the Clinton Global Initiative, The TerraMar Project, her use of EMT skills to help others, and her tutoring of inmates at the MDC. We further acknowledge that Maxwell is not solely responsible for the horrendous and irreparable damage caused by the decade.

PSR at 66-67.

**Adjustment to Incarceration**

Despite her extraordinarily restrictive conditions of detention, Ms. Maxwell has availed

herself of any programming or work opportunity available to her. While in solitary confinement,

she completed six courses, but until transferred to general population, she never had the

opportunity to make use of that training.  Post-trial she was permitted to work as an orderly which

has continued in general population.  Since placed in general population, she has eagerly provided

a wide variety of assistance to the women is her unit, including GED tutoring. *See* PSR. §16. In

addition, she has participated in and completed several educational courses. *See* PSR §15.

---

[8] Ms. Maxwell is planning to appeal her conviction following sentencing.  Accordingly, any discussion of the trial evidence in this submission is not an admission by Ms. Maxwell as to its accuracy or veracity.

## GHISLAINE'S PERSONAL CIRCUMSTANCES AND CHARACTERISTICS [9]

Ghislaine Noelle Marion Maxwell was born on December 25, 1961, in Maisons Laffitte, France, the last child born to the marriage of Robert and Elisabeth Maxwell. She is youngest of nine siblings. A sister died of childhood leukemia years before Ghislaine was born. Two days following Ghislaine's birth, her eldest sibling, Michael, was seriously and permanently injured in a car accident. He remained in a coma on and then off life support for the next seven years.

### Family Tragedy and Controversy[10]

The tragedy caused by Michael's accident and coma disrupted the equilibrium of the Maxwell family and transformed young Ghislaine's formative years. Ghislaine was hardly given a glance and became anorexic while still a toddler. At age three, she stood in front of her mother and said simply, "Mummy, I exist." On doctor's orders exactly a year after Michael's accident, her mother went on a long tour of India and Australia, leaving infant Ghislaine and her siblings not already in boarding school at home in the care of a nanny.

With Robert Maxwell's publishing company growing and his political career launched, the Maxwell home was filled with prominent guests and ongoing entertaining. As the children grew, they took part in the hosting of guests, having been instructed by their parents to be attentive to the needs of the guests. Despite Mr. Maxwell's professed love for his children, his relationship with them began to change soon after he became a Member of Parliament. He stopped living at home regularly, essentially seeing the children only on Sunday, leaving little normal daily contact between father and child to counterbalance the peaks of crisis and drama he created in the family. Even on those Sundays there was an inevitable contingent of authors and businesspeople in whose

---

[9] The following discussion amplifies information contained in the PSR at ¶¶134–178.

[10] This section is corroborated by the autobiography of Ghislaine's mother, Elisabeth Maxwell: *A Mind of My Own* (Harper Collins 1994).

presence the children would, so to speak, be put on trial, and the "Maxwellian Drama" would begin.

The ordeal occurred every Sunday at lunchtime. The conversation would start normally, until Mr. Maxwell selected one child to answer his questions on a particular topic in accordance with the rules of life he has encapsulated into mnemonics and drilled into them, *e.g.,* the 3Cs (Concentration, Consideration and Conciseness) or WWWH (What? Why? When? and How?). If the child stumbled, didn't speak on point, or gave a wrong answer, Mr. Maxwell would demand them to answer which of the principles they had forgotten to apply and the reason for that failure. The dressing down was always painful in the extreme with everyone around the table feeling uncomfortable. Mr. Maxwell, a man of large physical stature with a booming voice, would explode, threaten, and rant at the children until they were reduced to pulp. Mr. Maxwell was relentless, with children ending up in tears, punishments being doled out, and the whole family in utter distress.

Mr. Maxwell employed corporal punishment on his children. Ghislaine vividly recalls a time when, at age 13, she tacked a poster of a pony on the newly painted wall of her bedroom. Rather than mar the paint with tape, she carefully hammered a thin tack to mount the poster. This outraged her father, who took the hammer and banged on Ghislaine's dominant hand, leaving it severely bruised and painful for weeks to come.

**Out of the Home and Off to Boarding School**

Within a week after Ghislaine's seventh birthday, Michael, then 23 years old, died, further disrupting the family. By age eight, Ghislaine was sent off to boarding school, at a time when it was uncommon for girls, let alone girls of primary school age, to be boarded. The school was hours away from home, and she returned only during school holidays and at the end of the school year.

Mr. Maxwell's political career was ending, and he would face the loss of his publishing company, a contentious takeover battle, and legal investigations that would blight the family for the next seven years and permanently damage his reputation. The 1970s were difficult and demanding years for the family, marred by Mr. Maxwell's endless battle of lawsuits and financial ruin.  Despite the family chaos, Ghislaine thrived in boarding school, away from the whirlwind of emotional turmoil caused by the relentless demands of her father, which continued until his death in 1991.

**On Her Own**

Robert Maxwell demanded much of his children and informed them that they needed to keep industrious as they would not be receiving any inheritance. Hardworking, entrepreneurial, and resourceful, Ghislaine excelled academically and occupationally. Between finishing her A Levels at Marlborough College and attending Oxford University, she spent a year in Spain teaching English, then selling books for her father's publishing company in France. She began her first romance, only to have the relationship quashed by her father's disapproval of her engagement. A family reconciliation coinciding with Ghislaine's 20th birthday devolved into a miserable Christmas. Mr. Maxwell was at his absolute worst, making Ghislaine the scapegoat du jour.  The holiday ended with an announcement that her parents were separating.

While attending Oxford, she started a booster club which made discount tickets to sporting events available to students and participated in an organization which provided services to the elderly.  After receiving both bachelor and master's degrees from Oxford University, Ghislaine worked at a temp agency and started her own company - Maxwell's Corporate Gifts.  At her father's insistence, the business was merged into his business holdings.  By 1991, Ghislaine had relocated to New York to launch *The European*, an international magazine, as part of the Maxwell publishing conglomerate.   Within that year, Ghislaine's father died under suspicious and

unresolved circumstances and under a cloud of business impropriety. With Mr. Maxwell deceased, her brothers, Ian and Kevin, employees of their father, shouldered the accusations. All family assets were frozen, Elisabeth Maxwell was left penniless, the brothers were tried and ultimately acquitted, and Ghislaine was left to fend for herself.[11]

**Life After Epstein**

In 2003, Ms. Maxwell began a seven-year romantic relationship with Theodore "Ted" Waitt and developed a strong and loving bond with his four children, ranging in age from six to twelve. Her relationship with Waitt was on track for marriage and gave her what she had always hoped for and wanted most – the opportunity for a loving, stable family life and the chance to become stepmother to Waitt's children. But her hopes were destroyed, as was so much of her life, by her previous association with Epstein. A Miami lawyer named Scott W. Rothstein, Esq. attempted to blackmail Waitt to keep Ms. Maxwell's name out of civil lawsuits related to Epstein that his law firm was planning to file. Ms. Maxwell's relationship with Waitt could not survive the blackmail threats and it ended soon afterwards.[12]   The same thing has now occurred again several years later as a result of this prosecution. In 2013, Ms. Maxwell began a new relationship with the man she would later marry. She was with her husband for over seven years and became

---

[11] It was around this time that Ms. Maxwell met Jeffrey Epstein for the first time. As Ms. Maxwell plans to appeal her conviction, we will not comment on the events during this time period that were the subject of the trial.

[12] Through his law firm, Rothstein Rosenfeld Adler ("RRA"), Rothstein perpetrated a massive $1.2 billion dollar Ponzi scheme in Florida. Touting RRA as the "preeminent sexual harassment firm in the country," Rothstein claimed to be representing numerous underage girls who had been involved with Epstein. In the spring of 2009, RRA recruited Bradley J. Edwards, Esq., who immediately joined the firm. By the end of October 2009, Rothstein became a fugitive, and later returned to face arrest, to plead guilty to RICO charges in SDFL, and to receive a 50-year sentence. *See* 09 Cr. 60331(JIC). Rothstein had targeted Waitt, the deep-pocket co-founder of Gateway, Inc., because of his ongoing relationship with Ms. Maxwell, who had previously been involved with Epstein. Rothstein demanded $10 million to keep Ms. Maxwell's name out of civil lawsuits. Waitt successfully resisted Rothstein's blackmail attempt, but Ms. Maxwell was named in lawsuits filed by RRA. Ultimately, Ms. Maxwell's relationship with Waitt did not survive the ordeal. *See* PSR at ¶¶151-152.

a devoted stepmother to her husband's two youngsters, who were ages three and four and a half at the start of the relationship. Sadly, the marriage could not survive the negative impact of this case nor a husband's association with his dishonored wife.

Ms. Maxwell has always worked hard. Her many educational, occupational, and avocational accomplishments include becoming an Emergency Medical Technician (EMT), a helicopter pilot, a submersible pilot, a banker; partnering with the Cleveland Clinic to establish a telemedicine platform to enable people in remote areas to obtain quality medical treatment; helping develop the Clinton Global Initiative; and supporting a variety non-profit and charitable organizations. In 2012, at age 50, she turned a lifelong passion for the oceans into a non-profit environmental organization, *The TerraMar Project*, with the mission of creating a "global ocean community" based on the idea of shared ownership and responsibility of the global "commons" (the high seas and international waters). She spoke on topics related to ocean conservation, giving TED Talks, and delivering a speech at the United Nations. National Geographic and Oxford University were among the organizations that collaborated in support of the project. *The TerraMar Project* was closed after Epstein's death to spare her partners from invasion of privacy by the press due their association with her. *See* PSR ¶178.

**Letters from Family and Friends**

Accompanying letters from family and remaining friends (most having cut ties due to fear of association and the lure of "cancel culture") attest to Ghislaine's character; each offers a first-person narrative of some aspect of her life in sharp contrast to her characterization as a villain, rich heiress, and vapid socialite. *See* Exhibits A -I.

Her eldest siblings, Anne Halve, a psychotherapist, and Philip Maxwell, recount the impact of their father:

Her relationship with Epstein began at a moment of extreme vulnerability Ghislaine's life after the tragic death of our father. He (our father) was a powerful and dominant figure. And as elder siblings we witnessed our father taking Ghislaine under his wing whereby she became over dependent on his approval and vulnerable to his frequent rapid mood swings, huge rages and rejections. This led her to becoming very vulnerable to abusive andpowerful men who would be able to take advantage of her innate good nature.

It is striking that Ghislaine did not show any perverse behaviour before she met Epstein. Nor did she show any after leaving him, which she eventually managed to do. The effect of our father's psychologically abusive treatment of her, foreshadowed Epstein's own ability to exploit, manipulate and control her.

