UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                 :

   -v.-                                 :        S2 20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                       :

                    Defendant.        :

-------------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
Attorney for the United States of America


Maurene Comey
Alison Moe
Lara Pomerantz
Andrew Rohrbach
Assistant United States Attorneys
- Of Counsel -

**Table of Contents**

PRELIMINARY STATEMENT ......................................................................................... 1

I.  Background ............................................................................................................. 3

   A.  The Investigation ............................................................................................. 3

   B.  The Charges ..................................................................................................... 4

   C.  Summary of Proof at Trial ............................................................................... 5

      1.  Sexual Abuse of Jane .............................................................................. 8

      2.  Sexual Abuse of Kate .............................................................................. 9

      3.  Sexual Abuse of Annie Farmer ............................................................. 10

      4.  Sexual Abuse of Virginia Roberts ......................................................... 12

      5.  Sexual Abuse of Carolyn ....................................................................... 12

      6.  Sexual Abuse of Melissa ....................................................................... 14

II.  The Pre-Sentence Report and Sentencing Guidelines ........................................ 14

   A.  The 2004 Sentencing Guidelines Manual Applies ........................................ 16

      1.  The Court, and not the Jury, Determines Which Manual to Apply ....... 19

      2.  The Sex Trafficking Conspiracy Continued to 2005 ............................ 19

      3.  The Court Should Apply the 2004 Manual ............................................ 21

   B.  The Four-Point Leadership Enhancement Applies ........................................ 28

   C.  The Two-Point "Undue Influence" Enhancement Applies ........................... 28

   D.  The Five-Level Enhancement in Section 4B1.5 Applies .............................. 31

III.  Discussion .......................................................................................................... 34

   A.  The Defendant's Conduct Warrants a Term of Imprisonment Within the Guidelines Range of 360 to 660 Months' Imprisonment ................................................ 34

      1.  The Nature and Seriousness of the Offense ........................................... 34

      2.  History and Characteristics of the Defendant ....................................... 41

      3.  The Need to Promote Respect for the Law and to Afford Adequate Deterrence ... 43

   B.  The Defendant's Arguments for a Lenient Sentence Are Unpersuasive ................... 44

IV.  Financial Penalties ............................................................................................. 50

CONCLUSION ................................................................................................................ 53

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                 :

   -v.-                                              :          S2 20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                       :

                    Defendant.            :

-------------------------------------------------------------x

## PRELIMINARY STATEMENT

Ghislaine Maxwell played an instrumental role in the horrific sexual abuse of multiple young teenage girls.  As part of a disturbing agreement with Jeffrey Epstein, Maxwell identified, groomed, and abused multiple victims, while she enjoyed a life of extraordinary luxury and privilege.  In her wake, Maxwell left her victims permanently scarred with emotional and psychological injuries.  That damage can never be undone, but it can be accounted for in crafting a just sentence for Maxwell's crimes.

The Government respectfully submits this memorandum in connection with the sentencing of Maxwell in the above-captioned case, which is scheduled for June 28, 2022, and in response to the defendant's June 15, 2022 sentencing memorandum and objections to the Pre-Sentence Investigation Report prepared by the United States Probation Office.  For the reasons set forth below, the Government maintains that under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the applicable sentencing range is 360 months to life imprisonment.  Because the statutory maximum penalty is 660 months' imprisonment, the Guidelines range becomes 360 to 660 months' imprisonment.

Given the exceptionally serious nature of the defendant's years-long participation in the sexual abuse of minors, consideration of the relevant factors under 18 U.S.C. § 3553(a) weighs heavily in favor of a sentence within the Guidelines range of 360 to 660 months' imprisonment. Most significantly, the nature and seriousness of the offense, the harm to victims, the need to promote respect for the law, and the history and characteristics of the defendant weigh heavily in favor of a Guidelines sentence.

The Government addresses each of these factors in turn below. However, certain aspects of the defendant's submission bear addressing up front. First, the Court should reject the defendant's request for a reduced sentence in light of conditions at the Metropolitan Detention Center. The defendant's claims are inaccurate—and in fact, the defendant has enjoyed remarkable privileges as a high-profile inmate that vastly exceed the benefits accorded to the average inmate. It is unsurprising that a woman who had led a life of incredible luxury should complain about her life as a prisoner, but that fact does not come close to meriting leniency at sentencing, much less the extraordinary degree of leniency the defendant seeks.

If anything stands out from the defendant's sentencing submission, it is her complete failure to address her offense conduct and her utter lack of remorse. Instead of showing even a hint of acceptance of responsibility, the defendant makes a desperate attempt to cast blame wherever else she can. On that score, the defendant's attempt to cast aspersions on the Government for prosecuting her, and her claim that she is being held responsible for Epstein's crimes, are both absurd and offensive. Maxwell was an adult who made her own choices. She made the choice to sexually exploit numerous underage girls. She made the choice to conspire with Epstein for years, working as partners in crime and causing devastating harm to vulnerable victims. She should be held accountable for her disturbing role in an extensive child exploitation scheme.

The Government agrees that the defendant should be sentenced for her own conduct: she committed terrible crimes that caused irreparable harm to vulnerable children. Her own criminal actions demand that she serve every day of a Guidelines sentence in prison.

## I.    Background

### A.    The Investigation

The U.S. Attorney's Office for the Southern District of New York opened its investigation into Jeffrey Epstein and his co-conspirators in late November 2018. The investigation was prompted by investigative journalism, and not, as the defendant claims, by civil litigants who pressed for criminal charges. In light of the covert nature of the investigation, the Government interviewed a small group of witnesses and charged Epstein as soon as it was able to, obtaining an indictment against Epstein approximately six months later, on July 2, 2019, and arresting Epstein on July 6, 2019. (PSR ¶ 21). That initial phase of the investigation remained intentionally narrow in order to keep the circle of people aware of a federal investigation into Epstein small to avoid jeopardizing the investigation before Epstein could be apprehended.

The Government's investigation expanded upon charging Epstein, and several additional victims came forward after the charges were announced. After Epstein's death in August 2019, the Government continued that same investigation, which included interviewing several victims. Among the victims the Government interviewed were individuals identified on the record in this case as "Jane" and "Kate" (both of whom agreed to be interviewed by the Government for the first time) as well as Annie Farmer. The Government obtained the original Indictment against the defendant—which related to the abuse of Jane, Kate, and Annie Farmer—in late June 2020. In March 2021, the Government obtained a superseding indictment charging the defendant—which added counts relating to the defendant's abuse of an additional minor victim, Carolyn—based on

new evidence that was not available to the Government at the time the defendant was indicted in late June 2020 or at the time Jeffrey Epstein was indicted in 2019. Throughout its investigation, the Government followed the facts where they led, without fear or favor.

### B.    The Charges

On June 29, 2020, a grand jury sitting in this District returned an indictment charging the defendant in six counts. (Dkt. No. 1). On July 2, 2020, the Federal Bureau of Investigation ("FBI") arrested the defendant. (PSR ¶ 77). On July 8, 2020, a grand jury sitting in this District returned a superseding indictment containing the same charges, with ministerial corrections. (Dkt. No. 17).

On March 29, 2021, a grand jury sitting in this District returned a superseding indictment (the "Indictment") which charged the defendant in eight counts. (Dkt. No. 187). Count One of the Indictment charged the defendant with conspiring with Jeffrey Epstein and others to entice minors to travel to engage in illegal sex acts from in or about 1994 through in or about 2004, in violation of 18 U.S.C. § 371. Count Two charged the defendant with enticing Minor Victim-1 to travel to engage in illegal sex acts, and aiding and abetting the same, in violation 18 U.S.C. §§ 2422 and 2. Count Three charged the defendant with conspiring with Epstein and others to transport minors to participate in illegal sex acts from in or about 1994 through in or about 2004, in violation of 18 U.S.C. § 371. Count Four charged the defendant with transporting Minor Victim-1 to participate in illegal sex acts, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2423 and 2. Count Five charged the defendant with participating in a sex trafficking conspiracy between approximately 2001 and 2004, in violation of 18 U.S.C. § 371. Count Six charged the defendant with sex trafficking of Minor Victim-4, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1591 and 2. Counts Seven and Eight charged the defendant with perjury, in violation of 18 U.S.C. § 1623.

### C.    Summary of Proof at Trial

On November 29, 2021, the defendant proceeded to trial on Counts One though Six.[1]  On December 29, 2021, the jury returned a guilty verdict on Counts One, Three, Four, Five, and Six. The proof at trial established that over the course of a decade, the defendant facilitated and participated in the sexual abuse of multiple young girls.  From 1994 to 2004, the defendant and Epstein worked together to identify girls, groom them, and then entice them to travel and transport them to Epstein's properties in New York, Florida, New Mexico, and elsewhere.  (PSR ¶ 22).  The girls—some of whom were as young as 14 years old—were then sexually abused, often under the guise of a "massage."  (*Id.*).

Beginning in approximately 1991, the defendant had a close and intimate relationship with Epstein.  (PSR ¶ 23).  The defendant was Epstein's girlfriend for many years, until in or about the early 2000s; after that point, the defendant and Epstein remained close friends.  (*Id.*).  For over a decade, the defendant traveled with Epstein, a multi-millionaire, on his private planes and mingled with rich and famous people.  (*Id.*).  As the defendant wrote in an essay, she and Epstein were "a couple" who were "rarely apart," "great partners," and "the best of friends."  (*Id.*).  The defendant enjoyed a life of extraordinary luxury with Epstein.  (*Id.*).  The defendant and Epstein spent time together in Epstein's various properties, including his mansion on the Upper East Side in Manhattan, his villa in Palm Beach, his ranch in New Mexico, his apartment in Paris, and his private island in the U.S. Virgin Islands.  (*Id.*).  During the timeframe of the conspiracy, Maxwell received exceptional benefits from Epstein.  Beyond the lavish lifestyle that she enjoyed side-by-

---

[1] On April 16, 2021, the Court granted the defendant's motion to sever the perjury charges for a separate trial.  (Dkt. No. 207).  The Government intends to move to dismiss the perjury counts at the time of sentencing in light of the victims' significant interests in bringing closure to this matter and avoiding the trauma of testifying again.  (Dkt. No. 574).

side with Epstein, Maxwell also received a townhouse that Epstein bought for her in New York City, and Epstein transferred a total of approximately $23 million to Maxwell during the timeframe of the conspiracy.  (*Id.*).

In addition to her role as Epstein's girlfriend, the defendant also supervised Epstein's households and enjoyed a lifestyle of extraordinary wealth.  (*Id.*).  The defendant relished her role as "the lady of the house."  (PSR ¶ 24).  When the defendant took charge of Epstein's homes, she imposed strict rules for staff.  For example, the defendant helped author and implement a household manual, which contained rules for operating the Palm Beach house to "anticipate the needs of Mr Epstein, Ms Maxwell and their guests."  (*Id.*).  Staff were directed to have two sizes of notepads marked "Ghislaine Maxwell" and "Lady Ghislaine," in addition to Epstein's notepads. (*Id.*).  Staff were also instructed on Epstein and the defendant's breakfast preferences, and the items to keep in Epstein and the defendant's respective bathrooms.  (*Id.*).  The defendant's instructions extended to massages: she specified the massage oils and lotions for the Palm Beach house.  (*Id.*).  In short, the defendant was waited on hand and foot.