Exhibit A.

Another psychotherapist and family friend of some 55 years, James Martin Hollomon, recalls his observations of Ghislaine's father:

[T]heir father was narcissistic, demanding and highly controlling. He let them know early that he was going to leave his large fortune to charity. So, all the kids knew they had to "make it on their own" despite the wealth and privilege in which they were growing up. As I got to know each of these kids, including Ghislaine, I noticed that early on, every single one worked very hard at their jobs, as Bob wouldn't bear any idleness, and each strove for their father's and mother's respect through their intelligence and their own hard work.

Exhibit B.

Her twin sisters, Christine Malina Maxwell and Isabel Maxwell, attest to Ghislaine's work ethic:

[W]e were privileged, but we were not entitled and life was notalways perfect. Unfortunately, our family also became a grieving family. Our eldest brother Michaelwas gravely injured in a car accident just after Ghislaine was born; he remained in a coma until his death when Ghislaine was seven years old. In spite of this tragedy, I watched Ghislaine learn to adapt and to become a productive and caring human being.

[B]oth of our parents had an incredible work ethic. We were all encouraged from an early age to work to earn money and to respect the responsibility that came with that privilege. I have witnessed that work ethic in Ghislaine.

Ghislaine had money because she worked very hard to earn it. Her positions demanded hard, diligent work, great intelligence, great management skills,

great ability toget on well with people from all walks of life, artistic creativity, and caring about others. Her work was a far cry from the 'flippity-jibit socialite' label that the media has decided to cast on her every time they reference her.

Exhibit C.

[F]rom a very early age each of us had to learn and demonstrate what our father termed "the 3 Cs: Consideration, Concentration and Conciseness" and to "always treat others as you would like to be treated yourself." We were quizzed on these principles constantly and had to regularly report examples of how we followed them. Ghislaine was no exception in deeply absorbing, exhibiting and living these values. For example, I think it is no small feat to train and become a helicopter pilot, an Emergency Medical Technician (EMT),submersible pilot and more, as they all require dedication, concentration and quick thinking and reactions and no small amount of courage.

My sister was also very entrepreneurial in creating and investing in multiple companies andorganizations which created products and services, as well as employment. An important example is that in 2012, Ghislaine turned a lifelong passion for the oceans into a non-profit, *The TerraMar Project*, with the mission to create a "global ocean community" based on the idea of shared ownership and responsibility of the global "commons"—the high seas or international waters.

Exhibit D.

Her brothers, Ian and Kevin Maxwell, confirm the support Ghislaine has provided to

others:

My sister is Aunt to 13 nieces and nephews (now aged 18 to 37) and I have witnessed at first hand over the years her generosity to them – be it paying their school fees, mentoring them and they grew up or providing job opportunities for them. She also has an enduring capacity for friendship, a warm heart, and the ability to convert those feelings into action when required to help those less fortunate than herself. She had discreetly supported some friends financially and others by providing a roof over their heads when they were down on their luck, often for weeks at a time.

Exhibit E.

Ghislaine is an intelligent, warm hearted, generous, kind, funny, thoughtful and loving person. She cares about others. Ghislaine's first reaction on hearing of a problem  is how tosolve it or how to contribute to a solution. Her desire is always to engage, to bring energy toevery problem and to help.

15

Exhibit F.

Catherine Vaughan-Edwards, a friend, former employee, and the mother of Ghislaine's godson, relates her experience as a mentee:

> The person that I have known for 34 years, is not the same as the Ghislaine so negatively portrayed by the press and mainstream media. My own experience is that she is kind, caring and thoughtful and is always there to provide support as a loyal and generous friend. She has been a mentor, encouraging and helping me to develop my business and gives her time and advice freely.

Exhibit G.

And, finally, Harriet Jagger, a school mate from age 15, shares Ghislaine's longing for a family life:

> The last time I saw Ghislaine was in her home in New York a few years ago.  I listened to her as she spoke of her wish to find the security and happiness within a family unit, she was visibly upset that this, the simplest of things for so many others had still not been a part of her own life. I felt truly sorry for her.  Having known her large and great family, her love and great respect for her parents and closeness to her brothers and sisters, I knew this was something she had always craved. I gave her a huge hug on departing. So I was then thrilled to learn that she had finally met and married someone and was helping bring up his young children, but them desperate to hear that this much sought-after joy was so short lived.

Exhibit H.

## A NON-GUIDELINES SENTENCE WOULD BE "SUFFICIENT, BUT NOT GREATER THAN NECESSARY" TO ACHIEVE THE GOALS OF SENTENCING

### Advisory Sentencing Guidelines

As the Supreme Court has repeatedly explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. As a matter of administration and to secure nationwide consistency, the guidelines should be the starting point and the initial benchmark." *Peugh v. United States*, 569 U.S. 530, 536 (2013) (*quoting Gall v.*

*United States*, 552 U.S. 38, 49 (2007)). After correctly calculating the guidelines range, the Court must next consider the statutory factors set forth in 18 U.S.C. §3553(a). *Gall*, 552 U.S. at 49–50. As directed by the Supreme Court, a district court "may not presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). Rather, after calculating the appropriate guidelines range, sentencing courts must consider the §3553(a) factors, make an individualized assessment, and impose a sentence that is "sufficient, but not greater than necessary" to meet the objectives of sentencing. § 3553(a); *Gall*, 552 U.S. at 50 n.6.

### 18 U.S.C. § 3553(a)

The 3553(a) factors include, among other things:

1. the nature and circumstances of the offense and the history and characteristics of the defendant;

2. the need for the sentence imposed

   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B) to afford adequate deterrence to criminal conduct;

   (C) to protect the public from further crimes of the defendant;

   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

   (E) to avoid unwarranted sentence disparities; and

3. the kinds of sentences available.

In this case, we respectfully submit that the § 3553(a) factors—including Ms. Maxwell's "history and characteristics," the need for the sentence imposed to provide "just punishment," and the need to avoid unwarranted sentencing disparities - weigh heavily in favor of a sentence

significantly below the sentence recommended by the advisory Sentencing Guidelines and below the sentence recommended by Probation.

**Ms. Maxwell is Not a Danger to the Community**

Ms. Maxwell poses no threat to the public and there is no risk that she will reoffend upon her release from custody. The government has never argued, in connection with Ms. Maxwell's bail applications or otherwise, that Ms. Maxwell is a danger to the community; nor could they. Apart from the conduct at issue in this case, which occurred almost 20 to 30 years ago, Ms. Maxwell has never once been accused of a crime, much less sexual abuse of minors. In fact, after leaving Epstein, Ms. Maxwell was involved in committed, long-term relationships with two men, both of whom had young children who continue to support her. Ms. Maxwell is not a dangerous criminal or a habitual offender. She is someone who wants nothing more than to live a normal family life – something she was denied because of her association with Epstein and will now almost certainly never have. The public does not need to be protected from Ms. Maxwell and such considerations should have no weight in determining her sentence.

**A Guidelines Sentence is Not Necessary to Achieve Specific or General Deterrence**

A guidelines sentence for Ms. Maxwell would not serve the sentencing goals of either specific or general deterrence. A significant sentence is not necessary to achieve the goal of individual deterrence here. This is Ms. Maxwell's only brush with the law. Ms. Maxwell has already learned a painful lesson from her arrest and prosecution, has lost her marriage and her stepchildren, and has been harshly punished during pre-sentence incarceration. Ms. Maxwell has already shown that she will not reoffend and does not need to be further deterred from committing crimes in the future.

Nor can general deterrence be used to justify a harsh sentence for Ms. Maxwell.  Probation identifies two groups of potential offenders who will purportedly be deterred from committing future crimes as a result of Ms. Maxwell's sentence: (1) sexual predators who exploit and degrade minor victims and (2) "untouchable individuals who feel their privilege and affluence entitle them to victimize others without fear or consequence."  PSR at 67.  With regard to the first group, courts have expressed legitimate doubt as to whether people who have a sexual predilection for minors can be deterred at all.  *See, e.g., United States v. D.M.*, 942 F. Supp. 2d 327, 346 (E.D.N.Y. 2013) ("[T]he compulsive behavior and disorders motivating many offenders is less susceptible to general deterrence.").  With regard to the second group, the purported justification sweeps far too broadly.  Rather than identify a particular class of similarly situated defendants who will be deterred from committing specific crimes, Probation essentially makes the sweeping assertion that a harsh sentence for Ms. Maxwell is necessary to deter rich people from exploiting poor people. *See* PSR at 67.  That is not the purpose of general deterrence and should not be given any weight in determining the appropriate sentence.

**A Below Guidelines Sentence Would Provide Just Punishment, Promote Respect for the Law, and Avoid Unwarranted Sentencing Disparities**

While the offense conduct is indisputably serious, the record reflects that Epstein was the main offender.  Given the foregoing discussion, a shorter term of incarceration for Ms. Maxwell best serves the long-term goals of punishment.  A significantly below-guidelines sentence in this case would also promote respect for the law by demonstrating that the justice system considers each person who comes before the Court as an individual. A sentence tailored to Ghislaine Maxwell's particular circumstances—would appropriately distinguish between this defendant and more culpable individuals similarly charged. *See United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010) ("[C]ourts must guard against unwarranted similarities among sentences for defendants

who have been found guilty of dissimilar conduct.") (citing *Gall v. United States*, 552 U.S. 38, 55 (2007)).

In addition, a non-guidelines sentence would avoid unwarranted sentencing disparities. It would be plainly unjust to sentence Ghislaine Maxwell as if she were Jeffrey Epstein. Had Epstein been tried on this indictment he would have been exposed to a comparable guideline range. Justice would not be served by sentencing Ms. Maxwell to the extent of the more culpable Epstein. Nor should she be sentenced as if she were Harvey Weinstein. Following a state jury trial convicting him of forcible rape, Weinstein received a prison sentence of 23 years, less than the lowest part of the guideline range calculated by Probation for Ms. Maxwell.

Moreover, a non-guidelines sentence would at least mitigate the drastic disparity between the penalties under state and federal law in this case. The predicate state offense in Counts Three and Four – New York Penal Law § 130.55 – is a *misdemeanor* punishable by a maximum term of 90 days' imprisonment. *See United States v. Brown*, 843 F.3d 74, 88–89 & n.2 (2d Cir. 2016) (Pooler, J., dissenting) (noting the stark difference in sentences for offenses involving the sexual exploitation of minors under federal law versus New York State law). Viewing the conduct of conviction in the light most favorable to the government, imposition of a guideline sentence for Ms. Maxwell will lead to inequitable and disparate results.