To protect her criminal activities from exposure, the defendant also fostered a culture of silence at Epstein's homes.  (PSR ¶¶ 25, 79).  The Palm Beach household manual made clear that staff were to "see nothing, hear nothing, say nothing, except to answer a question directed at" that staff member.  (PSR ¶ 25; *see also* PSR at 49 (manual instructed employees to "NEVER disclose Mr Epstein or Ms Maxwell's activities or whereabouts to anyone")).  And the defendant reinforced the messages of the household manual.  She directed Juan Alessi, the former manager of Epstein's Palm Beach villa, to speak to Epstein only when spoken to and not to look Epstein in the eyes. (PSR ¶ 25).  Alessi explained during his trial testimony that he understood he was to be "blind, deaf and dumb" and "to say nothing of their lives." (*Id.*).

This culture of silence provided space for the defendant and Epstein to operate a playbook through which they sexually abused young girls.  At trial, Dr. Lisa Rocchio, an expert in psychology with a specialized expertise in traumatic stress and interpersonal violence, explained that children are most frequently sexually abused through grooming and coercion in the context of a relationship.  (Tr. 713).  Dr. Rocchio explained that abusers use a series of deceptive tactics to engage a child in sexual abuse.  (Tr. 715-20).  The defendant and Epstein used such tactics throughout the life of the conspiracy.  In the early phase of the conspiracy, from at least approximately 1994 through approximately 2001, the defendant identified vulnerable girls, typically from single-mother households and difficult financial circumstances.  (PSR ¶ 26).  The defendant and Epstein then isolated the girls, spending time with them away from their family and friends.  (*Id.*).  During that time, they groomed the girls through techniques such as giving them gifts, pretending to be friends, and building trust.  (*Id.*).  The defendant and Epstein then normalized sexual situations and sexual touching.  (*Id.*).  Finally, they transitioned to sexual abuse, often through the pretext of giving Epstein a massage.  (*Id.*).  This earlier phase required the defendant and Epstein to identify one girl at a time to target for grooming and abuse.

In the later phase, from approximately 2001 until at least approximately 2004, the defendant and Epstein developed a scheme that created a constant stream of girls who recruited each other to visit Epstein at his Palm Beach residence.  (PSR ¶ 27).  This new approach replaced some of the early grooming and trust-building steps with money provided to girls from struggling families.  (*Id.*).  Specifically, the defendant and Epstein paid young girls hundreds of dollars in cash in exchange for meeting Epstein to be sexually abused—again, often under the pretext of giving Epstein a massage.  (*Id.*).  Once a girl was introduced to these sexualized massages, she was offered more money if she brought other teenage girls to engage in sexualized massages with

Epstein. (PSR ¶ 28). As a result, the defendant and Epstein no longer had to identify and recruit victims themselves. (*Id.*). Instead, they used money to convince impoverished girls to bring other victims to provide Epstein with sexualized massages. (*Id.*). Once the girls were in Epstein's home, the defendant engaged in grooming behavior that normalized the sexualized massages that were taking place with Epstein. (*Id.*).

As set forth in the PSR, the defendant targeted vulnerable victims for sexual abuse, causing significant and lasting harm. The trial evidence focused on six girls who suffered abusive sexual contact as a result of the defendant's criminal actions: Jane, Kate, Annie, Carolyn, Virginia, and Melissa. Details concerning the evidence at trial with respect to the abuse by the defendant and Epstein of the six girls are provided in the PSR at ¶¶ 30-74, 80-82. The defendant was instrumental in the abuse of these girls. She personally engaged in sexual abuse when she fondled the breasts of Jane, Annie, and Carolyn. And she used her role as a supposedly respectable, glamorous, older woman to lure these victims into a false sense of security. By behaving as though the sexual abuse was normal, the defendant prevented these girls from understanding just how wrong the abuse was. The defendant also provided Epstein with the cover of an age-appropriate romantic partner, to put other adults at ease when interacting with Epstein and when allowing their children to spend time with him.

1. Sexual Abuse of Jane

The defendant and Epstein met Jane when she was just 14 years old in the summer of 1994 at a summer camp for talented kids. (PSR ¶ 30). Jane was particularly vulnerable, as her father had just passed away (a fact which she had told both Epstein and the defendant upon meeting them), and her family was struggling financially. (PSR ¶¶ 30-31). The defendant and Epstein cultivated a relationship with Jane, spending time with her at Epstein's Palm Beach home and

taking her to the movies and on shopping outings. (PSR ¶ 32). The defendant and Epstein gave Jane gifts, and Jane came to look up to the defendant like an older sister figure. (PSR ¶¶ 32-33).

The defendant and Epstein abused that relationship of trust in the worst way imaginable. They sexually abused Jane starting when she was just 14 years old, and the sexual abuse continued for years. (PSR ¶ 36). When Jane was still only 14 years old, the defendant and Epstein instructed Jane to follow them to Epstein's bedroom where the defendant and Epstein fondled each other, casually giggling about it, while Epstein asked Jane to take her top off. (PSR ¶ 34). While this was happening, "there were hands everywhere," Epstein began to masturbate, and the defendant rubbed, kissed, and fondled Epstein. (*Id.*). After this initial sexual interaction, the defendant and Epstein continued to sexually abuse Jane. (PSR ¶ 35). The defendant and Epstein taught Jane how Epstein liked to be massaged and gave Jane instructions about touching Epstein's penis. (*Id.*). Jane was 14 years old, and the defendant tried to make Jane feel like this was "very normal" and "not a big deal." (*Id.*). Jane was repeatedly sexually abused by Epstein between the ages of 14 and 16 years old, and the defendant was frequently in the room when the abuse happened. (PSR ¶ 36). Over time, the abuse escalated, and Epstein used vibrators on Jane, masturbated, put his fingers in Jane's vagina, and asked Jane to straddle his face. (*Id.*). The defendant sometimes touched Jane during these incidents; in particular, Jane recalled that the defendant touched her breasts. (*Id.*). The sexual abuse was not limited to Palm Beach, Florida, as Jane traveled with the defendant and Epstein to Epstein's townhouse in New York City and his ranch in New Mexico. (PSR ¶ 37). Jane was sexually abused during those trips. (*Id.*).

2. <u>Sexual Abuse of Kate</u>

The defendant and Epstein's sexual abuse of Kate started in 1994, around the same time that the defendant and Epstein started sexually abusing Jane. (PSR ¶ 39). After Kate, then 17

years old, told the defendant that she lived alone with her mother and that things were difficult at home, the defendant introduced Kate to Epstein in London. (PSR ¶¶ 39-40). The defendant delivered Kate to a naked Epstein in the defendant's own home for massages and told Kate to "have a good time." (PSR ¶¶ 41-42). During these massages, Epstein initiated sexual contact with her, putting her hand on his penis and grabbing Kate's breasts and in between her legs. (*Id.*).

Kate traveled to meet both Maxwell and Epstein in Palm Beach, Little Saint James, and New York City when she was between approximately 18 and 24 years old. (PSR ¶ 43). Epstein initiated sexual activity with Kate every time she spent time with him from when she was 17 years old through her early thirties. (*Id.*). The defendant brought up sexual topics with Kate, ranging from talking about how sexually demanding Epstein was to asking if Kate knew of anyone to give Epstein a blow job to remarking that Epstein liked cute, young, pretty girls like Kate. (PSR ¶ 44).

When Kate was approximately 18 years old, Kate visited Epstein and Maxwell at Epstein's villa in Palm Beach. (PSR ¶ 45). The defendant had left a schoolgirl outfit for Kate in the guest room and told Kate that she thought it would be fun for Kate to take Epstein his tea in the outfit. (*Id.*). Kate—alone with only Epstein and the defendant in a place she had never previously visited—complied. (*Id.*). Epstein raped Kate by engaging in forced intercourse with her. (*Id.*). Later that day, Maxwell asked Kate if she had fun and told Kate that she was a "good girl" and "one of [Epstein's] favorites." (*Id.*). Epstein engaged in unwanted sexual activity with Kate multiple times during that same trip. (*Id.*).

3. <u>Sexual Abuse of Annie Farmer</u>

The defendant also took steps to normalize sexual contact with Annie Farmer, who was then 16 years old. In the spring of 1996, Annie's mother, at Epstein's request, agreed to send Annie to Epstein's ranch in New Mexico for a retreat for a group of 20 to 25 students (both boys

and girls) that were academically gifted to discuss college plans and international trips.  (PSR ¶ 49).  Annie did not want to go to New Mexico after Epstein had caressed and held Annie's hand and rubbed her foot and leg while watching a movie at a theater in New York in December 1995. (PSR ¶ 48).  Despite those misgivings, Annie felt more comfortable going to New Mexico once she understood that the defendant, a grown woman in a romantic relationship with Epstein, would be there with Annie.  (PSR ¶ 49).  Yet, when Annie found herself alone at Epstein's ranch in New Mexico with just Epstein and the defendant, she found that the defendant was anything but a protector.  (PSR ¶ 50).  Instead, Annie found that the purpose of the trip was to groom her for sexual abuse.

During the New Mexico trip, the defendant took steps to normalize sexual contact under the ruse of massage.  The defendant asked Annie if she had ever had a professional massage, and said that she wanted Annie to have that experience and that she would be happy to give Annie a massage.  (PSR ¶ 52).  After telling Annie to get undressed, the defendant gave Annie a massage on a massage table while Annie was naked.  (*Id.*).  During the massage, the defendant rubbed Annie's body and directed Annie to roll over so that Annie was laying on her back.  (*Id.*).  After Annie complied and rolled to her back, the defendant pulled the sheet down and exposed Annie's breasts.  (*Id.*).  Then, while Annie was naked and isolated on a ranch in the middle of nowhere, the defendant rubbed Annie's breasts.  (*Id.*).  Annie testified that she wanted "badly to get off of the table and have this massage be done."  (*Id.*).  The defendant sexually abused a teenage girl in an effort to groom her for further abuse.

Following through on that plan on this same New Mexico trip, Epstein later got into Annie's bed, cuddled with her, pressed his body into her, and rubbed against her.  (PSR ¶ 53).  But

when Annie managed to extricate herself from the situation by running to the bathroom, thereby denying Epstein further sexual contact, the defendant seemed "very disinterested" in Annie.  (*Id.*).

4.  <u>Sexual Abuse of Virginia Roberts</u>

Beginning in or about the summer of 2000, the defendant and Epstein entered a new phase of their scheme to sexually abuse teenage girls.  That summer, Maxwell recruited a 17-year-old girl named Virginia Roberts from the parking lot of Mar-a-Lago to provide Epstein with massages.  (PSR ¶ 56).  Over the next several months, Virginia was paid to provide Epstein with sexualized massages at his Palm Beach residence, in exchange for hundreds of dollars in cash for each massage.  (PSR ¶ 55).  Virginia also traveled with Epstein and Maxwell to other locations, including New York and the Virgin Islands, on Epstein's private plane.  (PSR ¶ 57).  Virginia brought other teenage girls to Epstein's Palm Beach house.  (PSR ¶ 58).  One of those girls was a 14-year-old girl named Carolyn who Virginia introduced to the defendant and Epstein at the Palm Beach villa in 2001.  (PSR ¶¶ 58, 59).  Thus began the pyramid scheme phase of the defendant and Epstein's abuse of teenage girls.