In this case, the goals of sentencing will be achieved by a significant downward variance from the unduly harsh Guidelines range of 292 - 365 months and Probation's recommended 240-month sentence for offense conduct that occurred 18 to 28 years ago and where a 60-year-old female defendant with no prior- or post-offense history of misconduct requires no rehabilitation by incarceration and poses no risk of recidivism.

**Unusually Harsh Pre-Sentence Confinement Warrants a Downward Variance**

The phantom of the Epstein death fiasco hung over Ms. Maxwell's case and her detention. Throughout this prosecution, Ms. Maxwell's counsel challenged the conditions of her extraordinary detention as being exceptionally prejudicial and unprecedented, most especially for a 60-year-old female with no prior criminal record, who posed no threat to others, has no suicidal tendencies past or present, and was not charged with crimes of violence. Ms. Maxwell was charged with and convicted of acts allegedly committed 20 to 27 years ago.

The treatment meted out to Ms. Maxwell during her 22-month period of isolated detention was unparalleled. From the outset, Ms. Maxwell's conditions of detention were extraordinarily restrictive and unjustifiable in view of her personal circumstances and were manifestly unreasonable and unnecessary in view of meaningful alternatives available in the MDC. There is no explanation for her extraordinary conditions of confinement other than calculated efforts by the DOJ, BOP, MDC, and prosecutors to prevent another Epstein debacle and to ensure that Ms. Maxwell would fill the chair vacated by Epstein's demise. This assertion is supported by the swift and cavalier transfer of Ms. Maxwell from 22 months of isolation to general population.[13]  Ms. Maxwell was subjected to an exceptionally intrusive prison regime which undermined her dignity, health, safety, and psychological well-being. The  following discussion regarding the restrictions adds further texture to allegations concerning her confinement:

For 22 months, Ms. Maxwell was segregated from general population, locked in an isolation cell measuring 9-by-7 feet. While confined to that cell, she was restricted from moving

---

[13] The transfer was made without any notice to Ms. Maxwell's counsel or consultation with Ms. Maxwell, who had been prodded by psychologists daily until the day of the move.  Notably, within the week leading up to Ms. Maxwell's transfer, the MDC asked women in general population how they felt about Ms. Maxwell joining their unit.  No reciprocal inquiry was afforded Ms. Maxwell when it came to a radical change in her housing circumstances.

out of range of the camera focused into the cell.  During daytime hours she was isolated in a larger

space.  At no time  did she have contact with any other inmate.  She was watched round-the-clock

by a security detail dedicated exclusively to guard her as she was consistently monitored by video

surveillance. Her security detail rotated every two weeks and consisted of high-level BOP staffers

recruited from facilities outside New York who were instructed to guard a high-profile, high-

security inmate on suicide watch.[14]  Ms. Maxwell was subject to constantly changing rules and

whims.  Her only source of information was from the guards who controlled her. They became the

source of information regarding rules, regulations, and opportunities. If they chose not to dispense

information or if they provided incorrect information, she had no basis to challenge them. She was

instructed not to speak to them lest she face disciplinary sanction. Such is not the case in general

population, where inmates assist other inmates and bear witness to and identify inconsistent and

improper treatment.

      Unlike other inmates, Ms. Maxwell was subjected to various prohibitions and deprivations

not common to other inmates. She was monitored 24 hours a day by stationary security cameras

and by an additional hand-held camera that followed her while under the constant surveillance of

several prison guards who scrutinized her every move, even when she was showering, and taking

notes of her activities and recording them in various notebooks. The procedures in place deprived

Ms. Maxwell of any privacy and prevented uninterrupted sleep.  The constant illuminations during

the night disrupted her sleep, leaving her sleep deprived and causing exhaustion that affected her

ability to concentrate.  Initially, she was denied adequate and restful sleep by bright lights left on

in her cell for 24 hours a day coupled with a flashlight shining into her eyes or cell every 15 minutes

---

[14] The cost of her individualized detention should be of great concern to the taxpaying public and warrants
an investigation into the propriety of this enormous expenditure for a single non-violent inmate.

throughout the night. When the bright lights were turned off in her cell, bright lights remained on directly outside her cell;  and  the flashlight checks continued, a regime completely inappropriate for a non-suicidal inmate. This unjustified sleep deprivation - which continued throughout trial and afterward - affected her general physical condition as well as her psychological well-being. This practice does not exist in general population.

Despite never being in contact with any other inmate, under continuous surveillance by prison guards and cameras, and escorted to and from any isolated location, she was subjected to an excessive  number of physical searches on a daily basis: pat-down searches, strip searches, body-cavity searches.  She was unnecessarily exposed to radiation from body scanners; and was fortunate not to contract COVID when guards, who were not required to take COVID tests, looked and searched inside her mouth. Her cell was searched multiple times daily. The searches were redundant, unreasonable, unnecessary, and abusive beyond any legitimate penological purpose, especially where Ms. Maxwell had no opportunity to acquire contraband. *See Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir. 1983). At times, searches were conducted in inappropriate ways and were especially painful humiliating and intimidating, as when her breasts and genitalia were touched in a rough and reckless manner. Reports by Ms. Maxwell and counsel concerning sexually inappropriate searches by corrections officers went nowhere.

It is clearly established that excessive searches are unnecessary and unreasonable when a prisoner is isolated from other inmates and never out of range of the camera or a guard.  Ms. Maxwell was searched every time she was removed from or returned to her isolation cell, even when she had no conceivable opportunity (let alone no intention) to obtain contraband. Clearly, the search policy is one that was not applied consistently. Having been in general population for the past two months, Ms. Maxwell has only been searched after contact visits with counsel.

Because Ms. Maxwell was kept in isolation, she was denied the minimal amenities provided to general population inmates even during COVID. Except for programs that she completed but could never put to use in isolation, she was not permitted to participate in general programming (educational, leisure and wellness), to view movies, or to receive job assignment. When she first arrived in the MDC, she was handcuffed while seated in a chair watching television. During the first three months of detention, she was only allowed two 15-minute phone calls per month, further limiting contact with her family, most especially with her husband and stepchildren. This is the same restriction that was applied in MCC's 10 South, the super-secure special/segregated housing unit ("SHU") for inmates charged with terrorism offenses. A further chill was placed on her phone use when recordings of her calls were improperly released by the MDC to a third party. To forestall further disruption of the privacy of her family, she curtailed social use of the phone, further limiting contact with the outside.

Ms. Maxwell was denied adequate nutrition. She was provided meager, stale, often rancid and inedible meals in violation of her non-flesh diet and in packaging that melted when heated in a microwave. At times she was not provided food for prolonged periods or was given meals missing components. She was denied access to basic hygiene items, *e.g.,* soap, toothbrush, toothpaste, and provided only a limited amount of toilet paper. For more than a year, she brushed her teeth with an inch-long finger implement until given a normal toothbrush, that was never replaced. Her commissary list was restricted, and she was not permitted to order items available to other inmates.[15] When the tap water in her isolation cell was foul-smelling and undrinkable, requests for bottled water were initially rejected by the prison administration. As a result of being provided an inadequate diet, Ms. Maxwell has lost about 20 pounds and suffered from telogen

---

[15] Even in general population, her commissary is more restricted than other inmates. A unit officer confirmed that commissary operates on favoritism and discrimination.

effluvium (hair loss due to stress and poor nutrition).  Complaints made during trial regarding her inadequate daily nutrition were received as a nuisance rather than cause for concern and attention.

An extra blanket provided because of the cold temperature in her cell was removed on the claim it had not been approved by the warden, only to be returned when guards observed Ms. Maxwell shaking while asleep and became concerned that she might be having a seizure.  She was given limited time to exercise in an area without sunlight or fresh air, then constructively denied the ability to exercise because she was not provided proper-fitting footwear.

The treatment imposed on Ms. Maxwell was unnecessarily and intentionally degrading and threatening. While in isolation, a high-ranking prison guard told Ms. Maxwell that there was concern that she would be shot by sniper. Putting aside the reason and propriety of dispensing this alarming information, the diminution of security concerns resulting in her transfer to general population appears correlated to Ms. Maxwell having been sufficiently safeguarded to fill Epstein's empty seat – satisfying the concerns of the government, DOJ, BOP, MDC, prosecutors, Court, and accusers.

Deprived of sleep and adequate nutrition and subjected to such undignified and dehumanizing conditions of detention, Ms. Maxwell was considerably weakened psychologically and had great difficulty concentrating, thwarting her ability to participate in and prepare her defense.  The impact of the pandemic coupled with the restrictive conditions of her confinement made preparation for trial involving multi-million pages of documents especially difficult.  Despite being given a laptop,  she encountered persistent technical issues reviewing electronic discovery, at times unreadable on both the laptop and prison PC, and could not search, highlight, annotate, save, or print. Further, delivery of her mail (legal and non-legal) was significantly delayed as were receipt of CorrLinks emails, which were prematurely deleted by the MDC.

**Professional Assessment of Impact of Conditions of Confinement**

A report by an independent forensic psychiatrist who evaluated Ms. Maxwell throughout the period of her solitary confinement details the debilitating effect of those extraordinary conditions. *See* Exhibit J, Report by Alexander Sasha Bardey, M.D.[16]  Dr. Bardey performed an ongoing forensic psychiatric evaluation of Ms. Maxwell including 14 sessions with her from October 2020 to August 2021, including a battery of psychological tests to assess whether any psychological matters were present that might be relevant to the disposition of her criminal matters.

In summary, Dr. Bardey determined:



Ms. Maxwell's ability to cope with the stress of her legal proceedings and to participate meaningfully in her defense are gradually being eroded over time due to the conditions of her confinement, as reported by Ms. Maxwell, observed by this examiner, and corroborated by Ms. Saffian and in the results of her psychological

---

[16] The credentials of Alexander Sasha Bardey, M.D. include: Diplomate in Psychiatry, American Board of Psychiatry and Neurology; Diplomate in Forensic Psychiatry, American Board of Psychiatry and Neurology; Clinical Faculty, Department of Psychiatry, New York University Medical Center; and Adjunct Assistant Professor, Department of Psychiatry and Behavioral Sciences New York Medical College.

In accordance with the Court's Individual Practices in Criminal Cases, § 8(D); portions of the report have been redacted and those portions will be filed under seal.

testing. Recently she has manifested symptoms of depression and trauma such as anxiety, and minor cognitive deficits. These continue to be exacerbated by ongoing sleep deprivation and the conditions of her confinement. Given my extensive experience working with incarcerated individuals, based on the manner in which Ms. Maxwell's symptoms have manifest, it is clear that her symptoms are in no way related to the charges that have been brought against her. Instead they are directly related to the conditions of her confinement.