5.  <u>Sexual Abuse of Carolyn</u>

Carolyn visited Epstein's Palm Beach residence more than 100 times, during each of which she was sexually abused during paid sexualized massages.  (PSR ¶ 59).  Carolyn met the defendant the very first time she went to Epstein's house, and she interacted with the defendant multiple times thereafter.  (*Id.*).  On Carolyn's first visit to the house, the defendant greeted Virginia, who introduced Carolyn to the defendant.  (PSR ¶ 62).  The defendant then told Virginia, "You can bring her upstairs and show her what to do," after which Virginia showed Carolyn how to perform a sexual massage on Epstein.  (PSR ¶¶ 62-63).  Carolyn performed over 100 paid sexualized massages for Epstein when she was between 14 and 18 years old.  (PSR ¶ 64).  The vast majority

involved the same course of abuse.  At some point during each massage, Epstein rolled over and began masturbating himself.  (*Id.*).  Epstein then directed Carolyn to touch his nipples and he touched Carolyn's breasts and buttocks.  (*Id.*).  On one occasion, Epstein attempted to touch Carolyn's vagina with a vibrator, but Carolyn pulled away, so he stopped.  (*Id.*).  On two occasions, Epstein brought other females into the room with Carolyn, who engaged Carolyn in oral sex, and on one occasion Epstein raped Carolyn by penetrating her vagina with his penis.  (PSR ¶ 72). Every massage ended with Epstein ejaculating.  (PSR ¶ 64).

The defendant personally scheduled Carolyn's massages for approximately the first year or two, when Carolyn was between the ages of 14 and 15.  (PSR ¶ 66).  When the defendant scheduled Carolyn for an appointment, she sometimes sent a car to pick Carolyn up.  (*Id.*).  At the time, Carolyn was 14 or 15 years old and did not have a license.  (*Id.*).  Indeed, the defendant knew Carolyn's age and much of her background because she had multiple conversations with Carolyn about Carolyn's life.  (PSR ¶ 67).  During these conversations, Carolyn revealed that she had previously been sexually abused by a relative, that her parents were separated, and that her mother struggled with addiction.  (*Id.*).  The defendant invited Carolyn to travel with the defendant and Epstein, but Carolyn explained that because she was only 14 years old, she would not be able to get permission to travel.  (PSR ¶ 68).  Carolyn was paid several hundred dollars in one-hundred-dollar bills after each massage.  (PSR ¶ 65).  Usually, the money was laid out on the table or by the sink in the bathroom, but the defendant personally paid Carolyn after a few massages.  (*Id.*).

The defendant saw Carolyn fully nude in the massage room on approximately three occasions.  (PSR ¶ 69).  This happened when Carolyn had already undressed in preparation for the massage but before Epstein had come into the room.  (*Id.*).  One particular instance stands out in Carolyn's mind.  (*Id.*).  When Carolyn was 14 years old, she had set up the massage table and was

fully nude when the defendant walked into the massage room. (*Id.*). The defendant told Carolyn that she had a nice body and touched Carolyn's breasts. (*Id.*).

At some point, Epstein asked Carolyn if she had any young friends she could bring for massages. (PSR ¶ 71). Carolyn ended up bringing multiple girls to massage Epstein, including multiple minors. (*Id.*). When Carolyn brought girls to massage Epstein, both the girl and Carolyn would be paid hundreds of dollars in cash. (*Id.*). During those massages, Epstein masturbated and touched Carolyn's and her friend's breasts and buttocks. (*Id.*).

6. Sexual Abuse of Melissa

One of the minor girls Carolyn brought to provide paid sexualized massages to Epstein was named Melissa. (PSR ¶ 80). Melissa was just 16 years old when she went with Carolyn to Epstein's Palm Beach residence. (*Id.*). Melissa went to Epstein's residence to provide Epstein with massages on multiple occasions when she was under the age of 18. (*Id.*). When Melissa and Carolyn went to the Palm Beach house, they remained in the home for about an hour and then returned with hundreds of dollars in cash. (*Id.*). An entry entitled "Melissa's cell (Carolyn's friend)," as well as multiple entries with Carolyn's full name and an entry entitled "Virginia (parents)" were listed in the defendant and Epstein's black address book under the heading "Massage – Florida." (*Id.*; PSR ¶ 57). Thus, as a direct result of the pyramid scheme that began with Virginia and continued with Carolyn, Melissa suffered repeated sexual abuse.

## II.    The Pre-Sentence Report and Sentencing Guidelines

The United States Probation Office, in its Pre-Sentence Investigation Report, recommends a sentence of twenty years' imprisonment. In making that recommendation, the Probation Office characterized the defendant's offense conduct as "heinous and predatory in nature." (PSR at 67). Regarding the defendant's role, the Probation Office emphasized that "[t]he gravity of Maxwell's

14

involvement in the offense is immense," and that she was essential to "fostering a culture for the abuse to continue." (*Id.*). Moreover, the Probation Office observed that the defendant's conduct reflected a dark world view: "it appears that the defendant viewed the victims as objects who could be manipulated for her and Epstein's own selfish purposes without any regard for their personal wellbeing, health, or safety." (*Id.*).

As the PSR reflects, the United States Probation Office has calculated an applicable sentencing range under the advisory United States Sentencing Guidelines of 292 to 365 months, based on a total offense level of 40. The Government does not object to the calculation set forth in the PSR, except that the Government respectfully submits that, as noted in the Government's objections to the PSR, the Guidelines calculation should include two additional groups relating to two victims: Virginia Roberts and the victim identified at trial as Melissa. (PSR at 45). Pursuant to the Court's discovery order, the Government notified the defense by letter on September 13, 2022 that the Government intended to prove at trial that the conspiracy involved six victims, including Virginia Roberts and Melissa. The Government did just that at trial. (*See, e.g.*, Tr. 2874, 2882-84 (discussing evidence demonstrating the abuse of Virginia Roberts and Melissa in summation); PSR ¶¶ 55-58, 80). The PSR notes that Virginia Roberts and Melissa do not appear by name in the indictment, but Application Note 6 to U.S.S.G. § 2G1.3 expressly instructs that if the relevant conduct of an offense of conviction includes "prohibited sexual conduct in respect to more than one minor, *whether specifically cited in the count of conviction*, each such minor shall be treated as if contained in a separate count of conviction." (emphasis added).

Accordingly, the offense level should be increased by two levels, pursuant to U.S.S.G. § 2G1.3(d)(1). As a result, the applicable sentencing range is 360 to 660 months' imprisonment, based on an offense level of 42.

In a memorandum dated June 15, 2022, the defendant urges the Court to adopt a sentencing range of 51 to 63 months' imprisonment, which reflects a small fraction of the applicable sentencing Guidelines range. The defendant reaches this low number by disputing four aspects of the Probation Office's calculation. For the reasons set forth below, the Court should reject the defendant's Guidelines objections in their entirety. It would be both strange and anomalous for the Sentencing Guidelines to recommend such a short sentence for a defendant who spent years sexually exploiting teenage girls. The Sentencing Guidelines do not provide for a such an outcome.

### A.    The 2004 Sentencing Guidelines Manual Applies

In the ordinary course, the Sentencing Guidelines instruct courts to use the Guidelines Manual in effect on the date that the defendant is sentenced, which here would result in applying the 2021 Guidelines Manual (the "2021 Manual"). U.S.S.G. § 1B1.11(a). Where, as here, the current Guidelines Manual provides a higher range than the Manual in effect at the time of the offense conduct, using the current manual would violate the *Ex Post Facto* clause. U.S.S.G. § 1B1.11(b)(1); *Peugh v. United States*, 569 U.S. 530, 544 (2013). Here, the 2021 Manual calls for a substantially higher guidelines calculation than the Government seeks. For example, under the 2021 Manual, the base offense level would be 30 before any enhancements are applied, whereas the 2004 Sentencing Guidelines Manual (the "2004 Manual") provides for a base offense level of 24 before enhancements. In other words, under the 2021 Manual, the offense level is at least six levels higher. *Compare* U.S.S.G. § 2G1.3(a) (2004) *with* U.S.S.G. § 2G1.3(a)(2) (2021). As a result, the Court may not apply the 2021 Manual, but the Supreme Court has made clear that subsequent increases in the Guidelines may be a reason the sentencing court may deviate upwards from the applicable Guidelines, and sentencing courts are "free to give careful consideration to the

current version of the Guidelines as representing the most recent views of the agency charged by Congress with developing sentencing policy." *Peugh*, 569 U.S. at 549.

Where the Guidelines have increased after the offense conduct has concluded, "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1). Furthermore, Application Note 2 provides that "the last date of the offense of conviction is the controlling date" for determining which manual to apply. U.S.S.G. § 1B1.11(b)(1), app. n.2. That is true even if the Guidelines were amended during the course of the offense conduct. The Second Circuit has explained that "[w]here a conspiracy began while one version of the Guidelines was in effect and ended after another version became effective, application of the later version to the coconspirators does not violate the *Ex Post Facto* Clause." *United States v. Meneilly*, 28 F. App'x 26, 32 (2d Cir. 2001) (citations omitted).

Here, the offenses of conviction spanned from 1994 up to and including 2004, as set forth in the Indictment, and as the proof established at trial. As a result, for Guidelines purposes, December 31, 2004 is legally the last date of the offense conduct, and the 2004 Manual applies. In her objections to the PSR, the defendant claims that the *Ex Post Facto* clause requires the jury, and not the Court, to determine the last date of the offense of conviction. The defendant further claims that, as a factual matter, the offense conduct ended before November 1, 2004, the date upon which the 2004 Manual became effective. For the reasons set forth below, the defendant is wrong as a matter of law and as a matter of fact. The Court should apply the 2004 Manual.

1.  <u>The Court, and not the Jury, Determines Which Manual to Apply</u>

The defendant claims that a jury must determine which version of the Sentencing Guidelines to apply, but the defendant offers not a single case that has ever so held. That argument is inconsistent with the plain text of the Guidelines and established Second Circuit precedent. The Court should reject this argument.

As an initial matter, it is well settled that a question of fact that increases a defendant's offense level under the Guidelines need not be submitted to a jury. *United States v. Fusco*, 560 F. App'x 43, 45-46 (2d Cir. 2014); *United States v. Morel*, No. 10 Cr. 798 (PAC), 2021 WL 2821107, at *2 (S.D.N.Y. July 7, 2021). In addition, with respect to the sentencing court's determination of which Guidelines Manual to apply, the text of the Guidelines expressly contemplates that the court should determine the last date of the conspiracy. Application Note 2 provides the following example of a calculation of the last date of the offense: "For example, if the offense of conviction (*i.e.*, the conduct charged in the count of the indictment or information of which the defendant was convicted) <u>was determined by the court</u> to have been committed between October 15, 1991 and October 28, 1991, the date of October 28, 1991 is the controlling date for *ex post facto* purposes." U.S.S.G. § 1B1.11(b)(1), app. n.2 (2004) (emphasis added). As the underlined language makes plain, the Guidelines direct sentencing courts to make this factual determination, and not juries.

As the defendant acknowledges, not one of the cases cited in the defendant's motion involved increases in the Sentencing Guidelines, and instead, the defendant rests her argument entirely on cases involving *Ex Post Facto* challenges to increases of the applicable statutory penalties. (Dkt. No. 662 ("Def. Mem.") at 3-4). The law is clear that, so long as a fact at sentencing does not increase the statutory maximum or minimum penalty, that fact is for the sentencing court

to resolve, and not the jury. *Fusco*, 560 F. App'x at 45-46 (citing *United States v. Norris*, 281 F.3d 357, 369 (2d Cir. 2002)).