The conditions of her confinement are, in my opinion, directly influencing her increasing depression and trauma response symptoms, which will continue to worsen over time if she remains incarcerated under the current conditions.

Exhibit J.

**Pre-Sentence Detention Was Discriminatory**

In this case, the conditions of detention for Ms. Maxwell were evidently discriminatory. Considering her profile – her age, lack of violence or threat of danger to herself and others- the brutality of her detention regime was completely unwarranted.  The fact that she was subjected to an anti-suicide surveillance regime even though she has no suicidal tendencies demonstrates that she was being treated differently, without any objective justification.  Following the verdict, and in the presence of two officers, an MDC psychologist told Ms. Maxwell she was being placed on suicide watch.  The psychologist stated she had opposed placing Ms. Maxwell on suicide watch because Ms. Maxwell did not then and never had presented any suicidal indications.  However, the psychologist's professional opinion was overruled per directives from Washington, DC.

Isolated from all inmates and denied social visits due to COVID restrictions, her only human contact was with the staff that controlled her, except when COVID restrictions for counsel visits were lifted. As such, prison personnel were her primary source of MDC/BOP related information, and she often received misinformation, *i.e.*, the date by which she must file an administrative remedy.

Although legally presumed innocent, she was humiliated and treated in a way that even established guilt cannot justify. The high-profile nature of the case and the defendant has not diminished because the trial is over. Yet almost four months after the verdict, she was transferred to general population because, according to MDC Legal :

> MDC Brooklyn is entitled to assess Maxwell's security needs and change them as the facts dictate. Here, Maxwell has been found guilty and will be sentenced sometime this year. As such, *the institution does not have the same security concerns it had when she was a pretrial inmate.* The institution is aware Maxwell will be housed with other inmates and has instituted procedures to ensure she, like other high-profile inmates, remains safe.

Email from Sophia Papapetru, Supervisory Staff Attorney (Apr. 19, 2022) (emphasis added).

**Pre-Sentence Detention Was Equivalent to "Supermax" Confinement**

The contrast between the atypical conditions of Ms. Maxwell's detention and conventional confinement is so pronounced that it is disingenuous to describe both forms of confinement under the same terminology: "pretrial detention." Ms. Maxwell's detention equated to supermax confinement and punishment.

The term "supermax confinement," (whether pretrial or post-conviction) commonly refers to long-term placement in a SHU and generally includes the following conditions: cells approximately 8 by 10 feet; confinement to cells for between 22.5 and 24 hours per day; constant monitoring of inmates; no congregation between inmates; very limited access to activities or programs; and very limited access to visitors, including occurring though thick glass barriers or via video.[17] Although Ms. Maxwell's isolation was divided between a small isolation cell and a larger isolated area, she was subjected to all other conditions associated with supermax

---

[17] Ass'n of State Corr. Adm'rs and the Liman Ctr. for Pub. Interest Law at Yale Law Sch., *Reforming Restrictive Housing: The 2018 ASCA-Liman Nationwide Survey of Time-In-Cell,* 9 (2018) ("*Time-In-Cell*")

confinement, conditions far more arduous than those experienced by pretrial detainees, or even sentenced prisoners, in general population. Beyond duration of confinement (the quantitative measure of imprisonment), she was subjected to disparate treatment (*e.g.*, long-term isolation and unusual restrictions and deprivation) amounting to a profound qualitative difference.

**Pre-Sentence Detention Should Not Be Pre-Sentence Punishment**

Convicted offenders are sent to prison *as* punishment, not *for* punishment. Despite complaints made by Ms. Maxwell and her counsel, the MDC and BOP officials retained unchecked authority to incarcerate her as they pleased on conditions that constituted unusual punishment for a non-violent pretrial detainee who posed no threat to herself or others. Ms. Maxwell bore the brunt of unusual conditions imposed by unfettered prison bureaucrats. The Supreme Court defines "unusual" as "something different from that which is generally done."[18] Under an original understanding of the Cruel and Unusual Punishment Clause (U.S. Const. amend. viii), "a punishment is cruel and unusual if it is overly harsh in light of longstanding practice."[19] Ms. Maxwell's conditions of confinement were significantly and unjustifiably harsher than conditions in general population making it cruel and unusual under the Eighth Amendment. Following Ms. Maxwell's arrest, then-Attorney General William Barr was intent on making sure what happened to Epstein while in BOP custody would not be repeated and issued directives to be applied exclusively to Ms. Maxwell. The rough, discriminatory, and punitive treatment was implemented and condoned by supervisors and wardens.[20] High-ranking MDC personnel, psychologists, and

---

[18] *Trop v. Dulles*, 356 U.S. 86, 100-01 n.32 (citations omitted).

[19] John F. Stinneford, *The Original Meaning of "Cruel,"* 105 GEO. L.J. 441, 467 (2017); *The Original Meaning of Unusual: The Eighth Amendment as a Bar to Cruel Innovation*, 102 NW. U. L. Rev. 1739, 1745 (2008)

[20] During Ms. Maxwell's detention, approximately ten wardens have rotated in an out of the MDC.

guards commented that they had never seen a non-violent, non-suicidal detainee subjected to such drastic conditions.[21]The treatment was not based on any claim or evidence that Ms. Maxwell was suicidal, dangerous, violent, or in need of discipline. Quite the contrary.  The policies and actions implemented to detain Ms. Maxwell violated clearly established rights of inmates to be free from punishment and unreasonable searches.  Courts have been confronted with cases challenging conditions of confinement in the MDC. *See Turkman v. Hasty*, 789 F.3d 218 (2d Cir. 2015), which involved many of the same challenges to conditions of confinement.

There can be no dispute that Ms. Maxwell's detention was far more arduous and constituted a more serious penalty than conventional detention is general population.  While the hardship of imprisonment is normally measured in quantitative terms, *i.e.,* by the length of the prison term, the hardship and deprivations experienced by Ms. Maxwell also had a qualitative aspect. The difference between Ms. Maxwell's isolation and typical prison conditions is so pronounced that they differ not only in degree but in nature. This distinction demands a different calibration whereby each day spent in isolation - especially where isolation is not based on any behavior manifested by the inmate and while the inmate is presumed innocent - should result in an enhanced time-served credit.

**Incarceration During the Pandemic Supports a Well-Recognized Sentence Reduction**

Courts in this district and elsewhere have acknowledged COVID hardship as a basis for downward variances from the guidelines.  But even "before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually hard conditions merited recognition by courts in measuring the just sentence." *United States v. Romero*, 15 CR. 445-18

---

[21] Other similarly charged defendants, *e.g.,* Keith Raniere , 18 Cr. 204 (NGG) (NEXIUM case), and Robert Sylvester Kelly, aka "R. Kelly," 19 Cr. 286 (AMD), were detained in general population.

(PAE), 2021 WL 1518622, at *4, *6 (SDNY Apr. 16, 2021) (considering defendant's "13 months of incarceration during a once-in-a-century pandemic" as part of defendant's "history and characteristics" in granting motion for compassionate release). The extraordinarily harsh conditions Ms. Maxwell has faced during COVID warrant a downward variance.

This Court has "repeatedly found that the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals." *United States v. Tucker*, 13 Cr. 378 (AJN), 2021 WL 37227450, at *2 (S.D.N.Y. Aug. 23, 2021) (citations omitted). "[T]he existence of COVID-19 has created harsher conditions, and that's a fact that the Court should take into account." *United States v. Crispin*, 19 Cr. 323 (JSR) (S.D.N.Y. Aug. 21, 2020), Dkt. 124 at 9. It is beyond dispute that the pandemic has made incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) (internal citations omitted); *see also United States v. Henareh*, 11 Cr. 93 (JSR), 2021 WL 119016, at *5 (S.D.N.Y. Jan. 13, 2021) ("the heightened restrictions imposed upon all prisoners during the pandemic may enhance the deterrent effect of prison sentences served during the pandemic by making the conditions of confinement harsher, both physically and psychologically, than they would otherwise normally be."); *United States v. McRae*, 17 Cr. 643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) ("a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing").

Acknowledging that COVID hardship is a basis for downward variance, courts in this District have given credit for each day of pretrial detention served during the pandemic *See, e.g., United States v. Gonzalez*, 18 Cr. 669 (JPO) (Apr. 16, 2021), Dkt. 250 at 17 (time served during the pandemic is "basically like solitary confinement," "harsher than a usual period," "more punitive," "*essentially the equivalent of either time and a half or two times what would ordinarily be served*" (emphasis added); *United States. Brissett*, 19 Cr. 153 (KMW) (Sept. 22, 2021, Dkt. 56 at 26 (giving 31 months extra time-served credit for every day "spent in deplorably brutal conditions" during COVID.) Having served the entirety of her detention during the pandemic, Ms. Maxwell deserves no less consideration. And because her extraordinary conditions of pretrial detention were tantamount to pre-sentence punishment, she is entitled to an additional significant downward variance from the applicable guidelines.

**Extraordinary Conditions of Solitary Confinement Justifies a Hard-Time Credit**

To determine the nature and extent to which Ms. Maxwell has been penalized, it is important to factor in the impact of the hardship on Ms. Maxwell compared to general population inmates. Based on the underpinnings of punishment and the principle of proportionality, Ms. Maxwell should be given hard-time credit for the time she served in restricted and isolated detention. Ms. Maxwell was subjected to punitive conditions and abuse in violation of clearly established law protecting such individuals from punishment, to be free from "needlessly harsh conditions of confinement." *Iqbal v. Hasty*, 490 F.3d 143, 169 (2d Cir. 2007), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). She posed no danger to the security of the institution, the staff, or other inmates, and engaged in no misconduct requiring her placement in segregation. Confining her to unusually restrictive isolation for the better part of two years permits an inference of punitive intent in the absence of any penological reason. The claim that she was

segregated due to the high-profile nature of her case is belied by the fact that the case and the inmate are still high profile, yet Ms. Maxwell is now in general population.