Lacking any authority for her argument, the defendant cites *Peugh* and offers her own sweeping conclusion that, essentially, the Sixth Amendment requires that all *Ex Post Facto* issues be resolved by juries. But as the Supreme Court explained in *Peugh*, "the Sixth Amendment and *Ex Post Facto* Clause inquiries are analytically distinct" and "[n]othing that we say today 'undo[es]' the holdings of *Booker*, *Rita*, *Gall*, *Kimbrough*, or our other recent sentencing cases." *Peugh*, 569 U.S. at 549-50. It is thus unsurprising that the defendant has not located a single case, anywhere in the nation, that has concluded, in the nine years since *Peugh* was decided, that the determination of which Guidelines Manual to apply implicates the Sixth Amendment. Thus, even after *Peugh*, a sentencing judge's fact-finding authority continues to include the authority to find when an offense ended for purposes of deciding which Guidelines Manual to apply.

2. The Sex Trafficking Conspiracy Continued to 2005

The Indictment charged that the defendant participated in a conspiracy "from at least in or about 1994, up to and including at least in or about 2004," and that is exactly what the Government proved at trial. (Dkt. No. 187 at 1). There can be no question that the evidence establishes that the conspiracy ran past November 1, 2004, consistent with the charging language in the Indictment. At trial, Carolyn testified that she continued to perform sexualized massages for Epstein when she was 18, which was in 2005. Carolyn's birth certificate was admitted at trial as GX 11. Carolyn turned 18 in 2005, which is after November 1, 2004, the day that the 2004 Manual went into effect. In particular, Carolyn gave the following testimony:

Q: And about how old were you the last time you went over to his house?

A: Eighteen

(Trial Tr. 1525).  Carolyn further testified:

Q: Why did you stop going to Jeffrey Epstein's house?

A: Because I became too old.

Q: How old were you?

A: 18.

(Tr. 1549).  That testimony alone confirms that the offense conduct spanned the entirety of 2004, and thus that the 2004 Manual applies.

The thrust of the defendant's argument is that the Court should, at sentencing, discredit the testimony of a crime victim, when a jury has credited that victim and found the defendant guilty. Indeed, the jury convicted the defendant of Count Six, which solely relates to Carolyn.  In service of her lawless argument, the defendant asks the Court both to reject Carolyn's testimony *and* to do so in the face of documentary evidence that establishes that Carolyn told the truth at trial about when the offense conduct ended.  As the defendant acknowledges, a message book seized from the Palm Beach residence contains two messages from Carolyn, using her first and last name: one in November 2004 (GX 4B), and one dated March 1, 2005 (GX 4F).  The defendant asks the Court to ignore this evidence that Carolyn told the truth at trial, speculating that perhaps the message book is not authentic, because the Government did not offer these excerpts at trial.  That speculation is baseless.  As the defendant knows, the Government streamlined its proof at trial and elected not to call several witnesses, including employees who worked for Epstein in 2005 when this book was used.  Given the volume of messages relating to Carolyn that were admitted at trial, and her own testimony about the duration of the conspiracy, the testimony from the additional

employees was unnecessary. The book is authentic, and the defendant offers no basis for concluding otherwise.[2]

The Court should reject the defendant's argument and make its determination regarding the final date of the conspiracy based on the language of the Indictment (which plainly encompasses all of 2004) and the trial testimony of Carolyn (who testified that the offense conduct ran past 2004). The 2004 Manual applies.

3. The Court Should Apply the 2004 Manual

The defendant also claims that the "goals of sentencing are not served" by applying the 2004 Manual. (Def. Mem. 8 (capitalization removed)). Not so. The law plainly provides that the 2004 Manual applies here, and it would be unjust to provide a substantial break in the Sentencing Guidelines for a defendant who engaged in an extensive child exploitation scheme, especially when both Congress and the Sentencing Commission have since further increased the applicable penalties for these offenses.

Moreover, the Court should not credit the defendant's claim that she broke away from Epstein in 2002, based on the testimony of a sole defense witness who said that the defendant had "moved on" in 2002. (Def. Mem. 9). To be clear, "once it has been established that there existed a conspiracy of which the defendant was a member, [her] membership is presumed to continue unless and until the defendant proves that the conspiracy was terminated or that [she] took

---

[2] In any event, the Government will bring the message book to sentencing so that the Court may examine it if it deems such an assessment necessary. If the Court desires additional testimony in the record, a case agent would be prepared to testify at the sentencing hearing based on the FBI's investigation that this message book was seized by the Palm Beach Police Department along with the other three message books admitted at trial, and was transferred into the custody of the FBI, which has maintained it ever since. It is well established that hearsay is admissible at sentencing. *See United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings.").

affirmative steps to withdraw." *Meneilly*, 28 F. App'x at 32 (citations omitted).  The defendant has not claimed, as a legal matter, that there is any evidence that she withdrew from the conspiracy, nor could she.  Instead, she argues, as a policy matter, that the 2004 Manual should not be applied because the defendant had "moved on," an expression that has no legal meaning.

More importantly, documentary evidence establishes that the defendant remained a close associate of Jeffrey Epstein for multiple years after 2002.  In particular:

- Flight records reflect that the defendant flew on Epstein's private jet 49 times in 2003, 19 times in 2004, and 16 times in 2005.  Regarding 2004 in particular, the flight records for that year reflect that the defendant flew on Epstein's private jet twice in November 2004 and once in December 2004, which makes clear that the defendant was still traveling with Epstein after the Guidelines were amended and while the conspiracy was ongoing. (GX 662).

- In October 2005, the Palm Beach Police Department executed a search warrant at the Palm Beach residence, and discovered the defendant's desk, upon which a notepad with her named stationary was sitting. (GX 285).  The setup of the defendant's desk—and instructions that make clear the defendant was a forceful presence in the house—are set forth in the household manual, which is dated February 14, 2005.  (GX 606).

- Travel agency records from Shopper's Travel—offered by the defendant at trial—reflect that Epstein paid for the defendant's flights through at least 2006. (DX RS-1 (listing a May 1, 2006 flight on Epstein's account)).

- Bank records reflect that, as of 2007, Epstein transferred $7,759,793.40 to the defendant's personal bank account.

What the record makes clear is that the defendant remained a close associate of Jeffrey Epstein and continued to profit from their criminal relationship, long past 2004. There is nothing punitive about applying the 2004 Guidelines, which apply here as a matter of law. If anything, the fact that the defendant will be sentenced under the 2004 Guidelines, and not the higher range under the 2021 Guidelines, should be a factor that warrants a higher sentence. Indeed, the Supreme Court has expressly noted that sentencing courts may consider subsequent increases in offense levels for precisely that purpose. *See Peugh*, 569 U.S. at 549.

### B.    The Four-Point Leadership Enhancement Applies

The Government agrees with the Probation Office that the enhancement in U.S.S.G. § 3B1.1 applies because the defendant was the organizer or leader of a criminal activity that was "otherwise extensive." The defendant's conspiracy spanned at least five victims in three states, the United Kingdom, and the U.S. Virgin Islands, including at Epstein's various properties, which the defendant ran, over the course of a decade. It involved the participation of numerous members of the defendant and Epstein's staff, whether knowing or unknowing, and the use of minor victims to recruit other minor victims. *See* U.S.S.G. § 3B1.1 app. n.3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered," and use of "the unknowing services of many outsiders could be considered extensive."). For instance, Carolyn testified that she was recruited by Virginia and that Carolyn recruited other minor victims. Juan Alessi testified that he was driving when the defendant stopped to recruit Virginia. Two pilots testified about transporting minor victims on Epstein's planes. That alone is five individuals involved in the criminal activity, without even counting the defendant herself, Epstein, and Sarah Kellen. *See United States v. Kent*, 821 F.3d 362, 369 (2d Cir. 2016) (explaining that a scheme is "otherwise extensive" if it involves "the functional equivalent" of

"one involving five or more knowing participants" (internal quotation marks and emphasis omitted)).  Accordingly, there is ample basis in the record to impose this enhancement.

The text of U.S.S.G. 3B1.1(a) calls for the application of its enhancement if "the defendant was an organizer or leader of a criminal activity that" either "involved five or more participants," or "was otherwise extensive."  The defense correctly points out that Application Note 2 to this Guidelines provides, "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization."  Application Note 1 defines a "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  Despite those Application Notes, however, the Government is not aware of any Second Circuit case requiring that, where the enhancement turns on the "otherwise extensive" prong, rather than the "five or more participants" prong, the defendant must supervise a knowing participant.  Indeed, the defense fails to cite a single case holding that the "otherwise extensive" prong requires that the defendant supervised a knowing participant.

Instead, the Second Circuit has articulated three factors that sentencing courts should consider when evaluating whether the "otherwise extensive" enhancement applies.  *See United States v. Carrozzella*, 105 F.3d 796, 803-04 (2d Cir. 1997), *abrogated in part on other grounds*, *United States v. Kennedy*, 233 F.3d 157, 160-61 (2d Cir. 2000); *see also Kent*, 821 F.3d at 369 (applying *Carrozzella* factors); *United States v. Archer*, 671 F.3d 149, 165-66 (2d Cir. 2011) (same); *United States v. Skys*, 637 F.3d 146, 156-58 (2d Cir. 2011) (same); *United States v. Rubenstein*, 403 F.3d 93, 99 (2d Cir. 2005) (same); *United States v. Rittweger*, 274 F. App'x 78,

82 (2d Cir. 2008) (same). Specifically, when evaluating whether the "otherwise extensive" prong applies, the sentencing court must consider "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." *Carrozzella*, 105 F.3d at 803-04. In setting out these factors, the Circuit emphasized that "[t]he number of knowing participants" is "relevant" to the analysis "because a criminal scheme with four knowing participants that is aided by unknowing participants is more likely to be 'otherwise extensive' than a scheme with a single knowing participant." *Id.* at 804. Additionally, when evaluating the number of unknowing participants, the Circuit emphasized distinguishing between service providers, such as taxi drivers, from individuals who function more like knowing participants who receive direction from a defendant "with the specific intent" to further the criminal activity.

In this analysis, the Circuit did not articulate or rely on any requirement that a defendant must have supervised at least one knowing participant. *Id.* Rather, the Court expressly contemplated that the enhancement might apply to an organization involving multiple unknowing participants. *See id.* Consistent with that understanding, and contrary to the defense's proposed interpretation, the Circuit has affirmed the application of § 3B1.1 under the "otherwise extensive" prong to two defendants who were themselves the only two knowing participants identified in the scheme. *Rubenstein*, 403 F.3d at 99. That outcome makes clear that the Circuit does not require a defendant to supervise any other knowing participant in the scheme. Of particular note, the *Rubenstein* case applied the "otherwise extensive" enhancement" where the two knowing participants worked together, with one serving as a "right-hand man" to the other, while they organized "as many as seven participants who were unknowing," who worked under the

defendants' direction. *Rubenstein*, 403 F.3d at 99. The same analysis applies with equal force here. Even if the defendant and Epstein were the only two knowing participants—which, as discussed below, they were not—their joint supervision and organization of a large array of unknowing participants created an otherwise extensive organization that qualifies for the enhancement under U.S.S.G. §3B1.1.