If a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary and purposeless- a court may infer that the purpose of the governmental action is punishment and may not constitutionally be inflicted upon detainees. *Bell v. Wolfish,* 441 U.S. 520, 539 (1979). Failing to implement reasonable alternatives suggests that the decision to keep her restricted was made with no legitimate penological purpose and amounts to impermissible punishment.[22]

**Proportionality Supports a Hard-Time Credit**

The principle of proportionality – a core principle of the Eighth Amendment [23] and U.S. Sentencing Guidelines [24] -  requires that sentences should be relative to the crimes committed.[25] The Guidelines Manual states that one of the objectives at the core of the Sentencing Reform Act is "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." [26]  If inmates in isolation or supermax detention suffer

---

[22] Excepting inmates charged with terrorism, disciplined for severe institutional infractions and violence, and Mexican drug lord "El Chapo", Ms. Maxwell has been subjected to the most unusual and punitive form of pretrial detention. Accordingly, it is appropriate to make a sentencing submission that exposes the unfairness of her detention in the hope that the government (*e.g.*, DOJ, BOP, and prosecutors) not repeat such disparate treatment and courts recognize that it cannot abandon its supervisory powers to permit BOP bureaucrats to exercise administrative measures without accountability.

[23] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend xiii.

[24] USSG, Part A, §§ 2-5 (2021).

[25] *See Solem v. Helm,* 463 U.S. 277, 284-90 (1983) (discussing the longstanding principle that a punishment should be proportionate to the crime).

[26] USSG, Part A, §3. The most basic objective is to "combat crime through an effective, fair sentencing system" through (i) honesty in sentencing (that is, removing the power of the parole commission to reduce the term to be served); (ii) reasonable uniformity in sentencing - by reducing the wide disparity of sentences for similar offenses; and (iii) proportionate sentences. *See id.* at §§2-3.

more than prisoners in mainstream conditions, it follows that proportionality requires the severity of confinement be factored into sentencing. Courts sentence convicted offenders to prison as punishment. Courts order pretrial defendants detained to safeguard the community and to ensure presence at court proceedings, not for punishment. In evaluating the nature and extent of punishment, it is important to factor in the actual impact of the hardship on the defendant. If detention imposes an additional burden on a certain category of defendants, it is necessary to incorporate the actual total burden of the punishment into sentencing calibrations.

The principle of proportionality requires that the additional burden experienced by Ms. Maxwell during the 22 months spent is in supermax-type conditions should be factored into the Court's sentencing calculus. Based on the underpinnings of punishment and the principle of proportionality, a hard-time credit for Ms. Maxwell's unusual detention is warranted. Imprisonment in any form is a severe hardship. This is especially so when a person presumed to be innocent is detained pretrial. The standard measure for evaluating the hardship of incarceration is the length of the prison term, *i.e.,* a value is placed on this quantitative measure when assessing damages for wrongful conviction. Regardless of whether there is an objective mathematical formula for Ms. Maxwell's unique situation, a meaningful credit is warranted.[27]

There is a manifestly stark qualitative difference in the degree of deprivation, restriction, and punishment between the first 22 months of Ms. Maxwell's detention and her current detention in general population. Her detention in isolation – *de facto* solitary confinement comparable to

---

[27] Compensation determinations for individuals wrongfully incarcerated is illustrative. Thirty-six states and Washington, DC, have laws that offer compensation for exonerees. The federal standard to compensate those who are wrongfully convicted is a minimum of $50,000 per year of incarceration, plus an additional $50,000 for each year spent on death row. *See https://www.congress.gov/bill/117th-congress/house-bill/4019/text?r=13&s=1,*The enhanced compensation for incarceration on death row recognizes the *qualitative* severity of punishment beyond that which non-capital inmates are exposed.

supermax detention - involved imprisonment within imprisonment. It was so different from conventional conditions of pretrial detention as to constitute a different form of hardship and tantamount to a different form of punishment. Typically, a defendant receives time-served credit for each day incarcerated prior to sentencing. Pretrial detainees have received and continue to receive credit beyond time served for detention during COVID. *See, e.g., Gonzalez; Brissett, supra.* Ms. Maxwell should receive a hardship credit in addition to a COVID credit due to the restrictive and harsh conditions of her pretrial detention.

## CONCLUSION

Ghislaine Maxwell is not an heiress, villain, or vapid socialite. She has worked hard her entire life. She has energy, drive, commitment, a strong work ethic, and desire to do good in the world. She has supported friends and family through tough times and personal crisis and currently is assisting women in her unit at the MDC. She has endeavored to contribute to society (*e.g.,* by becoming an EMT, developing a platform so that people in remote areas could receive quality medical assistance, helping launch the Clinton Global Initiative, creating *TerraMar,* providing GED tutoring for inmates in her unit) and will continue to do so throughout her sentence and when she rejoins the community beyond prison walls. She has also tried to protect the people around her (Ted Waitt's children, her stepchildren, the people at *TerraMar*) from the onslaught of press and public vilification that come with having been associated with her.

She had a difficult, traumatic childhood with an overbearing, narcissistic, and demanding father. It made her vulnerable to Epstein, whom she met right after her father's death. It is the biggest mistake she made in her life and one that she has not and never will repeat. She has never been accused of anything untoward in the over-15-year period since her relationship with Epstein

ended.  In fact, she has been involved in two committed, long-term, loving relationships with men who had young children. She is not a danger to the community and there is no concern about recidivism.

In imposing an appropriate sentence, we urge the Court to credit a number of factors:

- Ms. Maxwell is being sentenced for non-violent offenses which occurred decades ago (1994 to 2004).

- Ms. Maxwell is over 60 years old.

- Ms. Maxwell is not a danger to the community in any way.

- Ms. Maxwell has no prior criminal history or prior bad acts.

- Ms. Maxwell has served the entirely of pre-sentence detention during the COVID pandemic.

- Ms. Maxwell served 22 months of pre-sentence detention under extraordinarily abnormal and restrictive conditions of solitary confinement as a non-violent defendant who posed no danger to herself or others.

- Ms. Maxwell is being sentenced solely for reasons of punishment.

- Ms. Maxwell is not being sentenced for rehabilitation.

- Ms. Maxwell poses no risk of recidivism.

In addition, Ms. Maxwell's personal characteristics and history of lawful behavior pre- and and post-dating  the offense  conduct further  distinguishes her  situation and warrants sentencing consideration.

Probation  recognizes  that  a  downward  variance  is  warranted  in  this  case.  However, noticeably absent from Probation's justification is any mention of detention served during the pandemic and under harsh conditions of solitary confinement.  A poll taken of the CJA Panel and Federal Defenders of the Southern and Eastern Districts of New York has resulted in no cases where Probation has referenced conditions of confinement or COVID, despite requests by defense

counsel. This absence is in stark contrast to recognition by courts in both districts (and elsewhere) in granting downward variances and compassionate release based on the devastating impact the pandemic and unduly harsh conditions of solitary confinement. Probation may ignore these factors, but the Court should not.

We submit that the appropriate sentence in this case is one that is well below the advisory guideline range.

Dated: June 15, 2022

Respectfully submitted:

*Bobbi C. Sternheim*

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
225 Broadway, Suite 715
New York, NY 10011
212-243-1100

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
212-957-7600

Jeffrey S. Pagluica
Laura A. Menninger
HADDON, MORGAN & FOREMAN
950 17th Street, Suite 1000
Denver, CO 80202
303-831-7364

*Attorneys for Ghislaine Maxwell*

# EXHIBIT A

Honorable Alison J. Nathan

United States District Judge

United States Courthouse

40 Foley Square

New York, NY 10007

3rd May 2022

Dear Judge Nathan,

This is a joint letter from Anne Holve (née Maxwell), and from Dr Philip Maxwell, eldest siblings of Ghislaine Maxwell. We are worried that the legal process as it moves to its close might not include information that provides a better understanding of Ghislaine.

The traumatic background of Ghislaine began with the 1961 automobile accident to our eldest brother Michael who suffered fatal injuries that hospitalized him in a coma for 7 years until his death These were the first seven years of Ghislaine's life. (The accident happened when she was 3 days old). Our entire family was shaken up by this. My mother gave almost daily attention at Michael's hospital bedside until his death.

We believe that  forensic psychologists use objective scales of trauma. Also clinical psychoanalysts could assess her case.

Ghislaine's evaluation in this area of trauma could only be favourable to her case. We should say that we ourselves have undergone lengthy psychoanalytical treatment.

We felt that the quality of the attachment of Ghislaine with Epstein – revealed characteristics similar to those of entrapment, affecting those in abusive relationships In this respect we felt sad that the contribution of the expert in intimate partner violence, Dr. Park Dietz, could not be heard.

Her relationship with Epstein began at a moment of extreme vulnerability in Ghislaine's life after the tragic death of our father.  He our father) was a powerful and dominant figure. And as elder siblings we witnessed our father taking Ghislaine under his wing whereby she became over dependent on his approval and vulnerable to his frequent rapid mood swings, huge rages and rejections. This led her to becoming very vulnerable to abusive and powerful men who would be able to take advantage of her innate good nature.

It is striking that Ghislaine did not show any perverse behaviour before she met Epstein.  Nor did she show any after leaving him,

which she eventually managed to do.

The effect of our father's psychologically abusive treatment of her, foreshadowed Epstein's own ability to exploit, manipulate and control her.

Given this record, and in consideration that she is not any threat to society

We would humbly ask you to consider issuing a lenient, or at least a survivable sentence.

We thank you for the opportunity to express our views on our sister's situation.

Yours sincerely,

*Anne J.J. Holve*

Anne Holve  MA Oxon

Psychotherapist

aholve@camdenpractice.co.uk

*Philip Maxwell*

(Dr) Philip Maxwell

Maths, Science and English Tutor

philedit163@gmail.com

# EXHIBIT B

James "Jamie" Martin Hollomon, JD, LMFT
Counseling Works Santa Cruz   (831) 454-8178   212 May Avenue Santa Cruz, CA 95060
Therapy License LMFT37788

May 2, 2022

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square, New York, NY 10007

Judge Nathan:

This letter provides evidence regarding Ghislaine Maxwell's character and future that bears on your upcoming sentencing in her case.

My name is Jamie Hollomon. I am a JD graduate of the Univ. of Pennsylvania Law School and an MS graduate of the Univ. of California Santa Cruz in counseling psychology. For the past 27 years I have practiced psychotherapy, first for Butte County's Division of Youth and Adult Services from 1995-2011 and then since then I've run my own private practice here in Santa Cruz, CA. I have never treated Ghislaine Maxwell professionally, Rather, I am writing this as a long-time close friend of the whole Maxwell family including Ghislaine.

My father, Dr. Herbert Hollomon, met Robert Maxwell, Ghislaine's father, in the mid-1950s because my father was a major research science manager at General Electric Co and Maxwell was by then already a major publisher of world science. Apart from earlier whole family stays with the Maxwells in the early 60s, my parents sent me back to Oxford for an entire summer for work experience and to stay with the Maxwell family in 1966 - Ghislaine was 5. I returned again in 1980 for more work experience that summer and returned multiple times in later years to see the siblings and her mother Betty after

Robert Maxwell himself died in 1991.