Here, the defendant acted as an organizer and leader of a massive operation that spanned many years. In operating as the lady of the house and as Epstein's right hand, the defendant was responsible for overseeing and organizing extensive logistics involved in facilitating the sexual abuse of multiple minors and ensuring a culture of silence that prevented that scheme from being uncovered. Epstein and the defendant were two knowing participants who took the lead in identifying, enticing, and grooming minor girls to be abused. Additionally, Sarah Kellen, who handled the responsibilities of scheduling sexualized massages and took nude photographs of Carolyn (PSR ¶ 66; Tr. 1554-55), constituted a third knowing participant, which number the Circuit has found sufficient, together with additionally necessary unknowing participants, to be sufficient for the enhancement. *See Archer*, 671 F.3d at 166.

Beyond those three knowing participants, Virginia and Carolyn both recruited other minor girls to provide paid sexualized massages to Epstein, thereby furthering the scheme and filling a crucial role in the scheme's later pyramid phase. Juan Alessi provided an essential role transporting Jane and Virginia to see Epstein, as well as scheduling appointments for massages, cleaning up the massage room after Epstein received sexualized massages, and putting away sex toys in the defendant's bathroom after Epstein received sexualized massages. (PSR ¶¶ 24, 57; Tr. 836-38). Those duties were essential both to the continued functioning of the scheme, by ensuring that minor girls were available to be abused, and to the avoidance of detection by ensuring that

someone who had been trained not to ask questions and who worked in a culture of silence carried out those necessary tasks. Both Larry Visoski and David Rodgers played the essential role of transporting minor victims to different locations, providing a discreet means of ensuring that Epstein had access to minor girls for his sexual gratification when he traveled. The defendant organized all of those individuals by telling Virginia to show Carolyn what to do, by scheduling Carolyn's appointments, by giving Alessi innumerable directions, and by providing instructions to both pilots. (PSR ¶¶ 24, 62, 66). Additionally, the defendant supervised all of Epstein's staff for years, thereby running an extensive operation. Those individuals more than satisfy the definition of an extensive operation in which the defendant served as an organizer.

In any event, this enhancement applies even under the defense's interpretation of U.S.S.G. § 3B1.1 because Maxwell also supervised at least one other knowing participant in Sarah Kellen. Larry Visoski testified that he understood Sarah Kellen to be one of Maxwell's assistants. (Tr. 140). Even if he was not certain that Kellen had that precise title, his understanding is consistent with Maxwell's role as second in command beneath Epstein over all other employees. (Tr. 139). Consistent with Visoski's recollection, David Rodgers testified his understanding was that "Sarah was more of Ghislaine's assistant, but actually she was probably both," an assistant to the defendant and an assistant to Epstein, again confirming that the defendant supervised Kellen. (Tr. 1890). Rodgers also testified that Maxwell was "number two" below Epstein among Epstein's employees. (Tr. 1809-10). Alessi testified that he did not know exactly what Kellen's job responsibilities were, but Kellen took over the "scheduling of massages" in approximately 2002. (Tr. 833). Carolyn also recalled that even after Kellen took over calling to schedule massages, Maxwell was still present inside the Palm Beach residence when Carolyn arrived for massage appointments. (Tr. 1527). Moreover, the household manual makes clear that as of 2005, Maxwell

27

was still the lady of the house, supervising other staff, (GX 606), and flight records make clear that the defendant and Kellen flew together on Epstein's private planes approximately thirty-nine times in 2003 and approximately ten times in 2004, confirming their continued overlap, (GX 662).

The combination of this evidence demonstrates that Kellen joined the conspiracy when Maxwell was still second in command under Epstein. Given Maxwell's role in the household and in the conspiracy, she certainly exercised authority over Kellen. The clear inference from this record is that Maxwell instructed Kellen regarding how to schedule massages and run the part of the scheme that Maxwell had previously handled, at which point Kellen switched to making calls to schedule appointments following Maxwell's directions. Thus, even if the defense were correct that the defendant needed to supervise a knowing participant in the scheme for the leadership enhancement to apply, the record amply supports the conclusion that Maxwell did so with respect to Kellen.

Given the breadth of the defendant's criminal scheme, spanning multiple continents, abusing multiple victims, and employing numerous underlings to accomplish the conspiracy's goal over the course of multiple years, the defendant clearly warrants the enhancement under U.S.S.G. § 3B1.1 contemplated by the PSR.

### C.    The Two-Point "Undue Influence" Enhancement Applies

Pursuant to U.S.S.G. § 2G1.3(b)(2)(B), two levels are added if "a participant . . . unduly influenced a minor to engage in prohibited sexual conduct." This enhancement applies where "a participant's influence over the minor compromised the voluntariness of the minor's behavior." *Id.* app. n.3(B). Where, as here, "a participant is at least 10 years older than the minor," the Guidelines provide for "a rebuttable presumption . . . that such participant unduly influenced the minor to engage in prohibited sexual conduct. In such a case, some degree of undue influence can

be presumed because of the substantial difference in age between the participant and the minor." *Id.*

On the facts, the defendant does not resist application of this enhancement to any victim other than Carolyn. As to Carolyn, the defendant ignores the presumption, instead arguing that the record lacks evidence of additional acts of undue influence. (Def. Mem. 21-22). None is required: the age difference alone provides a basis for the Court to apply the enhancement. *See United States v. Watkins*, 667 F.3d 254, 264-65 (2d Cir. 2012) (applying the presumption and noting that the defendant "failed to offer any evidence rebutting the presumption on this basis," even though the defendant argued that the "evidence demonstrated that [the defendant] failed to compromise the voluntariness of [the victim]" (internal quotation marks and alteration omitted)). And, in any event, the record shows that the defendant directed Virginia to show Carolyn how to sexually gratify Epstein (Tr. 1521), called to set up appointments with Carolyn at Epstein's lavish Palm Beach mansion (Tr. 1527), sent cars or cabs to pick her up (Tr. 1532), gave Carolyn what, to Carolyn, were large sums of money needed to fuel her drug addiction (Tr. 1528-31, 1541), and helped Epstein send Carolyn gifts, including lingerie (Tr. 1541-42). The record also shows that the defendant talked with Carolyn about her family problems, traumatic personal experiences, and goals (Tr. 1534-35), and complimented her body (Tr. 1536), which—as Dr. Rocchio explained— can help to build a relationship of trust and attachment. Although the defendant suggests that Carolyn's behavior was entirely voluntary, this was no arms-length transaction. The defendant and Epstein encouraged Carolyn to engage in sex acts for money. That is undue influence. *See, e.g.*, *United States v. Patterson*, 576 F.3d 431, 443 (7th Cir. 2009) (affirming application of an undue influence guideline where the victim "had never worked in prostitution before the defendant encouraged her to try it" and "was destitute and penniless"). In support of her claim that Carolyn's

behavior was voluntary, the defendant argues that Carolyn did not do "whatever [Epstein and Maxwell] asked of her"—noting that Carolyn did not travel with them to Little Saint James. (Def. Mem. 21). But that shows only that their undue influence was not all-consuming, not that they lacked influence whatsoever. The standard is "'undue influence,' not coercion." *United States v. Montijo-Maysonet*, 874 F.3d 34, 52 (1st Cir. 2020).

The defendant also argues that application of this enhancement would constitute double-counting because the base offense level for Counts Three, Four, and Six covers her conduct enticing and coercing minors. (Def. Mem. 20). This argument lacks merit. As the defendant correctly notes, "[i]mpermissible double counting occurs when one part of the Guidelines is applied to increase the defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the Guidelines." *Watkins*, 667 F.3d at 261. But "when the challenged part of the Guidelines aim[s] at different harms emanating from the same conduct, there is no impermissible double counting," and "[e]nhancements are not duplicative when they reflect different facets of the defendant's conduct." *Id.* at 261-62 (alterations, citations, and internal quotation marks omitted).

The relevant inquiry therefore is whether the base offense level is aimed at the same harm as the enhancement. Here, it is not: the base offense level (which refers to § 2G1.3) captures the category of sex offenses against minors, and § 2G1.3(b)(2)(B) applies to the use of undue influence. *See United States v. Kohlmeier,* 858 F. App'x 444, 446-47 (2d Cir. 2021) (describing the focus of § 2B1.3(b)(2)(B)); *United States v. Arbaugh*, 951 F.3d 167, 173 (4th Cir. 2020) ("By its plain terms, § 2G1.3(b)(2)(B) focuses on a different aggravating factor (undue influence) than § 2G1.3 (minor victims) . . . . As such, subsection (b)(2)(B) does not 'consider' the same factor as these other Guideline provisions.").

The defendant's argument to the contrary—that her particular crime involved undue influence of minors—does not demonstrate double-counting. The fact that the defendant's course of conduct triggers both the harm targeted by the base offense level and the harm triggered by an enhancement shows that the enhancement applies, not that the enhancement is redundant with the base offense level.[3]

### D.        The Five-Level Enhancement in Section 4B1.5 Applies

Section 4B1.5 has two provisions, depending on whether a defendant has a prior sex offense conviction. Where, as here, the defendant does not have a prior conviction, § 4B1.5(b) adds five offense levels and sets a minimum offense level of 22, so long as the defendant satisfies that section's three requirements: (1) the offense of conviction must be a "covered sex crime," (b) the defendant is neither a career offender nor a repeat offender, and (c) the defendant "engaged in a pattern of activity involving prohibited sexual conduct." *Id.* § 4B1.1(b). "Prohibited sexual conduct," in turn, covers any offense under Chapters 117, 109A, or 110, and any state law offense that would be a federal offense under those chapters if committed "within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 2426 (2003); *see* U.S.S.G. § 4B1.5 app. n.4(A) (incorporating that definition); *see also, e.g.*, *United States v. Phillips*, 431 F.3d 86, 90 & n.6 (2d Cir. 2005) (applying these requirements).

---

[3] The defendant also argues that the enhancement does not apply as to Jane and Annie because, under the 2003 Guidelines, the undue influence must occur with the object of having the minor engage in a commercial sex act. (Def. Mem. 21). As explained above, the 2004 Guidelines manual applies, and it contains no such provision. In any event, Jane testified that she received money during the course of her abuse (Tr. 301-02), and Annie testified that she was promised a trip to Thailand which she ultimately received (Tr. 2059, 2090-92). *See* U.S.S.G. § 2G1.1 app. n.1 (incorporating the definition of "commercial sex act" in 18 U.S.C. § 1591(c)(1)); 18 U.S.C. § 1591(c)(1) (2000) (defining a "commercial sex act" and "any sex act, on account of which anything of value is given to or received by any person").

All three of these requirements are satisfied here. The offense of conviction is a "covered sex crime." *See* U.S.S.G. § 4B1.5 app. n.2 (stating that offenses in Chapter 117 of Title 18 are covered sex crimes); 18 U.S.C. § 2423 (located in Chapter 117). The defendant is neither a career offender nor a repeat offender. And the defendant "engaged in a pattern of activity involving prohibited sexual conduct." As discussed at length above, the defendant transported Jane to New York, a Chapter 117 offense, she transported Virginia, and she touched Jane and Carolyn's breasts—which would be Chapter 109A offenses had they occurred within the territorial jurisdiction of the United States. *See* 18 U.S.C. §§ 2243, 2244, 2246 (2003) (defining "sexual contact" to include the touching of the breast with the intent to "gratify the sexual desire of any person," and criminalizing knowingly engaging in sexual contact with a minor under the age of 16). This is well more than required by the Guidelines. *See United States v. Telles*, 18 F.4th 290, 303 (9th Cir. 2021) (applying the enhancement where "Telles sexually abused T.B. on two separate occasions—the first night he arrived in the United Kingdom and the second night of his trip").