So you see how our families met, how we've all been friends for over 60 years and how I've maintained a close relationship with the Maxwell clan for most of my life. Though I was spending more of my time with the older siblings who were closest to my age, I also chose deliberately to spend time as well with Ian, Kevin and Ghislaine, from early on until they were soon going to prep school together during term-time. You may know that their father was narcissistic, demanding and highly controlling. He let them know early that he was going to leave his large fortune to charity. So, all the kids knew they had to "make it on their own" despite the wealth and privilege in which they were growing up.

As I got to know each of these kids, including Ghislaine, I noticed that early on, every single one worked very hard at their jobs, as Bob wouldn't bear any idleness, and each strove for their father's and mother's respect through their intelligence and their own hard work. So it didn't surprise me that in her prep school classes, as well as her bachelor's work at Oxford, where Ghislaine had followed her elder siblings, she produced exemplary grades and a reputation as a serious student. I also personally noticed that Ghislaine was quick-witted, smart, full of initiative and good humor, and sincerely caring towards everyone she knew.

So let me share, your Honor, my core point here. Ghislaine is a very smart and sensitive person. I observed this since I met her at age 5. I've already heard through her sister Isabel that she has truly regretted ever meeting Jeffrey Epstein. She has been severely punished with nightly awakenings every 15 minutes in her years already now in jail. She lost her bid for retrial. Like other smart, insightful

people, she fully recognizes how much her whole life has dramatically changed. So she does not need many more months, or certainly years, to pay for whatever crimes the verdict says she committed and aim for rehabilitation.

You will surely sentence her in a just manner. I assure you that upon her release, under probation and beyond, just as she never committed a single crime before her arrest, nor will she commit any other crimes, and instead, dedicate her entire life and work to helping the world. I knew her to be hardworking and committed to her aims throughout her young life when I knew her personally, and through her siblings when I heard about her later on when she was in New York and elsewhere.

I want you to be assured of two things specifically, since I have treated former prisoners myself. First, she doesn't need much prison time to learn her lesson the hard way. In fact, I'm sure she already has. And second, she will surely respond to probation responsibly, and dedicate her whole life to ocean clean-up from plastics and all the other debris, or indeed to other critical social causes. This is because she isn't stupid, and after all this hellish fate re Epstein, the only way she will be able to create some good out of her life will be through that kind of dedicated work. Her siblings will certainly support that. The faster she can be permitted to rehabilitate herself in that way, the faster she will do only good in this world. More time won't accomplish anything. Your honor, please believe me and only sentence her to the lower range of the sentencing guidelines.

Thank you very much for your attention. Sincerely yours,

James "Jamie" Martin Hollomon, JD, MS, LMFT

# EXHIBIT C

Honorable Alison J. Nathan
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

May 2, 2022

To Honorable Judge Nathan:

My name is Christine Malina Maxwell. I am one of Ghislaine's sisters. I am fully aware of the charges to which Ghislaine has been found guilty. Despite this fact, I continue to hold my sister in the highest regard. This letter is being submitted for your consideration as to her sentencing.

<u>My Background</u>

I will be 72 years old before the end of this year. I have been married to my husband, an endowed professor of Physics and Art & Technology, for 34 years. We have three grown children: an emergency medicine doctor, a research scientist, and a data scientist. Following in my mother's footsteps, I have a Humanities PhD in the arena of Holocaust Studies from the University of Texas at Dallas. Professionally, I have taught grade school, worked as an editor and marketing director for an international scientific and educational publishing company, and served as President & CEO of an information broker company and two online search engine companies. Today, my Internet knowledge discovery company strives to help people find actionable insights to foster a better, safer, smarter world.

<u>What I Particularly Know About My Sister</u>

Ghislaine is human. Each of us is born into this world with no choice into which family. Ghislaine and my other siblings were all fortunate that our parents were able to provide us with a comfortable upbringing. We always had enough to eat, a nice home to grow up in, and we all went to good public or private schools. Yes, we were privileged, but we were not entitled and life was not always perfect. Unfortunately, our family also became a grieving family. Our eldest brother Michael was gravely injured in a car accident just after Ghislaine was born; he remained in a coma until his death when Ghislaine was seven years old. In spite of this tragedy, I watched Ghislaine learn to adapt and to become a productive and caring human being.

Ghislaine is independent and upstanding. Two attributes of our parents are pertinent to understanding foundational aspects of Ghislaine's character. First, both of our parents had an incredible work ethic. We were all encouraged from an early age to work to earn money and to respect the responsibility that came with that privilege. I have witnessed that work ethic in Ghislaine. She is a far cry from the media's wholesale mis-characterization of her as just a 'British Socialite'. Second, our parents raised us to respect others and to follow the Golden Rule: to treat each person as we would like to be treated ourselves. I have never seen Ghislaine show any hurtful intentions or tendencies against anyone, including any living thing. As you have stated on three occasions, Ghislaine is not a threat to the public.

Ghislaine is educated and hard-working. She found her passion in life at aged 50, when she poured her heart and soul into setting up and running a non-profit environmental organization, The TerraMar Project. During its development, Ghislaine reached out to me for educational and publishing advice. One measure of its success is evidenced in the major collaborations with entities and organizations, such as National Geographic and Oxford University, that she managed to secure. These recognized leaders could not afford to be linked to anything but the most reputable entities, which is how they viewed Ghislaine's endeavor. Each allowed their logos/names to be associated on the public TerraMar website.

Ghislaine is a caring person. The goals that she set for TerraMar were laudable and reflect her concern for the well-being of humanity. The only reason she was compelled to close down the Project was to protect the supporting individuals and groups from being hounded and starting to be vilified by the Press after her arrest. I know that Ghislaine still very much wants to find more ways to give back to society.

We live in a world where malicious envy of people seen to have wealth and perceived 'undeserved' social position in life, is perfect fodder for selling newspapers and filling social media platforms with gaudy, single faceted views. Ghislaine had money because she worked very hard to earn it. Her positions demanded hard, diligent work, great intelligence, great management skills, great ability to get on well with people from all walks of life, artistic creativity, and caring about others. Her work was a far cry from the 'flippity-jibit socialite' label that the media has decided to cast on her every time they reference her.

I am asking you to consider a lesser sentence for my sister Ghislaine. If Ghislaine is able to regain freedom while she still has all her faculties, I know she has much to still offer in dedicating the rest of what is left of her life to advocacy to helping others. Thank you for your consideration of all the points in my letter that speak to the worthiness of Ghislaine's contributions and abilities, and to her truly wanting to make a positive difference again if given the opportunity to do so.

Respectfully,

*Christine Malina Maxwell*

CHRISTINE MALINA MAXWELL

11420 Santa Monica Blvd. #25424
Los Angeles, CA 90025

# EXHIBIT D

ISABEL MAXWELL
11420 SANTA MONICA BLVD #25424
LOS ANGELES, CA 90025

May 18, 2022

The Honorable Alison J. Nathans
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square, New York, NY 10007

RE: LETTER IN SUPPORT OF GHISLAINE MAXWELL AT SENTENCING

Dear Judge Nathan:

My name is Isabel Maxwell and I am one of Ghislaine Maxwell's older twin sisters. I am 71 years of age and have known Ghislaine all her life. I am a Graduate of Oxford University,  cofounder of one of Silicon Valley's earliest search engines, and a Technology Pioneer of the World Economic Forum. I am of course aware of the charges of which she has been found guilty at jury trial. I have been present at every one of  the pretrial and trial court days. Notwithstanding the jury's verdict, I continue to hold Ghislaine in the highest regard and I believe very strongly that she still has much of value to contribute in the world. I wish to share some things about my sister that speak to her character and to her values that I have personally witnessed throughout her life, including from the early 1990s right up to today.

Despite a very tragic start to her life due to a fatal car crash suffered by our eldest brother which deprived Ghislaine of the immediate attention of our parents in her earliest years, I observed her grow up and become a lovely, witty, resourceful, scrupulous and trustworthy human being. Our parents taught us key values such as kindness, consideration, generosity, and an extremely hard work ethic. For example, from a very early age each of us had to learn and demonstrate what our father termed "the 3 Cs:Consideration, Concentration and Conciseness" and to

"always treat others as you would like to be treated yourself." We were quizzed on these principles constantly and had to regularly report examples of how we followed them. Ghislaine was no exception in deeply absorbing, exhibiting and living these values. For example, I think it is no small feat to train and become a helicopter pilot, an Emergency Medical Technician (EMT), submersible pilot and more, as they all require dedication, concentration and quick thinking and reactions and no small amount of courage. These are not the usual pursuits of a "flibberti-gibbet" or a "socialite", terms with which my sister has been branded with to this day.

Ghislaine was always an extremely generous, thoughtful and kind host in New York to her many siblings including me, and her many nieces and nephews which I deeply appreciated. She also helped our mother greatly in her late life and exhibited deep caring and concern which I noticed personally on many occasions. For example she dropped everything and flew to France at her own expense to help me with medical issues our mother was having and to just be there to comfort her.  She also did not hesitate to help her many personal friends with their problems not only with kindness but practical help too and did not ask for anything in return.

My sister was also very entrepreneurial in creating and investing in multiple companies and organizations which created products and services, as well as employment. An important example is that in 2012, Ghislaine turned a lifelong passion for the oceans into a non-profit, *The TerraMar Project*, with the mission to create a "global ocean community" based on the idea of shared ownership and responsibility of the global "commons"—the high seas or international waters.  Efforts like these to help our planet are sorely needed and frankly, our fragile Earth continues to need all the help and activism it can get. It would be within your power to allow her to renew her fight as soon as possible for Ocean conservation In light of the dire warning just issued by the UN that the "Earth's oceans have reached the hottest and most acidic levels on record".

Ghislaine has managed to live through the most arduous pre-trial detention for over 500 days under an "enhanced security schedule" at MDC Brooklyn, with courage, humility and stoicism. During her pre-trial detention, she suffered conditions that have constantly and daily contravened the UN Mandela Rules of detention to which the US is a party. Examples highlighted by Ghislaine's counsel include "severe sleep deprivation, a lack of potable water, prison computers that do not function and inability to access the Prosecution discovery or keep jail guards from reviewing her confidential materials." I am in awe of the depth of her life force and forbearance. This shows me that she will be able to emerge from incarceration with fortitude and magnanimity.

I conclude this letter with a reiteration of the government's and the Court's own repeated assertions that Ghislaine is no threat to society; and in restating my strongest belief that Ghislaine would bring all her deep and demonstrated qualities to bear again to help society. I hope greatly that she will be given the opportunity to do so sooner rather than later.