The defendant has no serious argument that the text of the Guidelines is inapplicable on these facts. Instead, she argues that the Guideline is only intended to apply to continuing sexual offenders, and so should not be applied to her. (Def. Mem. 11-14). The background commentary incorporates her principle, she adds, and such commentary is "authoritative." (*Id.* at 14). This argument fails at each step.

First, applying § 4B1.5(b) to the defendant is entirely consistent with the Guidelines commentary. That commentary explains that the enhancement is meant to prevent repeat sexual offenders from committing further crimes, as the defendant notes. But it *also* explains that the Guideline was enacted in response to a congressional directive to "ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual abuse or exploitation of

minors." U.S.S.G. § 4B1.5 background cmt.; *see* Protection of Children from Sexual Predators Act of 1998, Pub. L. 105-314 § 505 ("Pursuant to its authority . . . the United States Sentencing Commission shall . . . promulgate amendments to the Federal Sentencing Guidelines to increase penalties applicable to [certain offenses] in any case in which the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor."); *see id.* § 502 (directing the Sentencing Commission to "ensure that the sentences, guidelines, and policy statements for offenders convicted of [Chapter 117 offenses] are appropriately severe and reasonably consistent with other relevant directives with other Federal Sentencing Guidelines"). That is, while one concern motivating the Guideline is protection of the public from future offenses, another is just punishment for the seriousness of criminal conduct involving the abuse of multiple minors or a minor on multiple occasions. *See also, e.g.*, U.S.S.G. Amend. 615 (explaining that this Guideline was promulgated to "increase penalties in *any* case in which the defendant engaged in a pattern of activity of sexual abuse or sexual exploitation of a minor" (emphasis added)); Protection of Children from Sexual Predators Act of 1998, Proceedings and Debates Before the Senate, 105th Cong., 2nd Session (Sept. 17, 1998) (statement of Sen. Orrin Hatch), *available at* 144 Cong. Rec. S10518-02, S10521, 1998 WL 636904 ("[T]he bill will also recommend that the Sentencing Commission reevaluate the guidelines applicable to these offenses, and increase them where appropriate to address the egregiousness of these crimes."). In any event, Guidelines commentary is not binding over the text of the relevant Guideline. The commentary on which the defendant relies is not "interpretive or explanatory," but "background" commentary. *United States v. Sash*, 396 F.3d 515, 523 (2d Cir. 2005); *see* Def. Mem. 14 ("The government ignores the *background* commentary to § 4B1.5 . . . ." (emphasis added)). Background commentary, which "merely provides . . . reasons underlying promulgation of the guideline," is not binding. *Id.* (internal

quotation marks omitted); *see United States v. Parkins*, 935 F.3d 65, 67 (2d Cir. 2019) (citing *Sash*). And even when Guidelines commentary is explanatory and binding, it is "akin to an agency's interpretation of its own legislative rules," and therefore does not control where it is "inconsistent with the regulation." *Stinson v. United States*, 508 U.S. 36, 45 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). If the Guidelines commentary were flatly inconsistent with the plain text of the Guideline itself—because the Guideline squarely applies where the commentary says it should not—the Guideline itself would control. *See Sash*, 396 F.3d at 522 ("We need not resort to background commentary interpretations when the language of the Guidelines is plain.").

Finally, the defendant's argument that the public does not need to be protected from her is an available argument under § 3553(a), but it is not a justification for deviating from the text of the Guidelines.[4]

## III. Discussion

### A. The Defendant's Conduct Warrants a Term of Imprisonment Within the Guidelines Range of 360 to 660 Months' Imprisonment

#### 1. The Nature and Seriousness of the Offense

The defendant stands convicted of sexually exploiting multiple underage girls. Her crimes were monstrous, and the Court should impose a sentence that reflects her role in serious federal

---

[4] The defendant also argues that application of the Guideline to her would yield absurd results, because she would have a lower sentencing range if she had been convicted of a prior sex offense, and (she claims) the same sentencing range that Epstein would face. (Def. Mem. 14-16). But Section 4B1.5(a) is structured differently than Section 4B1.5(b), setting floors for the offense level and criminal history category rather than imposing a five-level increase. *See* U.S.S.G. Amend. 615 (explaining that § 4B1.5(a)'s penalties rely on the prior conviction but § 4B1.5(b) does not). Because the Guidelines have different structures, where—as here—a defendant is near the top of the Guidelines by virtue of her criminal conduct on her one and only conviction, the five-level enhancement is more significant than § 4B1.5's penalty floors. That result is not absurd, but a reflection of the seriousness of the defendant's conduct.

crimes.  For the reasons set forth below, the nature and seriousness of the offense weigh in favor of a Guidelines sentence, in light of the role the defendant played in the conspiracy and the irreparable harm the defendant caused to her victims.

*The Defendant's Role in the Conspiracy*

Maxwell's conduct was shockingly predatory.  She was a calculating, sophisticated, and dangerous criminal who preyed on vulnerable young girls and groomed them for sexual abuse.

Although there are many unsettling aspects of the defendant's conduct, what stands out from the trial record is that she worked with Epstein to select victims who she knew were vulnerable to exploitation.  As the trial record establishes, Maxwell met Jane shortly after her father passed away, and her family was struggling to make ends meet.  Annie's mother was struggling to raise her daughters alone.  Carolyn was living alone with her mother, who was an addict.  It is not a coincidence that all of Maxwell's victims came from single-mother households. Not only did her conduct exhibit a callous disregard for other human beings, but her practice of targeting vulnerable victims reflects her view that struggling young girls could be treated like disposable objects.

Once the victims were selected, Maxwell played an essential role in the conspiracy by grooming victims for abuse.  Maxwell did this by forging trust with her victims so that they could be sexually exploited.  As Dr. Rocchio explained, the psychological harms of sexual abuse are greater where, as here, the abuse arises from a relationship of trust with the abuser:

> Trust is central often in the treatment of someone who's been sexually abused, because it's often the part that is most confusing and also causes the most – the most harm.  We know that the more they trusted the individual, then, of course, the more they feel betrayed, the more betrayal there's been.  And to the extent there's been betrayal in the relationship, then the individuals are really struggling to a much, much greater degree, often trying to

> understand what happened, how it happened and why, and what its
> effect is certainly.

(Tr. 742-43).  Maxwell's victims trusted her: she was a seemingly respectable woman who showed interest in them and promised to help them.  She was key to the entire operation of the scheme, and Epstein could not have committed these crimes without her.

Maxwell befriended her victims, won their trust, slowly broke down their boundaries, and normalized sexual abuse.  For example, Jane testified that the defendant showed her how Epstein liked to be massaged and how he liked his penis touched.  The defendant did this when Jane was only 14 years old.  The defendant was an adult, in her thirties, helping to normalize abusive sexual conduct with a young teenager.  The defendant's demeanor was "casual, like it was – like it was very normal, like it was not a big deal."  (Tr. 309).  When Jane was in her twenties, she described Maxwell this way to her boyfriend, who remembered years later how Jane told him that Epstein had abused her, and the defendant had made her feel comfortable.  (Tr. 644).

The degree to which the defendant manipulated her victims is an aggravating factor in this case.  But her abusive conduct did not end with the grooming and manipulation of the victims.  She also participated in the sexual abuse of her victims.  Not only was Maxwell the person who was most frequently in the room when Epstein abused Jane (Tr. 289), but multiple victims testified that the defendant groped their breasts.  (Tr. 310 (Jane), 2224 (Annie), 1536 (Carolyn)).  In particular, Annie described a terrifying encounter in which she found herself alone with Maxwell at Epstein's ranch in New Mexico, and Maxwell told her to remove her clothing so she could give Annie a "massage" during which she rubbed Annie's breasts.  (Tr. 2224; PSR ¶ 52).  That so-called massage was the defendant sexually abusing a teenage girl.

The conspiracy in this case was extensive and sophisticated by any metric: it involved multiple victims, at multiple properties in different states, over a span of many years.  In order to

operate the scheme, Maxwell and Epstein used many employees: pilots, household staff, personal assistants, and drivers. Maxwell was central to operating the scheme and managing employees at these properties. Most importantly, the offense conduct was extensive because so many young girls were sexually exploited as a direct result of the defendant's conduct. At trial, the evidence established that Jane, Annie, Kate, Carolyn, Virginia, and Melissa were all exploited as a direct result of the defendant's actions.

The trial record also makes clear that there were many other victims who were harmed by this conspiracy. First, Carolyn testified that she brought multiple additional minors, including Melissa, to provide paid sexualized massages to Epstein. Although these minors did not necessarily interact directly with Maxwell, they were subjected to sexual abuse as a result of the pyramid scheme that Maxwell and Epstein set in motion. Carolyn specifically recalled bringing girls named Tatum and Amanda when they were under the age of 18 to provide paid sexualized massages for Epstein. (Tr. 1543-44). Second, the defendant's black book contained dozens of entries under the heading "Massage – Florida," and included entries referencing individuals' parents. (GX 52). Third, records recovered from Epstein's Palm Beach residence during a 2005 search by the Palm Beach Police Department reveal that additional minors provided Epstein with sexualized massages between 2001 and 2004. In particular, message pads seized from the residence contain multiple messages from underage girls who called to schedule massage appointments. (GX 1, 2, 3, and 4). Lest there be any doubt that the individuals named in the message pads were in fact minors providing sexualized massages to Epstein, many of the girls identified in the messages were listed as identified minor victims of Epstein in connection with his resolution of the investigation conducted by the U.S. Attorney's Office for the Southern District of Florida ("USAO-SDFL"). Specifically, in a letter dated July 10, 2008, the USAO-SDFL

identified a total of thirty-two minor victims, including Carolyn and Virginia.[5]  Of those thirty-two individuals, thirteen appear in the message pads, again including Carolyn and Virginia.

The Government notes that, from interviewing many of these victims during the course of its investigation, the Government has learned that, in the later phases of the conspiracy, victims primarily scheduled appointments with—and interfaced with—Epstein's personal assistants, who were in their early twenties.[6]  Although the Government does not seek to include these minors as victims for purposes of the Guidelines calculation, the scope of the pyramid scheme that the defendant helped devise with Epstein bears emphasis when evaluating the harms that the defendant's criminal conduct ultimately caused.

*Victim Impact*

It is difficult to capture in words the harm that Maxwell caused to her victims.  They were children who experienced what can only be described as a recurring nightmare: again and again, they found themselves alone with Maxwell and Epstein in terrifying mansions where they were sexually abused and physically violated.  They were trapped in an exploitative relationship with Maxwell and Epstein that, for many victims, lasted for years.

Often, in cases involving sexual exploitation, the Court is left to consider the harms the victims have suffered during the offense conduct and to predict the likely effects on their lives going forward.  What is remarkable in this case is that the Court need make no such predictions

---

[5] The letter was marked with Jencks Act control number 3505-022.  With the exception of Carolyn and Virginia, none of the other thirty individuals named in this document have been publicly identified on the record in this case.  Those victims retain significant privacy interests.