Yours respectfully,

*Isabel Maxwell*

Isabel Maxwell

# EXHIBIT E

IAN MAXWELL
15 Half Moon Street
London, W1J 7DZ, U.K.

29 April 2022

The Honorable Alison J. Nathan
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Nathan,

I write this letter in support of my sister, Ghislaine, aware of the charges she was been found guilty of, noting too that she has no prior criminal convictions in any jurisdiction.

I have known Ghislaine for over 60 years and have formed a settled view of her good character based on our growing up together and continuing to remain close to this day. I respect her enormously for her generous (often anonymous) donations to charities and her valuable contributions to non-profit and other organizations; for her many personal achievements which have included obtaining her helicopter licence, becoming a banker, an EMT (Emergency Medical Technician) and a submersible pilot, as well as for the courage she has shown in the face of close on two years of intolerable conditions of incarceration, for her stoicism and indeed humility under such trying circumstances which have witnessed so many setbacks for her. For all this and many other reasons besides I hold her high in my affections and shall certainly continue to do so.

My sister is Aunt to 13 nieces and nephews (now aged 18 to 37) and I have witnessed at first hand over the years her generosity to them – be it paying their school fees, mentoring them as they grew up or providing job opportunities for them.   She also has an enduring capacity for friendship, a warm heart, and the ability to convert those feelings into action when required to help those less fortunate than herself.  She has discreetly supported some friends financially and others by providing a roof over their heads when they were down on their luck, often for weeks at a time.  Ghislaine has also been a truly supportive sister. During my divorce from my then wife my sister allowed me stay rent-free at her home in London for six months when I had nowhere else to go until I was able to find alternative

IAN MAXWELL
15 Half Moon Street
London, W1J 7DZ, U.K.

accommodation. She never asked for anything in return.  These are the actions of a fundamentally good and decent person, with great empathy for others and a capacity for altruism. This is the real – the true – Ghislaine whom I know and love as her brother.

My sister was fortunate – as I and my siblings were too - in benefitting from an outstanding formal education which culminated for Ghislaine with a good degree from Oxford University.  She put that achievement to good effect, using amongst other skills her gift for foreign languages and networking abilities to start up, invest in and develop numerous businesses in the UK and in the US, employing people, making a difference, making a contribution.

Perhaps her single most important contribution is to have converted a lifelong passion for conservation and the oceans into a non-profit, *The TerraMar Project*, to create a robust awareness program and a thriving social network around the oceans at a time when they were perhaps not so high up the conservation agenda as they are today.  *TerraMar* ran from 2012 to 2019 and at its peak had hundreds of thousands of visitors to its website and many thousands of subscribers to its programs. None of this would have happened but for Ghislaine's determination, her hard work and capacity for organizing and mobilizing and sheer perseverance as well as financial generosity in sustaining *TerraMar* over the years. Those personal efforts of hers (along with others from key corporate supporters and sponsors), were acknowledged when the U.N. made oceans conservation one of their 17 Sustainable Development Goals for 2015-30.

I believe Ghislaine still has much to contribute to the world if she is given a meaningful opportunity to do so.

Sincerely yours,

Ian Maxwell

# EXHIBIT F

Kevin Maxwell
15 Half Moon Street
London W1J 7DZ
United Kingdom

May 3rd 2022

The Honorable Alison J Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square, New York
NY 10007

Dear Judge Nathan

I write this letter in support of my sister Ghislaine, in the knowledge of the guilty verdicts reached at trial.

Ghislaine is my youngest sister by three years. I have known her all her life. We have always been close and remain so today. The person described in court by the prosecution and some of the witnesses is completely alien to me; to my knowledge of her.

Ghislaine is an intelligent, warm hearted, generous, kind, funny, thoughtful and loving person. She cares about others. Ghislaine's first reaction on hearing of a problem is how to solve it or how to contribute to a solution. Her desire is always to engage, to bring energy to every problem and to help. Her care and thoughtfulness has been exhibited to me repeatedly over the years in many individual acts of kindness, to my own knowledge, to friends, family, and to many third parties including employees whether it was financial help with school fees, or providing needed accommodation or cash to help out with an

emergency or time off for something personal or simply being empathetic: providing time to talk, to listen to someone's problems.

Ghislaine's commitment to ocean conservation and the creation of a charity that engaged with literally thousands of people across the globe is an example of what her drive, determination and ability to organise can achieve.

I urge you to take into the balance of your consideration about sentencing, notwithstanding the gravity of the offences of which she has been found guilty, Ghislaine's previous lifetime good character, the high regard and continuing love and esteem of her friends and family based on a lifetime's knowledge of her, her character, conduct and achievements; the very real hope and expectation that she be allowed to participate with and contribute to once more her family, friends and society at large.

Yours sincerely

Kevin Maxwell

**EXHIBIT G**

vaughanedwards@ukgateway.net

24th April 2022

Honorable Alison J. Nathan
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Nathan,

**Ghislaine Noelle Marion Maxwell**

My name is Catherine Vaughan-Edwards and I am sending this letter of support knowing it is

to be presented to the Court in connection with the sentencing of Ghislaine Maxwell for the

charges that she was found guilty of in December 2021. The content of this letter is true

and within my knowledge.

I first met Ghislaine in 1988 when she employed me as her Personal Assistant at Maxwell's

Corporate Gifts, a business she had started herself. I left her employment in 1989 but

remained in regular contact and count her as a close, personal, friend. I helped her move

from London to the US and stayed with her in New York for some weeks immediately after

the burial of her Father in 1991 to help her and provide moral support. I have visited her in

the US, stayed with her and her family and helped when they moved into their new house.

We always meet when she travels to the UK, she has stayed with my family, has known my

children since they were born and is Godmother to one of my sons.

Whilst I fully acknowledge the verdict of the Court, I continue to standby and support Ghislaine. The person that I have known for 34 years, is not the same as the Ghislaine so negatively portrayed by the press and mainstream media. My own experience is that she is kind, caring and thoughtful and is always there to provide support as a loyal and generous friend. She has been a mentor, encouraging and helping me to develop my business and gives her time and advice freely. Since her arrest I have written to her and plan to visit her once my application is approved

Respectfully,

**Catherine Vaughan-Edwards**

# EXHIBIT H

**Harriett Jagger**
**1 Moore Park Road**
**London, SW6 2JB**

5 May 2022

The Honorable Alison J. Nathan
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Nathan

My name is Harriett Jagger and I have known Ghislaine for 45 years since we were at school together. We have always kept in touch and I have been writing to her regularly whilst she has been in prison.

I am of course aware of the charges of which she has been convicted but my love, care, support and lifelong friendship for her remains unchanged. I believe that true friendship and understanding of what a person's life journey takes, with its many twists and turns is always a test.

I first met Ghislaine running down a corridor a school, she was 15 and carrying two pairs of corduroys, one green, one black, she had great energy, a huge smile and I liked her immediately.  She was very popular at school, bright, kind, engaging and fun.  Being close friends we have of course had the social times, the help with advice on personal issues, the connection of like-minded people.  I totally trust Ghislaine to always be there for me the same as I am for her.

When I was going through a sad separation from my husband and living in a lowly rental, Ghislaine would often ring me with a 'call me if you need cheering up', knocking on the door To see if I was OK,  'do you want me to nip to the supermarket for anything'. I have always liked her straight forward intelligent advice, her strong personality but with a genuine

1

**Harriett Jagger**
**1 Moore Park Road**
**London, SW6 2JB**

sensitive understanding of other people's problems. Her warmth, devotion and huge loyalty to her family and friends are qualities I admire enormously in her.

We had trips together, most notably to Madrid when we were both working on different publications. I was showing her the ropes of the industry. She was happy to listen to other people, take on board experiences and knowledge from those in the business. She was open and friendly, often lacking in confidence herself she would work hard to understand and appreciate those who knew more.

Despite being on different sides of the Atlantic we have always remained friends, Ghislaine was always quick to answer a message, to meet up whenever possible, keen to keep a grounded attachment to those she valued and were constant in her life. Wanting news, catch ups and the gossip of old friends.

The last time I saw Ghislaine was in her home in New York a few years ago. I listened to her as she spoke of her wish to find the security and happiness within a family unit, she was visibly upset that this, the simplest of things for so many others had still not been part of her own life. I felt hugely sorry for her. Having known her large and great family, her love and great respect for her parents and closeness to her brothers and sisters, I knew this was something she had always craved. I gave her a huge hug on departing. So I was then thrilled to learn that she had finally met and married someone and was helping to bring up his young children, but then desperate to hear that this much sought-after joy was so short lived.

I read constantly in papers and social media about her, often from those who have never met her, but this is not the Ghislaine I know and have known for 45 years. This is not a true representation of the real person, my loyal, trusted and great friend.  This person

2

**Harriett Jagger**
**1 Moore Park Road**
**London, SW6 2JB**

is not Ghislaine.

I can only plead for the court to show her some form of mercy and understanding with a

sentence that is survivable as I honestly believe she has so much more in her life to give.

Yours sincerely,

Harriett Jagger

# EXHIBIT I

May 4th, 2022


The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007


Dear Judge Nathan:

My name is Jeffrey Roth, I am on the staff of The New York Times and I am a cousin of

Ms. Ghislaine Maxwell. We have known each other for fifty years. My Mother, Jolana Roth

and her late father, grew up together. Our families have been close for ninety years.

I attended the trial as a family member and am aware of the charges that she has been

found guilty of. Ghislaine is a friend and confidant.

Forthright, kind, respectful. Qualities that all parents hope for in their children. I saw those in

Ms. Maxwell many times and especially towards her late Mother, Elisabeth. When Betty would

come to the States, I would come by and here's what I observed. A kind,

caring daughter who was respectful to her Mother and to all around her. Qualities learned and

inherited and apparent to all. That's who Ghislaine is.

Respectfully,



Jeffrey Roth

# EXHIBIT J



Alexander S. Bardey, M.D.
Kate Termini, Psy.D.
Amy DeSimon, LMHC

Laura Menninger, Esq.
Haddon, Morgan, & Foreman, P.C.
150 E. 10th Avenue
Denver, CO 80203

Bobbi C. Sternheim, Esq.
Law Offices of Bobbi C. Sternheim
225 Broadway, Suite 715
New York, NY 10007

August 24, 2021

**RE: Ghislaine Maxwell**
**Case No.: 20-Cr-330 (AJN)**

Dear Ms. Menninger and Ms. Sternheim,

I am performing an ongoing forensic psychiatric evaluation of Ms. Maxwell to assess whether any psychological matters are present that might be relevant to the disposition of her criminal matters. In this letter, I address her current mental state and risk of flight in light of an pending bail application.