[6] Of course, there can be no comparison between the defendant—a woman in her forties in the 2000s—and the young women (often in their very early twenties) who worked as personal assistants, and whose roles and life circumstances dramatically differed from those of the defendant.

here.  The Court has seen firsthand the lifetime of harm that the defendant's crimes caused her victims.  It was evident on the witness stand that the victims have carried the trauma of these crimes throughout their adulthood, and that the defendant's actions have forever altered the course of their lives.  As Dr. Rocchio testified at trial, victims of child sexual abuse suffer ongoing trauma:

> We know that although all adverse events that occur during childhood can place children at higher risk for adverse outcomes, we know that among those, child sexual abuse in particular increases risk for a very, very high number of various health problems and mental health problems and also increases risk for the severity of those problems.

(Tr. 741-42).  That is true for all of the victims in this case.

The repeated sexual abuse that Jane experienced has had lasting effects.  During the years of abuse, Jane felt hopeless and thought about physically hurting herself.  (PSR ¶ 38).  Jane continues to struggle with the abuse.  As Jane explained at trial: "It ruined my self-esteem, my self-worth," and it "led me to not trust people."  (*Id.*).  She remarked: "How do you navigate a healthy relationship with a broken compass? I didn't even understand what real love is supposed to look like."  (*Id.*).  Jane's pain was evident as she sobbed leaving the courtroom after her testimony.

In a letter[7] to the Court in connection with sentencing, Annie explained: "One of the most painful and ongoing impacts of Maxwell and Epstein's abuse was a loss of trust in myself, my perceptions, and my instincts.  When predators groom and then abuse or exploit children and other vulnerable people, they are, in a sense, training them to distrust themselves."  She further

---

[7] The victim impact statements referenced in this submission have been provided to defense counsel in accordance with the Court's June 21, 2022 Order (Dkt. No. 668).  Subject to the process outlined in the Court's Order, the statements will be publicly filed.

explained: "This toxic combination of being sexually exposed and exploited, feeling confused and naïve, blaming myself all resulted in significant shame."

Kate has explained that "the consequences of what Ghislaine Maxwell did have been far reaching for me." In a letter to the Court in connection with sentencing, Kate shared: "I have struggled with, and eventually triumphed over, substance use disorder. I have suffered panic attacks and night terrors, with which I still struggle. I have suffered low self esteem, loss of career opportunities. I have battled greatly with feeling unable to trust my own instincts, in choosing romantic relationships."

Carolyn's testimony at trial made clear that she, too, has suffered greatly as a result of the defendant's crimes. Over her years of abuse at Epstein's hands, Carolyn fell deeper into drug addiction, and she has experienced significant struggles with mental health and addiction throughout her adult life. (PSR ¶ 59). When explaining the trauma she experienced, Carolyn expressed, "my soul is broken and so is my heart." (Tr. 1678). Her pain was palpable on the witness stand as she described the horrifying years of abuse she suffered.

As the foregoing makes clear, the defendant played an essential role in a child exploitation conspiracy that caused lasting harm to many young girls. The defendant preyed on vulnerable young girls, manipulated them, and served them up to be sexually abused by Epstein, a prolific predator and abuser of children. Years of sexual abuse, multiple victims, devastating psychological harm: none of this could have happened without Maxwell. A Guidelines sentence is necessary to reflect the gravity of the offense conduct and the pain and trauma the defendant inflicted upon her many victims.

## 2.  History and Characteristics of the Defendant

The history and characteristics of the defendant also weigh in favor of a Guidelines sentence.

Although many defendants come before sentencing courts with compelling mitigating factors from difficult upbringings, Maxwell is not among them.  She has enjoyed a remarkable life of privilege, having lived in luxury and moved in social circles among the famous and powerful. And while the defendant may have had a marginally less positive experience than other exceptionally wealthy children, it is difficult to see how stern conversation at the family dinner table is an excuse for participating in a child exploitation scheme.

Moreover, the record at sentencing makes clear that the defendant has engaged in a significant pattern of dishonest conduct, which speaks volumes about her character.  The defendant's record includes the following:

- In 2016, the defendant testified under oath in a civil deposition in connection with a lawsuit brought by Virginia Roberts and lied repeatedly during her testimony. For example, she denied, among other things, having given Annie Farmer a massage. (PSR ¶ 75-76).  As the evidence at trial established, that was a lie.

- Upon her arrest, the defendant was interviewed by Pretrial Services, and told them that the home she owned in New Hampshire was owned by a corporation, and that she was "just able to stay there."  (PSR ¶ 149).  That was a lie, as were her statements to Pretrial Services about her finances.  In an Order denying the defendant's renewed application for bail, the Court remarked on the defendant's "lack of candor" about her finances and concluded that the defendant had

41

"misrepresent[ed] key facts to Pretrial Services and, by extension, the Court." (PSR ¶ 172, December 28, 2020 Opinion at 14-16).

- On November 1, 2021, the Court allocuted the defendant about whether she had engaged in plea discussions with the Government. Although the Court's question called for a yes or no answer about plea offers, the defendant elected to volunteer the following: "I have not committed any crime." (November 1, 2021 Tr. at 113). That was a lie.

- In preparation for sentencing, the defendant was interviewed by the Probation Office, and she refused to provide any information about the circumstances of her marriage and, accordingly, the Probation Office was unable to verify these facts. (PSR at 145). Moreover, the defendant reported that she had almost no assets, a sharp contrast from the defendant's earlier representation to the Court—in pursuit of bail—that she had approximately $22 million in assets. (PSR ¶ 172). In short, the defendant apparently decides when she wishes to disclose facts to the Court, and those facts shift when it serves the defendant's interests.

Moreover, even now, at sentencing, the defendant has shown no acceptance of responsibility, and her submission fails to even mention, much less accept responsibility for, the harm she has caused her victims. Instead, her entire submission is an effort to cast herself as a victim: of her father, of Epstein, of the media, of prosecutors, of the Bureau of Prisons. Although much of the defendant's sentencing memorandum aims to cast aspersions on the Government, these claims are baseless. This Office did what it always does in any case: it followed the facts and law. The investigation uncovered that the defendant committed terrible crimes, and that is what this case is about. The Court should see the defendant's attack on the Government's motives

42

for exactly what it is: a desperate attempt to shift the blame for her own crimes and distract from the gravity of her offense conduct.

In short, the defendant has lied repeatedly about her crimes, exhibited an utter failure to accept responsibility, and demonstrated repeated disrespect for the law and the Court. The defendant's history and characteristics weigh in favor of a Guidelines sentence.

### 3.  The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The importance of promoting respect for the law and affording adequate deterrence further supports imposing a sentence within the Guidelines range. Given the magnitude, breadth, and sophistication of the conduct in this case, those interests are best served by a significant term of imprisonment. The defendant's pattern of exploitative conduct, and her lies to evade responsibility for her crimes, should be met with punishment that holds her accountable for the full measure of her criminal conduct and the abuse and horror for which she is responsible.

A Guidelines sentence would also deter those who would facilitate sexual abusers in positions of power. As the Government has emphasized throughout this case, Jeffrey Epstein could not have committed these crimes without the defendant. The defendant, an adult woman, was able to provide a cover of respectability to Epstein that lulled the victims and their families into a false sense of security. This case sends the important message that those who would conspire with sexual predators will be held responsible for their significant role in these crimes. Accordingly, a Guidelines sentence is necessary to afford deterrence.

The lenient sentence the defendant seeks would send the message that there is one system of laws for the rich and powerful, and another set for everyone else. It would also send the message to victims that, even if they have the courage to report their abusers and undergo the excruciating experience of testifying in court, there will be no meaningful accountability. As the Probation

Office recognized in its report, a significant sentence "should promote general deterrence against the exploitation and degradation of humans made possible by this offense, as well as untouchable individuals who feel their privilege and affluence entitle them to victimize others without fear of consequence." (PSR at 67).[8]

### B. The Defendant's Arguments for a Lenient Sentence Are Unpersuasive

The defendant spends the majority of her sentencing submission complaining that her conditions of pretrial confinement warrant a downward variance. Not only are the defendant's claims inaccurate, but the defense overlooks the extraordinary steps that the Court has taken throughout the pendency of this case to oversee the conditions of this defendant's confinement. Indeed, the Court received regular updates regarding the defendant's conditions of confinement throughout this case, which were based on regular communications between the Government and Bureau of Prisons ("BOP") legal counsel. As a result, the Court already has exceptional insight into the defendant's conditions of pretrial confinement and is well aware of the many privileges the defendant has received while in custody. Although the defendant has clearly disliked her experience at the Metropolitan Detention Center ("MDC"), the conditions she in fact experienced do not rise to a level of extremity that warrant a downward variance, much less the extent of a variance the defendant seeks.

---

[8] The defendant argues that she should not be "sentenced as if she were Harvey Weinstein" who was convicted of forcible rape following a state jury trial. (Dkt. No. 663 at 20). These are different cases, under different sentencing regimes, with different facts. It is pointless to compare a state rape case involving adults to a federal case involving child exploitation. The defendant should be sentenced under the applicable federal Sentencing Guidelines for her extensive crimes against children. Defendants engaged in sexual abuse of minors are regularly sentenced to significant sentences of imprisonment in this District. *See, e.g.*, *United States v. Maria Soly Almonte*, 16 Cr. 670 (KMW) (defendant sentenced to twenty years' imprisonment for a non-violent child trafficking scheme, notwithstanding mitigating factors, including defendant's poverty and personal experience with sexual abuse). The defendant is not an exception.

Unlike the vast majority of inmates at the MDC, the defendant has been able to receive almost immediate attention from legal counsel at the MDC, the Court, and the Government when raising issues regarding her confinement. Her lawyers have not hesitated to alert the Court to issues requiring its attention, and the Court has ensured that the defendant was able to prepare for trial and participate in her defense. In addition, the defendant has filed numerous administrative complaints with the BOP, all of which have apparently been evaluated as unfounded. For example, the Government understands from legal counsel at the MDC that the BOP has investigated the defendant's complaints of physical abuse and concluded that they are unfounded. Legal counsel at the MDC further informed the Government that all pat-down searches of the defendant that took place pretrial were, in fact, video recorded.

Taken together with the defendant's perjury in her civil deposition, her lies to Pretrial Services, and her blatant lies about her own weight while in BOP custody, the Court can fairly reject many of the defendant's complaints about her conditions of confinement. Simply put, the defendant lies when it suits her. It apparently suits her to spread horror stories about her experiences in jail to the press in an attempt to garner public sympathy. *See, e.g.*, Laurence Dollimore, *Exclusive: Ghislaine Maxwell Speaks from Behind Bars for the First Time in the Mail on Sunday: Heiress Tells How 'Creepy' Guards Have Forced Her to Stop Taking Showers, Rats Live in Her Cell, and Why She Has No Hope of a Fair Trial*, DAILY MAIL, Nov. 15, 2021 (*available at* https://www.dailymail.co.uk/news/article-10198309/Ghislaine-Maxwell-speaks-bars-time-Mail-Sunday.html) (last visited June 20, 2022). She is trying the same tactic now with the Court.