I have met with Ms. Maxwell on numerous (14) occasions, from October 2020 to the present via telephone interview, video teleconference, and one in-person meeting at Metropolitan Detention Center (MDC) on April 22, 2021. During those meetings, I reviewed her personal, social, educational, vocational, and psychiatric histories. I performed a mental status examination to assess her intelligence, thought processes, cognitive functioning, memory, credibility, orientation, judgment, insight, and impulse control. I reviewed numerous legal correspondences between Ms. Maxwell's legal counsel, MDC legal, and the Honorable Alison J. Nathan. Additionally, I conducted a collateral interview with Ms. Leah Saffian, part of Ms. Maxwell's legal counsel and a longtime acquaintance, on July 16, 2021, to gain insight into Ms. Maxwell's current level of functioning. The limits of confidentiality inherent to such an evaluation were explained to Mr. Maxwell.

**Term of Incarceration**

Ms. Maxwell reported that she has filed over 100 grievances regarding the conditions of her pretrial confinement since her incarceration at the MDC in July of 2020. I reviewed numerous grievances filed to the court by Ms. Maxwell's legal team since her incarceration, which allege that Ms. Maxwell has been subject to physical and emotional abuse by the correction officers, poor and unsanitary living conditions, malnutrition, difficulties reviewing the millions of legal discovery documents in the case against her, and sleep deprivation. She is currently housed in segregation from all other inmates, reportedly with a team of 10 correction officers at a time – three officers are on duty from 7am until 8pm, and two officers from 8pm until 7am – groups of which rotate on a bi-weekly basis and many of the officers are reportedly often hostile toward her. There are cameras on her constantly, some are stationary and one camera is on wheels and follows her as she moves throughout the facility. Ms. Maxwell reported that she has been threatened by correction officers that she will be subject to discipline if she is ever out of the camera's view.

Ms. Maxwell reported that she is subject to numerous pat searches per day, despite being completely isolated, during which she alleges to have been touched in a sexually inappropriate manner by correction officers on multiple occasions. Ms. Maxwell reported that in January of 2021, a correction officer grabbed her breast with intense pressure during a routine pat search, causing her significant discomfort and pain. She reported that she often refuses to go to recreation to avoid being searched, which has negatively impacted her physical health because she is unable to get fresh air or exercise. She was reportedly denied an extra blanket in the winter and on more than one occasion an officer took one of her blankets from her after her request for an extra blanket was granted. She further reported that she was not provided a proper food regimen for the first few months she was incarcerated, wherein she was provided with small, inadequate portions or rotten food. She has reportedly lost at least 15 pounds since her incarceration and has experienced hair loss. She reported that currently, she suffers from constant headaches and back pain.

Ms. Maxwell is subject to flashlights being shined on the ceiling of her cell in 15-minute intervals every night since she has been incarcerated. A letter authored by U.S. Attorney Audrey Strauss states, "…MDC staff conduct flashlight checks every fifteen minutes because the defendant, while not on suicide watch, is on an enhanced security schedule…because MDC has identified a number of factors that raise heightened safety and security concerns with respect to this defendant."[1] Ms. Maxwell reported that these flashlight checks have significantly hindered her ability to sleep, as she frequently wakes up every time the guards shine the flashlight into her cell. When she was brought from the detention facility to court, she was awoken at 3am, transported, and held in a cold cell for hours prior to her scheduled court appearance.

Upon my initial meeting with Ms. Maxwell in October 2020, she did not manifest psychiatric symptoms of any kind. She was coherent, optimistic, and confident in her ability to defend herself in court. Over time, she has manifest depressive symptoms, anxiety, and

---

[1] Letter, authored by U.S. Attorney Audrey Strauss, Re: United States v. Ghislaine Maxwell, 20 Cr. 330 (AJN)

*Forensic-Psychiatric Report*
*Ghislaine Maxwell*

minor cognitive deficits. More recently, during our meetings Ms. Maxwell has been depressed, fatigued, anxious, and tearful. She endorsed experiencing irritability, memory deficits, inattention, word finding difficulties, and trouble organizing and sequencing her legal documents. Despite her symptoms, Ms. Maxwell has maintained her innocence and continues to express a determination to fight her case.

## Collateral Interview

I conducted a collateral telephone interview with Ms. Leah Saffian, Ms. Maxwell's longtime acquaintance and part of her legal team, to gain further insight into her current level of functioning. Ms. Saffian reported that she has worked with Ms. Maxwell's family since 1991, as she represented her brother, Kevin Maxwell, at that time. She was reportedly hired to legally represent Ms. Maxwell in 2015 and has spoken to her on the phone every day since that time.

Since Ms. Maxwell's incarceration, Ms. Saffian has spent approximately six hours per weekday on video conference with Ms. Maxwell, during which they review legal discovery documents to prepare her defense for the upcoming trial. She described Ms. Maxwell as "highly intelligent, well-educated, exceptional in so many ways," however, she stated, "I have seen her deteriorate" since her incarceration, which Ms. Saffian described as "frightening." She described the conditions under which Ms. Maxwell is being detained as "psychological torture," in that she is being held in "quasi-solitary confinement," where the officers assigned to her are often hostile.

Ms. Saffian characterized Ms. Maxwell as "vibrant" and "witty" prior to her recent incarceration. However, she reported that currently, due to sleep deprivation and the conditions of her confinement, there are days when Ms. Maxwell is so exhausted that she can't string a sentence together, she often misuses words, and she struggles to maintain focus. Ms. Saffian reported that Ms. Maxwell is the most important asset in her own legal defense, as there are millions of legal discovery documents to review, and Ms. Maxwell has been the primary source of information to "string together the facts" of the case. Ms. Saffian added that Ms. Maxwell is often the one to notice factual errors within the legal discovery that her legal team often does not pick up on, however, due to "marked deterioration" since her incarceration, it has been increasingly difficult for Ms. Maxwell to sustain her attention to do so. Ms. Saffian added that recently, Ms. Maxwell has completely lost her sense of humor and often "misses the beat."

Ms. Saffian reported that she does not consider Ms. Maxwell to be a flight risk, as she had the opportunity and means to do so prior to her arrest but she chose not to. Ms. Saffian stated, "If I was permitted by law to post bail, I would put my house on the line without hesitation."

*Forensic-Psychiatric Report*
*Ghislaine Maxwell*



*Forensic-Psychiatric Report*
*Ghislaine Maxwell*



*Forensic-Psychiatric Report*
*Ghislaine Maxwell*



## FORMULATION

Ms. Maxwell is a 59-year-old Caucasian woman, who is being evaluated at the request of her attorney in order to assess her current mental state and risk of flight.



Ms. Maxwell has consistent described, and complained formally of, being subject to unfair and inconsistent treatment by correction officers and ongoing sleep deprivation throughout her incarceration. Research indicates that the experience of unfairness, disrespect, and a lack of safety significantly contributes to psychological distress in incarcerated individuals.[3] Furthermore, recent research on the effects of sleep deprivation on cognitive functioning states that "sleep deprivation resulted in a loss of cognitive flexibility through feedback blunting…sleep deprivation causes a fundamental problem with dynamic attentional control."[4] Furthermore, one study showed that:

> *Relative to baseline, sleep deprivation was associated with lower scores on Total EQ (decreased global emotional intelligence), Intrapersonal functioning (reduced self-regard, assertiveness, sense of independence, and self-actualization), Interpersonal functioning (reduced empathy toward others and quality of interpersonal relationships), Stress Management skills (reduced impulse control and difficulty with delay of gratification), and Behavioral Coping (reduced positive thinking and action orientation). Esoteric Thinking (greater reliance on formal superstitions and magical thinking processes) was increased.[5]*

---

[2] American Psychiatric Association. (2013). Diagnostic and statistical manual of mental disorders (5th ed.). Arlington, VA: American Psychiatric Publishing

[3] Liebling, A., Durie, L., Stiles, A., & Tait, S. (2013). Revisiting prison suicide: The role of fairness and distress. In *The effects of imprisonment* (pp. 229-251). Willan.

[4] Honn, K. A., Hinson, J. M., Whitney, P., & Van Dongen, H. P. A. (2019). Cognitive flexibility: a distinct element of performance impairment due to sleep deprivation. *Accident Analysis & Prevention*, *126*, 191-197.

[5] Killgore, W. D., Kahn-Greene, E. T., Lipizzi, E. L., Newman, R. A., Kamimori, G. H., & Balkin, T. J. (2008). Sleep deprivation reduces perceived emotional intelligence and constructive thinking skills. *Sleep medicine*, *9*(5), 517-526.

*Forensic-Psychiatric Report*
*Ghislaine Maxwell*

Ms. Maxwell's ability to cope with the stress of her legal proceedings and to participate meaningfully in her defense are gradually being eroded over time due to the conditions of her confinement, as reported by Ms. Maxwell, observed by this examiner, and corroborated by Ms. Saffian and in the results of her psychological testing. Recently she has manifested symptoms of depression and trauma such as anxiety, and minor cognitive deficits. These continue to be exacerbated by ongoing sleep deprivation and the conditions of her confinement. Given my extensive experience working with incarcerated individuals, based on the manner in which Ms. Maxwell's symptoms have manifest, it is clear that her symptoms are in no way related to the charges that have been brought against her. Instead they are directly related to the conditions of her confinement.

The conditions of her confinement are, in my opinion, directly influencing her increasing depression and trauma response symptoms, which will continue to worsen over time if she remains incarcerated under the current conditions. If she were permitted to be released into the community, her symptoms would likely resolve completely, and she would be afforded the opportunity to properly prepare her defense for trial.

At this time, Ms. Maxwell currently poses little to no risk to the community, as she has no prior history of criminal or violent behavior and her current charges could only have been manifest under a very specific set of circumstances which she cannot find herself in if she were to be released. Additionally, in my psychiatric opinion, she is not a flight risk, as she has maintained a strong desire to fight the case against her, despite any psychiatric symptoms that have manifested. Ms. Maxwell has the personality characteristics of a fighter, she has demonstrated a firm resolve to fight her current charges and clear her name. There is no indication that she would attempt to flee given her personality profile.

Respectfully,

**Alexander Sasha Bardey, M.D.**
**FIFTH AVENUE FORENSICS**
Diplomate in Psychiatry, American Board of Psychiatry and Neurology
Diplomate in Forensic Psychiatry, American Board of Psychiatry and Neurology
Clinical Faculty, Department of Psychiatry, New York University Medical Center
Adjunct Assistant Professor, Department of Psychiatry and Behavioral Sciences
New York Medical College