The defense's attempts to compare the defendant's conditions of confinement to that of a defendant under Special Administrative Measures ("SAMs") are stunningly off-base. As the Court is well aware, before she was placed in general population, the defendant was permitted out of her

cell into a day room for thirteen hours per day, seven days per week. In the day room, the defendant had exclusive access to a telephone, a television, a desktop computer, a laptop computer, and a shower. The defendant had access to recreation time and programming, as well as multiple hours each day to meet with her attorneys. Those conditions are a far cry from the 23-hour-per-day lockdown experienced by inmates in SAMs, and indeed, a far cry from many inmates in general population during the COVID-19 pandemic, who were often locked in their cells for significant periods of time to prevent the spread of the virus.

The defendant baselessly claims that her conditions of detention "thwart[ed] her ability to participate in and prepare her defense." (Dkt. No. 663 at 25). The Court was actively involved in ensuring that the defendant's conditions of confinement did not interfere with the ability to review her discovery materials and confer with her counsel in order to prepare for trial. (*See, e.g.*, Dkt. Nos. 49, 92, 116, 131, 265, 268, 282). Indeed, the Court repeatedly found that the defendant has had sufficient time to confer with defense counsel and review her discovery. (*See, e.g.*, Dkt. Nos. 49, 106). As the Government has repeatedly informed the Court throughout the pendency of this case, Maxwell received more time to review her discovery than any other inmate at the MDC. She was permitted to review her discovery thirteen hours per day, seven days per week. During her pretrial confinement, Maxwell had access to both a desktop computer provided by the MDC and a laptop computer provided by the Government in November 2020 on which to review discovery. Also during those thirteen hours per day, the defendant had access to the MDC desktop computer to send and receive emails with her attorneys. Maxwell also had as much, if not more, time as any other MDC inmate to communicate with her attorneys. She received five hours of VTC calls with her counsel every weekday, for a total of 25 hours of attorney VTC calls per week, and she had access to in-person visits with her attorneys.

46

Additionally, the defendant's attorneys had full copies of her discovery and were able to review all discovery material with her during their ample time for attorney visits both by VTC and in person.  The Government also took numerous steps to address the defendant's complaints about unreadable files within her discovery, including by providing a laptop (in addition to the BOP-provided desktop computer) on which to review her discovery, providing new copies of discovery, and conferring with defense counsel regarding specific files the defendant had difficulty viewing. As the Government has previously informed the Court in response to the defendant's allegations regarding her emails, legal counsel for the MDC has conveyed that per BOP policy, all inmate emails are routinely purged every six months.  In response to complaints from the defense regarding prematurely deleted emails, MDC staff examined the defendant's inmate email account. According to legal counsel for the MDC, that examination revealed that the defendant had herself deleted some of her emails and had archived others, but it revealed no evidence to suggest that MDC staff deleted any of the defendant's emails.  As the Government has previously informed the Court in response to the defendant's complaints about delivery of mail, Maxwell's legal mail was processed and delivered to her in the same manner as mail for other inmates at the MDC.  During trial, MDC legal counsel permitted the Government to bring hard drives and disks containing legal materials to court and Maxwell was permitted to bring those materials back with her to the MDC.

As the Government has previously informed the Court in response to the defendant's complaints regarding nighttime checks, legal counsel for the MDC had indicated that staff conduct flashlight checks at night *for all inmates* as a matter of course throughout the facility for the safety and security of the inmates at the institution.  During these flashlight checks, MDC staff point a flashlight at the ceiling of each cell to illuminate the cell sufficiently to confirm that the inmate is present in the cell, breathing, and not in distress.  Legal counsel for the MDC has explained that

staff conduct flashlight checks every 30 minutes for inmates housed in the Special Housing Unit and conduct flashlight checks of inmates in the general population multiple times each night at irregular intervals, but at an average of at least once per hour.

The defendant's repeated claims about jail food and her weight should be rejected out of hand as a basis for a downward variance. Legal counsel for the MDC has informed the Government that when the defendant was housed outside of the general population, her meals arrived in containers that were both microwavable and oven safe, and her meals were heated in a thermal oven as of at least April 6, 2021. As the Government previously informed the Court in response to the defendant's complaints about her weight, during her time at the MDC, the defendant's weight has fluctuated between the 130s and the 140s. Medical records reflect that the defendant weighed 146 pounds when she was arrested, and she weighed 144.5 pounds when she was last weighed in April 2022. In short, the defendant's claims of extreme weight loss are not true.

At bottom, the defendant's complaints about jail seem to come down to the vast gulf between the conditions of her confinement and the defendant's lived experience up until her arrest and detention on July 2, 2020. Until July 2020, the defendant spent her entire life living in extraordinary luxury. Her childhood and adolescence were filled with wealth and privilege. That access to wealth continued into adulthood when the defendant found a benefactor in Epstein, who provided her with millions of dollars and invited her to share in his luxurious lifestyle of mansions, house staff, private chefs, and private planes. After leaving that relationship, the defendant remained exceptionally wealthy, residing in palatial estates and owning multiple homes. It is no wonder, then, that she found jail jarring. Going from being waited on hand and foot to incarceration is undoubtedly a shocking and unpleasant experience. The massive difference

between the defendant's prior life and the life of an inmate may feel extreme to the defendant, but when compared to the experiences of other pretrial detainees in this District, her experience is by no means so shocking as to merit a downward variance.

If anything, the defendant's privilege remained intact while at the MDC, as demonstrated by the exceptional benefits she received. No other inmate received the kind of access to discovery and to counsel that the defendant did. The defendant had her own shower, her own television, her own desktop computer, her own laptop, and her own space to spend the day outside of her cell. The defendant was able to get any concerns, no matter how small, immediately brought to the attention of MDC legal counsel through her attorneys. Comparing that treatment to SAMS is out of touch with reality. In many respects, the defendant's conditions of confinement were preferential and more beneficial than those experienced by other inmates.

Tellingly, the defendant's complaints about the MDC seem internally inconsistent. On the one hand, she complains that she was removed from general population. On the other hand, she claims that she should not have been moved abruptly into general population after the conclusion of her trial.[9] On the one hand, she claims that she would have had more freedom in general population. On the other hand, she asks the Court for a lesser sentence because the general population lost visitation and was locked into their cells for excessive periods because of COVID-19. On the one hand, she complains that a camera was always on her. On the other hand, she

---

[9] The defendant also makes the sensational claim that she was the target of a "credible death threat." (Dkt. No. 663 at 7). The Government has conferred with legal counsel for the MDC and has been informed that the MDC conducted an internal investigation of the purported threat and determined the following: an inmate at the MDC remarked to someone in passing, in sum and substance, "I'd kill her if someone paid me a million dollars." Someone else overheard that remark and reported it, resulting in the inmate being moved out of the housing unit. The MDC's investigation revealed that the inmate had not actually been paid to kill the defendant and had not actually threatened Maxwell.

claims that multiple abuses, all of which BOP has concluded were unfounded, were somehow not caught on camera. At bottom, the defendant does not like jail. But the defendant's experiences at the MDC come nowhere near justifying a downward variance from the Guidelines range.

Finally, it bears emphasizing that the defendant has told blatant lies about her conditions of confinement. She repeatedly claims to have suffered significant hair loss, but anyone who has seen the defendant in court can easily see that is not true. She repeatedly claims to have lost an extreme amount of weight, but, as noted above, BOP medical records make clear that she has not. The defendant is perfectly healthy, with a full head of hair. Throughout trial, she was visibly engaged in her defense, often actively communicating with defense counsel throughout each stage of the trial. Given the defense's exaggerated claims that the conditions of confinement somehow deteriorated the defendant to the point of struggling to assist in her own defense, the Government respectfully requests that the Court put on the record at sentencing the Court's own observations of the defendant's appearance and demeanor throughout the proceedings in this case.

## IV.    Financial Penalties

In addition to a Guidelines sentence of incarceration, the Government respectfully submits that the Court should impose the maximum fine allowable under statute. Because each of the three counts of conviction carries a maximum fine of $250,000, the maximum total allowable is $750,000. That amount constitutes a mere drop in the bucket for a multi-millionaire like the defendant, but it nevertheless sends the message that a defendant who uses wealth to accomplish criminal activity will suffer financial losses in addition to the loss of liberty. No amount of money can undo the harm that the defendant's crimes have done, but given the defendant's substantial means, the majority of which appears to have come from her co-conspirator, a hefty fine is certainly warranted in this case.

Money is a key theme underlying the criminal conduct in this case. The defendant's access to wealth enabled her to present herself as a supposedly respectable member of society, who rubbed shoulders with royalty, presidents, and celebrities. That same wealth dazzled the girls from struggling families who became the defendant and Epstein's victims. That same wealth enabled the defendant and Epstein to hire a parade of staff to transport victims and maintain the fabulous properties where those victims were abused. That same wealth motivated the defendant to make sure that Epstein's repulsive desire for sexual contact with teenage girls was always met. That wealth was the defendant's reward. The defendant has lived a life of extraordinary privilege, and she profited from her relationship with Epstein. It is only right that she should suffer some small financial penalty for the incalculable harm she has caused.

The defense's submissions to the Probation Office suggest that the defendant is attempting to make the outrageous claim that she cannot afford a fine. (Dkt. 106). This Court has already found that the defendant has attempted to conceal the full extent of her assets in connection with this case. After getting caught in her lie to Pretrial Services that her only asset was her London townhouse, the defendant provided a very different picture when seeking bail in December 2020. The breakdown of the defendant's finances provided then demonstrated that the defendant is a remarkably wealthy woman. (*See* Dkt. No. 97, Ex. O). That wealth appears to have primarily come from Epstein. The primary source of funds reflected in that financial breakdown was the sale of the defendant's Manhattan townhouse. Kate testified at trial that the defendant told Kate that Epstein obtained the New York townhouse for the defendant. (Tr. 1194). Additionally, the evidence at trial demonstrated that Epstein transferred a total of approximately $23 million to the defendant. (PSR ¶ 23). The defendant's dishonesty surrounding her finances is an aggravating factor weighing in favor of an above-Guidelines fine in this case. The defendant's assets range in

the multiple millions of dollars.  A $750,000 fine will hardly impact her financial outlook, but it is the most the law will allow in this case.  The Court should impose it without hesitation.

With respect to forfeiture, the Government is not seeking to forfeit any property because the Government has not identified specific property used in the offense conduct that the defendant herself owned.

Finally, because each of the identified victims has already received monetary compensation for the harms caused to them by the defendant's criminal conduct, the Government does not seek restitution in this case.  Restitution is not available where victims have received compensation for their losses from another source.  Each of the six victims identified at trial—Jane, Annie, Kate, Carolyn, Virginia, and Melissa—has received funds from the Epstein Victim Compensation Fund and/or civil settlements as compensation for the harms they suffered as a result of the defendant's and Epstein's crimes.  The Government is not aware of any otherwise recoverable losses for which these victims have not received monetary compensation.  Accordingly, there is no legal basis for restitution in this case.

## CONCLUSION

Ghislaine Maxwell sexually exploited young girls for years.  It is difficult to overstate the magnitude of her crimes and the harm she caused.  Her crimes demand justice.  The Government urges the Court to impose a sentence within the applicable Guidelines range of 360 to 660 months' imprisonment.

Dated: New York, New York
       June 22, 2022

                    Respectfully submitted,

                    DAMIAN WILLIAMS
                    United States Attorney


By:     _s/_____
                    Maurene Comey
                    Alison Moe
                    Lara Pomerantz
                    Andrew Rohrbach
                    Assistant United States Attorneys