UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 20 Cr. 330 (PAE) |
| -v- | OPINION & ORDER |
| GHISLAINE MAXWELL, | |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

On December 29, 2021, a jury convicted defendant Ghislaine Maxwell of five felonies involving the sexual abuse of young girls that she and the notorious pedophile Jeffrey Epstein committed between 1994 and 2004. This decision resolves the Government's July 18, 2025 motion to unseal grand jury transcripts and exhibits in Maxwell's case, subject to redactions aimed at protecting victim confidentiality. Dkt. 785; *see also* Dkt. 808. For the reasons that follow, the Court denies the motion.[1]

## I.      Background to the Motion to Unseal

### A.      Indictments

In late November 2018, prompted by investigative journalism, the United States Attorney in this District opened an investigation into Epstein and his co-conspirators. On July 2, 2019, a grand jury returned an indictment that charged Epstein with participating in a sex trafficking conspiracy, in violation of 18 U.S.C. § 1591(a) and (b).[2] On July 6, 2019, Epstein was arrested.

---

[1] A motion seeking, on similar terms, the unsealing of grand jury materials in Epstein's case is pending before the Hon. Richard M. Berman. *See United States v. Epstein*, 19 Cr. 490 (RMB) (S.D.N.Y. July 18, 2025), Dkt. 61.

[2] *See United States v. Epstein*, 19 Cr. 490 (RMB) (S.D.N.Y. July 2, 2019), Dkt. 2.

On August 10, 2019, Epstein committed suicide while in pretrial custody at the Metropolitan Correctional Center ("MCC").  *See generally* Dkt. 670 at 3–4; Dkt. 785 at 2.

On June 29, 2020, a grand jury in this District returned a six-count indictment against Maxwell, alleging that she had facilitated and participated in Epstein's sexual abuse of multiple minor girls.  It charged her with conspiracy to entice minors to travel to engage in illegal sex acts, in violation of 18 U.S.C. § 371; enticement of a minor to engage in illegal sex acts, in violation of 18 U.S.C. §§ 2422 and 2; conspiracy to transport minors with intent to engage in illegal sexual activity, in violation of 18 U.S.C. § 371; transportation of a minor with intent to engage in illegal sexual activity, in violation of 18 U.S.C. §§ 2423(a) and 2; and, in two counts, perjury, in violation of 18 U.S.C. § 1623.  *See* Dkt. 1 ("Initial Indictment").  It based these charges on Maxwell's conduct with respect to three minor victims, whom the Government identified pseudonymously.  On July 8, 2020, the grand jury returned a superseding indictment that made ministerial corrections.  Dkt. 17 ("S1 Indictment").  On March 29, 2021, a different grand jury in this District returned a second superseding indictment.  It added two counts, based on a fourth minor victim, to whom it also referred pseudonymously.  One charged a sex trafficking conspiracy, in violation of 18 U.S.C. § 371; the other charged sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a), (b)(2), and 2.  *See* Dkt. 187 ("S2 Indictment").  The S2 Indictment also broadened the time period of the sexual abuse crimes, originally alleged to span 1994 to 1997, to span 1994 to 2004.

### B.    Trial

Trial commenced on November 29, 2021, before the Honorable Alison J. Nathan, to whom this case was then assigned, and a jury, on six counts in the S2 Indictment—all but the

two perjury counts.[3]  It ended on December 29, 2021, with Maxwell's conviction on five of the six counts and her acquittal on the substantive enticement count.

The evidence adduced at trial is well-summarized in Judge Nathan's post-trial decision denying Maxwell's post-trial motions, including under Federal Rule of Criminal Procedure 29 for a judgment of acquittal, Dkt. 657; in the Government's brief in Maxwell's appeal, *see United States v. Maxwell*, No. 22-1426 (2d Cir. June 29, 2023), Dkt. 79; and in the Second Circuit's decision in that appeal, *see United States v. Maxwell*, 118 F.4th 256 (2d Cir. 2024).

In brief, the Government's evidence included the testimony of four women who described the sexual abuse they had suffered, as girls, at the hands of Epstein and Maxwell; the testimony of individuals who worked for Epstein and Maxwell; the testimony of law enforcement officials; corroborating physical evidence, including photographs of and evidence recovered from searches of Epstein's residences, and Epstein's and Maxwell's black address book; and other corroborating records, such as flight logs of Epstein's private planes and FedEx records.

The trial evidence focused on six girls, including the four testifying victims, who suffered abusive sexual contact as a result of Maxwell's criminal actions: Jane, Kate, Annie, Carolyn, Virginia, and Melissa.  It established that Maxwell had been instrumental in an approximately decade-long scheme with Epstein to entice, groom, transport, and traffic numerous young women and underage girls to engage in sexual activity with Epstein.  Maxwell helped identify vulnerable girls for abuse, targeting those who faced difficult family circumstances, including

---

[3] On April 16, 2021, Judge Nathan granted Maxwell's motion to sever the perjury charges. Dkt. 207.  After Maxwell's sentencing, the Government moved to dismiss these counts, in light of victims' interests in closure and avoiding the trauma of testifying again.  Judge Nathan granted that motion.  *See* Dkt. 670 at 5 n.1; Dkt. 737 at 99.

financial hardship, substance use disorders, and prior sexual abuse.  Maxwell purported to befriend the girls to gain their trust and create the illusion of friendship and responsible adult supervision, while isolating them from others.  She then manipulated that trust to normalize sexual abuse by Epstein and herself, often through the pretext of giving Epstein "massages."  Maxwell personally participated in acts of sexual abuse, including, for example, instructing then–14-year-old Jane how to touch Epstein's penis during a "massage," and touching Jane's breasts herself.  Maxwell and Epstein also paid young girls hundreds of dollars of cash in exchange for meeting Epstein to be sexually abused.  Once a girl was introduced to these sexualized massages, she was offered more money if she brought other girls to engage in sexualized massages.  Maxwell also fostered a culture of silence at Epstein's various households where sexual abuse occurred, directing employees to "see nothing, hear nothing, say nothing."

### C.    Post-Trial Motions

On January 19, 2022, Maxwell moved for a new trial under Federal Rule of Criminal Procedure 33, based on a juror's provision of inaccurate information during jury deliberations.  Dkt. 580.  On April 1, 2022, after an evidentiary hearing, Judge Nathan denied that motion.  Dkt. 653.

On February 11, 2022, Maxwell made other pretrial motions, under Rules 29 and 33.  Dkt. 600.  On April 29, 2022, Judge Nathan denied all but one of these motions.  In the motion she granted, Judge Nathan found that the three conspiracy counts were multiplicitous, and therefore entered judgment on only one of them.  Dkt. 657.

### D.    Sentencing

Sentencing was held on June 28, 2022.  The Government sought a sentence of at least 360 months' imprisonment.  Dkt. 670 at 53.  The defense sought a sentence below the Guidelines

4

range (188–235 months) calculated by Judge Nathan.  Dkt. 737 at 84.  Eight victims submitted victim impact statements.  Dkt. 686.

Judge Nathan imposed an above-Guidelines sentence of 240 months' imprisonment. Dkt. 737 at 96.  Maxwell, she stated, had "directly[,] repeatedly, and over the course of many years participated in a horrific scheme to entice, transport, and traffic underage girls, some as young as 14, for sexual abuse by and with Jeffrey Epstein."  *Id.* at 89.  As an example, she noted, after Carolyn had confided in Maxwell her personal history of having been raped and molested by her grandfather starting at a very young age, Maxwell used that knowledge to continue the "cycle of sexual abuse," inducing Carolyn to give Epstein "sexualized massages" for "years," and by herself touching Carolyn's breasts when Carolyn was 14 years old.  *Id.* at 90–91.  Judge Nathan also noted that Maxwell had repeatedly deflected blame and lied about her offenses, including in a civil deposition and to Pretrial Services and the Court.  *Id.* at 95.[4]

**E.    Appeal**

On February 28, 2023, Maxwell appealed her conviction and sentence.  *United States v. Maxwell*, No. 22-1426 (2d Cir. Feb. 28, 2023), Dkt. 59.  The Second Circuit affirmed.  It upheld Judge Nathan's (1) holding that a 2007 non-prosecution agreement between Epstein and the U.S. Attorney's Office for the Southern District of Florida did not bar Maxwell's prosecution in this District; (2) holding that the S2 Indictment had been timely filed; (3) denial of Maxwell's Rule 33 motion based on juror misconduct; (4) response to a jury note, which Maxwell had argued resulted in a constructive amendment of or prejudicial variance from the S2 Indictment; and (5) sentence as procedurally reasonable.  *United States v. Maxwell*, 118 F.4th 256, 270 (2d Cir.

---

[4] Judge Nathan also sentenced Maxwell to a post-imprisonment term of five years' supervised release and to pay a $750,000 fine (the maximum allowable).

2024).  On November 25, 2024, the Second Circuit denied Maxwell's petition for rehearing. *United States v. Maxwell*, No. 22-1426 (2d Cir. Nov. 25, 2024), Dkt. 120.

On April 10, 2025, Maxwell petitioned for a writ of certiorari before the Supreme Court. Her petition argues that Epstein's non-prosecution agreement with the U.S. Attorney's Office for the Southern District of Florida barred her prosecution in this District.  *See United States v. Maxwell*, No. 24-1073 (S. Ct. Apr. 10, 2025).  On July 14, 2025, the Government opposed the petition.  On July 28, 2025, Maxwell replied.  As of this decision, the petition remains pending.

**F.    DOJ's Recent Statements Regarding the Disclosure of Epstein Records**

On February 27, 2025, the Department of Justice ("DOJ") issued a press release.  It stated that the Attorney General ("AG") and Federal Bureau of Investigation ("FBI") had declassified and were publicly releasing files relating to Epstein's exploitation of more than 250 girls. Quoting the AG and the FBI Director, the press release stated:

> "This [DOJ] is following through on President Trump's commitment to transparency and lifting the veil on the disgusting actions of Jeffrey Epstein and his co-conspirators," said Attorney General Pamela Bondi.  "The first phase of files released today sheds light on Epstein's extensive network and begins to provide the public with long overdue accountability."

> "The FBI is entering a new era—one that will be defined by integrity, accountability, and the unwavering pursuit of justice," said FBI Director Kash Patel.  "There will be no cover-ups, no missing documents, and no stone left unturned—and anyone from the prior or current Bureau who undermines this will be swiftly pursued.  If there are gaps, we will find them.  If records have been hidden, we will uncover them.  And we will bring everything we find to the DOJ to be fully assessed and transparently disseminated to the American people as it should be.

U.S. Dep't of Just., *Attorney General Pamela Bondi Releases First Phase of Declassified Epstein Files* (Feb. 27, 2025), https://www.justice.gov/opa/pr/attorney-general-pamela-bondi-releases-first-phase-declassified-epstein-files [https://perma.cc/H2QZ-WZCV].[5]

---

[5] The released documents are described and accessible on the DOJ's website.

In the same press release, the DOJ quoted a letter from the AG to the FBI Director, stating that the AG had just learned that the FBI possessed "thousands of pages of documents related to the investigation and indictment of Epstein."  The AG's letter continued:

> By 8:00 a.m. tomorrow, February 28, the FBI will deliver the full and complete Epstein files to my office, including all records, documents, audio and video recordings, and materials related to Jeffrey Epstein and his clients, regardless of how such information was obtained.  There will be no withholdings or limitations to my or your access.  The [DOJ] will ensure that any public disclosure of these files will be done in a manner to protect the privacy of victims and in accordance with law, as I have done my entire career as a prosecutor. . . .
>
> I appreciate your immediate attention to this important matter.  I know that we are both committed to transparency for the American people, and I look forward to continuing to work with you to serve our President and our country.

*Id.*

On July 6, 2025, the DOJ and the FBI issued another memorandum regarding Epstein.  It stated, in part:

> As part of our commitment to transparency, the [DOJ] and the [FBI] have conducted an exhaustive review of investigative holdings relating to Jeffrey Epstein.  To ensure that the review was thorough, the FBI conducted digital searches of its databases, hard drives, and network drives as well as physical searches of squad areas, locked cabinets, desks, closets, and other areas where responsive material may have been stored.  These searches uncovered a significant amount of material, including more than 300 gigabytes of data and physical evidence.
>
> The files relating to Epstein include a large volume of images of Epstein, images and videos of victims who are either minors or appear to be minors, and over ten thousand downloaded videos and images of illegal child sex abuse material and other pornography. . . .  Only a fraction of this material would have been aired publicly had Epstein gone to trial, as the seal served only to protect victims and did not expose any additional third-parties to allegations of illegal wrongdoing.  Through this review, we found no basis to revisit the disclosure of those materials and will not permit the release of child pornography.
>
> This systematic review revealed no incriminating "client list."  There was also no credible evidence found that Epstein blackmailed prominent individuals as part of his actions.  We did not uncover evidence that could predicate an investigation against uncharged third parties. . . .

> One of our highest priorities is combatting child exploitation and bringing justice to victims. Perpetuating unfounded theories about Epstein serves neither of those ends.
>
> To that end, while we have labored to provide the public with maximum information regarding Epstein and ensured examination of any evidence in the government's possession, it is the determination of the Department of Justice and the Federal Bureau of Investigation that no further disclosure would be appropriate or warranted.

U.S. Dep't of Just., Untitled Memo (July 2025), https://www.justice.gov/opa/media/1407001 /dl?inline, at 1. The memorandum included a hyperlink to video footage from Epstein's housing unit, which, it stated, supported the FBI's investigative conclusion that Epstein had committed suicide in his cell at the MCC on August 10, 2019. *Id.* at 2.

Ensuing news accounts reported public and congressional dissatisfaction with the July 6, 2025 memorandum, and calls for the release of records held by the DOJ and FBI regarding their investigation into Epstein.[6]

---

[6] *See, e.g.*, Perry Stein et al., *Rift Erupts Among Justice, FBI Leaders Over Epstein Memo, Sources Say*, Wash. Post (July 11, 2025), https://www.washingtonpost.com/national-security/ 2025/07/11/trump-bondi-patel-bongino-epstein-files/; Sadie Gurman & Alex Leary, *Top Trump Officials Split Over Epstein Investigation Conclusion*, Wall St. J. (July 11, 2025, 4:38 PM), https://www.wsj.com/politics/policy/top-trump-officials-split-over-epstein-investigation-conclusion-9449f83f; Emma Colton, *DOJ Brass Vowed Full Transparency on Epstein Before Turning Up Empty-Handed*, Fox News (July 13, 2025, 4:56 PM), https://www.foxnews.com/ politics/doj-brass-vowed-full-transparency-epstein-before-turning-up-empty-handed [https://perma.cc/V8SV-KSRT]; Hannah Rabinowitz et al., *House Speaker Johnson Joins Growing Number of Republicans Pressing Trump Administration for More Transparency on Epstein Case*, CNN (July 15, 2025, 7:05 PM), https://www.cnn.com/2025/07/15/politics/epstein-files-trump-bondi [https://perma.cc/7SCN-LGVZ].

## II.    Motion to Unseal the Maxwell Grand Jury Materials

On July 18, 2025, the Deputy Attorney General ("DAG") filed a three-and-a-half-page motion to unseal the grand jury transcripts in this case.  Dkt. 785 ("Motion to Unseal").[7]  The motion stated:

> On July 6, 2025, the [DOJ] and [FBI] issued a memorandum describing an exhaustive review undertaken of investigative holdings relating to Jeffrey Epstein (the "Memorandum").  The Memorandum detailed the steps taken by the [DOJ] and [FBI] to determine whether evidence existed that could predicate an investigation into uncharged third parties.  As the Memorandum concluded, no such evidence was uncovered during the review.

> Since July 6, 2025, there has been extensive public interest in the basis for the Memorandum's conclusions.  While the [DOJ] and [FBI] continue to adhere to the conclusions reached in the Memorandum, transparency to the American public is of the utmost importance to this Administration.  Given the public interest in the investigative work conducted by the [DOJ] and [FBI] into Epstein, the [DOJ] moves the Court to unseal the underlying grand jury transcripts in [*United States v. Maxwell* and] *United States v. Epstein*, subject to appropriate redactions of victim-related and other personal identifying information.

*Id.* (citation omitted).[8]  The motion noted that the Second Circuit has recognized that, in "special circumstances," release of grand jury records may be appropriate even where not authorized by Federal Rule of Criminal Procedure 6(e).  *Id*. at 3 (citing *In re Petition of Craig*, 131 F.3d 99, 102 (2d Cir. 1997)) ("*In re Craig*").

On July 22, 2025, after the case was reassigned to this judge, Dkt. 786, the Court issued an order stating that it required further information to resolve the motion, Dkt. 789.  It ordered the Government, by July 29, 2025, to file a memorandum addressing the factors identified in *In*

---

[7] The same day, the DAG filed a similar motion on the docket of Epstein's case.  *See United States v. Epstein*, 19 Cr. 490 (RMB) (S.D.N.Y. July 18, 2025), Dkt. 61.

[8] On July 19, 2025, the White House press secretary announced that the President had directed the AG "to move forward with requesting grand juries related to the Epstein files unseal their relevant documents."  White House, *MAGA Minute* (July 19, 2025), https://www.whitehouse .gov/videos/maga-minute-july-19-2025/ [https://perma.cc/Q3BJ-V24S].

*re Craig*; to disclose whether it had given notice of its motion to Maxwell's victims; and to file under seal the grand jury transcripts (unredacted and as redacted for proposed public release) and other grand jury materials, including exhibits. *Id.* at 3. The order authorized Maxwell and her victims to file, by August 5, 2025, letters addressing the Government's motion.[9]

On July 29, 2025, the Government[10] submitted a memorandum responding to the July 22, 2025 order. It represented that it had now given notice of its filing to all but one victim, and sought leave to file a supplemental submission responding to the victims' submissions. Dkt. 796 ("Gov't Mem."). The Government also filed, under seal, the grand jury materials the Court had requested.

On July 31, 2025, the Court directed the Government to file a letter (1) stating whether, as its July 29 memorandum suggested, it was moving to unseal the grand jury exhibits along with the transcripts; and (2) identifying the portions of the grand jury transcripts and exhibits that, as proposed for public release, are not already matters of public record. Dkt. 797.

On August 4, 2025, the Government submitted a letter seeking leave to advise the Court by August 8, 2025, of its position with respect to unsealing the grand jury exhibits. Dkt. 800. It also filed, under seal, a document indicating the portions of the grand jury transcripts that are not matters of public record.

On August 5, 2025, Maxwell filed a letter opposing unsealing the grand jury transcripts. Dkt. 803. That day and the next, the Court docketed a total of six letters that representatives of

---

[9] In a later order, the Court provided victims with logistical instructions for the submission (and redaction) of their letters. Dkt. 801.

[10] The July 29, 2025 filing (and all ensuing Government filings) were filed by both the DAG and the United States Attorney for this District.

victims and other witnesses had submitted to the Government, which the Government in turn furnished to the Court.  *See* Dkts. 804, 806.

On August 8, 2025, the Government clarified that it was moving to unseal the Maxwell grand jury exhibits, subject to appropriate redactions, in addition to the transcripts.  Dkt. 808.[11] It also submitted a sealed letter that identified the portions of those exhibits that were not already matters of public record.

## III.    Grand Jury Secrecy:  Applicable Legal Principles

### A.    Federal Rule of Criminal Procedure 6(e)

The policy that "proceedings before a grand jury shall generally remain secret" is "older than our Nation itself."  *In re Biaggi*, 478 F.2d 489, 491 (2d Cir. 1973) (quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959)).  The rule of secrecy "contribute[s] to the success of grand juries and to the protection of those who appear before them."  *In re Craig*, 131 F.3d at 101–02.  The purposes served by grand jury secrecy include:

(1) [t]o prevent the escape of those whose indictment may be contemplated;

(2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors;

(3) to prevent subornation of perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it;

(4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; [and]

(5) to protect [the] innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial when there was no probability of guilt.

---

[11] The Court hereinafter refers to the grand jury transcripts and exhibits together as the "grand jury materials."

*Id*. (quoting *United States v. Procter & Gamble Co*., 356 U.S. 677, 681–82 n.2 (1958)) (alterations in original); *see also In re Biaggi*, 478 F.2d at 491–92.

The rule of secrecy is today embodied in Rule 6(e), which bars disclosure of grand jury matters by persons privy to them: grand jurors, attorneys for the Government, court reporters, operators of recording devices, and interpreters. *See* Fed. R. Crim. P. 6(e)(2)(B). Rule 6(e)(3) defines narrow exceptions. It authorizes disclosures:

- to other Government personnel assisting in the enforcement of federal criminal law, *id.* at 6(e)(3)(A)–(B);

- to another federal grand jury, *id.* at 6(e)(3)(C);

- to law enforcement or national security officials, where the disclosures involve foreign-intelligence or counter-intelligence information and assist in the performance of official duties, *id.* at 6(e)(3)(D); and

- to persons as authorized by a court in the district where the grand jury convened, *id.* at 6(e)(3)(E)–(F), provided the disclosure is: "preliminar[y] to or in connection with a judicial proceeding," *id.* at 6(e)(3)(E)(i); "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury," *id.* at 6(e)(3)(E)(ii); "at the request of the government, when sought by a foreign court or prosecutor for use in an official criminal investigation," *id.* at 6(e)(3)(E)(iii); "at the request of the government if it shows that the matter may disclose a violation of State, Indian tribal, or foreign criminal law," provided that the disclosure is to an appropriate such government official for the purpose of enforcing that law, *id.* at 6(e)(3)(E)(iv); or "at the request of the government if it shows that the matter may disclose a violation of military criminal law under the Uniform Code of Military Justice," provided that the disclosure is to an appropriate military official for the purpose of enforcing that law, *id.* at 6(e)(3)(E)(v).

## B.     The "Special Circumstances" Doctrine

The Second Circuit has recognized that in "special circumstances," the disclosure of grand jury materials may be appropriate even where it is not authorized by Rule 6(e). The Second Circuit developed this doctrine in three cases where disclosure was sought of grand jury matters claimed to be of unusual historical or public interest. *See In re Biaggi*, 478 F.2d at 492–93; *In re Craig*, 131 F.3d at 101–02; *Laws.' Comm. for 9/11 Inquiry, Inc. v. Garland*, 43 F.4th

12

276, 285–87 (2d Cir. 2022) ("*Lawyers' Committee for 9/11*").  The doctrine is based on the

district court's supervisory authority over the grand juries it empanels.  *In re Craig*, 131 F.3d at

102 & n.2.  It today is recognized in the Second and Seventh Circuits, but not elsewhere.[12]

The Second Circuit has set out a "non-exhaustive list of [nine] factors that a trial court

might want to consider when confronted with these highly discretionary and fact-sensitive

'special circumstances' motions." *Id.* at 106.  These are:

(i) the identity of the party seeking disclosure;

(ii) whether the defendant to the grand jury proceeding or the government opposes the disclosure;

(iii) why disclosure is being sought in the particular case;

(iv) what specific information is being sought for disclosure;

---

[12] Most Circuits to address the issue have held that the only justifications for disclosing grand jury matters are those set out in Rule 6(e)(3).  *See, e.g.*, *McKeever v. Barr*, 920 F.3d 842, 843, 850 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 597 (2020); *In re Grand Jury 89-4-72*, 932 F.2d 481, 488 (6th Cir. 1991); *United States v. McDougal*, 559 F.3d 837, 841 (8th Cir. 2009); *Pitch v. United States*, 953 F.3d 1226, 1241 (11th Cir. 2020) (en banc), *cert. denied*, 141 S. Ct. 624 (2020).  The Seventh Circuit is in accord with the Second Circuit that a district court may order the release of grand jury materials upon a showing of special circumstances.  *See Carlson v. United States*, 837 F.3d 753, 766–67 (7th Cir. 2016).  The First Circuit has held that a district court may not authorize disclosure of grand jury materials based on their historical or public interest, but has left open whether a court could do so "when the fair administration of justice in a proceeding is at issue." *Lepore v. United States*, 27 F.4th 84, 93–94 (1st Cir. 2022).

Before the D.C. Circuit's 2019 decision finding Rule 6(e) to supply the only bases for disclosure, district courts in that Circuit had considered—and sometimes granted—petitions to disclose grand jury materials of historical importance, citing the Second Circuit's precedents recognizing their authority to permit such disclosures.  *Compare In re Petition of Kutler*, 800 F. Supp. 2d 42, 50 (D.D.C. 2011) (granting request to disclose President Nixon's grand jury testimony about Watergate due to its historical importance), *and In re Application to Unseal Dockets Related to the Independent Counsel's 1998 Investigation of President Clinton*, 308 F. Supp. 3d 314, 330–36 (D.D.C. 2018) (ordering disclosure of some grand jury materials related to the investigation of President Clinton's business dealings and his relationship with a White House intern), *with In re Shepard*, 800 F. Supp. 2d 37, 39–40 (D.D.C. 2011) (denying as overbroad request for disclosure of all testimony and materials associated with every witness before three Watergate grand juries), *and In re Nichter*, 949 F. Supp. 2d 205, 212–13 (D.D.C. 2013) (denying disclosure of certain grand jury records about Watergate because at least one subject of the testimony was still alive).

(v) how long ago the grand jury proceedings took place;

(vi) the current status of the principals of the grand jury proceedings and that of their families;

(vii) the extent to which the desired material—either permissibly or impermissibly—has been previously made public;

(viii) whether witnesses to the grand jury proceedings who might be affected by disclosure are still alive; and

(ix) the additional need for maintaining secrecy in the particular case in question.

*Id.*

The doctrine is to be applied only in "exceptional circumstances," and it does not justify granting "garden variety" petitions for disclosure unauthorized by Rule 6(e). *Id.* at 103 (citation omitted). The burden is on the requestor to demonstrate that disclosure is appropriate, and "the baseline presumption [is] against disclosure." *Lawyers' Committee for 9/11*, 43 F.4th at 285 (alteration in original). "[T]he discretion of a trial court in deciding whether to make public the ordinarily secret proceedings of a grand jury investigation is one of the broadest and most sensitive exercises of careful judgment that a trial judge can make." *In re Craig*, 131 F.3d at 104; *see also Lawyers' Committee for 9/11*, 43 F.4th at 285–86.

## IV.    Discussion

### A.    The Government's Basis for Claiming "Special Circumstances"

No Rule 6(e)(3) exception authorizes the disclosure the Government proposes here: of, subject to redactions, all testimony and exhibits before the two grand juries that indicted Ghislaine Maxwell. The Government's motion to unseal does not contend otherwise. It does not argue that these materials would aid federal, state, military, tribal, or foreign law enforcement; or would be relevant to national security officials, another grand jury, or another judicial proceeding. Nor does the Government (or Maxwell) argue that the materials could reveal a

14

ground to dismiss the indictment against her.  And any such motion to dismiss on this basis today would very likely be futile, because Maxwell's conviction at trial renders all but the most serious errors in the grand jury proceedings harmless.  *See Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799–802 (1989) ("Only a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment, gives rise to the constitutional right not to be tried."); *United States v. Mechanik*, 475 U.S. 66, 70–73 (1986).[13]

The Government instead invokes the "special circumstances" doctrine, on the ground that there is an "abundant public interest" in obtaining additional information about Epstein and Maxwell's crimes, and the DOJ and FBI's investigation into them.  Gov't Mem. at 4; *see also id*. at 1.  It states that "[a]ttention given to the Epstein and Maxwell cases has recently intensified in the wake of the July 6, 2025 Memorandum announcing the conclusions of the Government's review into the investigation," *id*. at 5, and that release of the Maxwell grand jury materials is essential to the goal of "transparency to the American public," which "is of the utmost importance to this Administration," Motion to Unseal at 1.  "Public officials, lawmakers, pundits, and ordinary citizens," it states, "remain deeply interested and concerned about the Epstein matter."  *Id*. at 3.  And the Maxwell grand jury materials, the Government represents, are "critical pieces of an important moment in our nation's history," and "[t]he time for the public to guess at what they contain should end."  *Id*. at 3–4 (quoting *In re Petition of Nat. Sec. Archive*, 104 F. Supp. 3d 625, 629 (S.D.N.Y. 2015)).

---

[13] A district court in the Southern District of Florida recently denied the Government's motion to unseal grand jury materials relating to the Government's investigation of Epstein in that district, finding that no Rule 6(e) exception applied.  *See* Order Den. Pet. to Unseal Grand Jury Trs., *In re Grand Jury 5-02 (WPB) & 7-103 (WPB)*, 25 Misc. 80920 (S.D. Fla. July 23, 2025), Dkt. 4. Because the Eleventh Circuit does not recognize the "special circumstances" doctrine, that argument for disclosure was not available to the Government in that district.

The Government's invocation of special circumstances, however, fails at the threshold. Its entire premise—that the Maxwell grand jury materials would bring to light meaningful new information about Epstein's and Maxwell's crimes, or the Government's investigation into them—is demonstrably false.

The Court, after receiving the Government's motion to unseal, ordered it to provide materials to substantiate its claim that the Maxwell grand jury materials contained undisclosed information of significant historical or public interest.  Specifically, the Court ordered the Government to submit the grand jury transcripts and exhibits for *in camera* review, with the portions the Government proposed to redact highlighted.  And it ordered the Government to file a submission identifying the portions of the transcripts and exhibits, if any, that are not today matters of public record, including based on Maxwell's month-long jury trial on the charges returned by the grand jury.

The Government's submissions in response to the Court's orders were telling.  They belied the Government's claim, in its motion to unseal, that the Maxwell grand jury materials contain significant, undisclosed information about Epstein's and Maxwell's crimes, or the investigation into them.  Two features of these materials, which were not disclosed in the Government's motion, are noteworthy.  The Court reports these here, at a level of generality that does not disclose the substance of grand jury proceedings.

*First*, the grand juries in this case were not used for investigative purposes.  They did not hear testimony from any firsthand witness to any event at issue.  They did not hear testimony from any victim, eyewitness, suspect, or even a records custodian.  The grand juries met instead for the quotidian purpose of returning an indictment.

Each grand jury received evidence on a single day.  On that day, it heard testimony from one person: a law enforcement agent who, acting as a summary witness, testified to information obtained in the Government's investigation to support the charges in the proposed indictment. The agent, responding to tightly structured questions from an Assistant United States Attorney ("AUSA"), provided highly abbreviated, hearsay accounts of the statements of select witnesses (*e.g.*, the victims on whom counts in the proposed indictment were based).[14]  The agent led the jury through a PowerPoint of exhibits (*e.g.*, photographs and business records).  At the end of the testimony, the agent testified that he or she had not disclosed all that he or she knew, but had only responded to the AUSA's questions.  Afterwards, each grand jury voted to return the proposed indictment.[15]

---

[14] Under federal law, "[i]t is entirely permissible for the government to use hearsay evidence in its presentation to the grand jury."  *United States v. Garcia*, 413 F.3d 201, 213 (2d Cir. 2005) (quoting *United States v. Ruggiero*, 934 F.2d 440, 447 (2d Cir. 1991)); *see also United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) (noting the common "grand jury practice, improper at trial, of a single agent simply summarizing an investigation by others").

[15] The first Maxwell grand jury met on June 29, 2020.  It heard testimony from an FBI special agent.  The agent's testimony lasted approximately one hour and 25 minutes, spanning 74 double-spaced transcript pages.  Two exhibits were put before the grand jury: a PowerPoint containing slides referred to during the agent's testimony; and the proposed indictment of Maxwell.  The same grand jury briefly met again on July 8, 2020, for the purpose of returning the "S1" superseding indictment, which corrected two typographical errors in the indictment. *Compare* Dkt. 17, *with* Dkt. 1.  The grand jury did not receive additional evidence.

The second Maxwell grand jury met on March 29, 2021.  It heard testimony from a New York Police Department detective.  The detective's testimony lasted approximately an hour and 48 minutes, not including a brief recess, and spanned 117 double-spaced transcript pages.  Nearly two-thirds of the testimony consisted of reading into the record the special agent's June 29, 2020 testimony.  Six exhibits were put before the grand jury: the transcript of the June 29, 2020 grand jury testimony; the PowerPoint put before the June 29, 2020 grand jury; a new PowerPoint with further exhibits; the two earlier indictments of Maxwell; and the proposed "S2" superseding indictment.

*Second*, the evidence put before the Maxwell grand juries is today, with only very minor exceptions, a matter of public record. The Government admitted as much in response to the Court's order: "The enclosed, annotated transcripts show that much of the information provided during the course of the grand jury testimony—with the exception of the identities of certain witnesses—was made publicly available at [Maxwell's] trial or has otherwise been publicly reported through the public statements of victims and witnesses." Dkt. 800 at 3. And because the Government proposes to redact the witnesses' identities, the exception it noted does not reflect information that the public would learn were the grand jury transcripts unsealed.

The Court's review confirmed that unsealing the grand jury materials would not reveal new information of any consequence. In response to the Court's order, the Government supplied the Court with a binder highlighting any information that the Government had been unable to determine is public. Only scattered words, clauses, and occasional sentences are highlighted. These items are few and far between.[16] The highlighted snippets supply, at most, tertiary details about the same conduct that was the focus of Maxwell's month-long trial. The same is so for the exhibits put before the grand juries. Save inconsequential portions of a few exhibits, these were received in evidence at Maxwell's trial. Some were reproduced in the Maxwell indictments.

A member of the public familiar with the Maxwell trial record who reviewed the grand jury materials that the Government proposes to unseal would thus learn next to nothing new. The materials do not identify any person other than Epstein and Maxwell as having had sexual contact with a minor. They do not discuss or identify any client of Epstein's or Maxwell's. They do not reveal any heretofore unknown means or methods of Epstein's or Maxwell's crimes.

---

[16] And the Government's highlighting is significantly over-inclusive: On the Court's review of the trial record, a number of items highlighted in fact were covered by testimony at Maxwell's trial.

They do not reveal new venues at which their crimes occurred.  They do not reveal new sources of their wealth.  They do not explore the circumstances of Epstein's death.  They do not reveal the path of the Government's investigation.

Insofar as the motion to unseal implies that the grand jury materials are an untapped mine lode of undisclosed information about Epstein or Maxwell or confederates, they definitively are not that.  A "public official," "lawmaker," "pundit," or "ordinary citizen" "deeply interested and concerned about the Epstein matter," Motion to Unseal at 3, and who reviewed these materials expecting, based on the Government's representations, to learn new information about Epstein's and Maxwell's crimes and the investigation into them, would come away feeling disappointed and misled.  There is no "there" there.

This case is thus a far cry from every reported case applying the Second Circuit's "special circumstances" doctrine.  In each such case, the petition to unseal, whether granted or denied, sought unique, undisclosed information.  That information generally consisted of firsthand testimony from a public figure or a witness to an important event.  *See, e.g.*, *In re Biaggi*, 478 F.2d at 490–91 (granting petition to unseal grand jury testimony of New York City mayoral candidate Mario Biaggi); *In re Craig*, 131 F.3d at 101 (denying petition to unseal 1948 grand jury testimony of Harry Dexter White, an Assistant Secretary of the Treasury accused of being a Communist spy); *In re Petition of Nat'l Sec. Archive*, 104 F. Supp. 3d 625, 626, 629 (S.D.N.Y. 2015) ("*In re National Security Archive*") (granting petition to unseal 1950 grand jury records leading to the indictment of Julius and Ethel Rosenberg for conspiracy to commit espionage); *In re Petition of Am. Hist. Ass'n for Order Directing Release of Grand Jury Minutes*, 49 F. Supp. 274, 278, 297–98 (S.D.N.Y. 1999) ("*In re AHA*") (granting in part and denying in part petition to unseal transcripts of 1947–1950 grand jury testimony regarding alleged espionage

by State Department official Alger Hiss); *see also* note 12, *supra* (citing similar D.D.C. cases). None of these cases involved the secondhand, summary-witness testimony of law enforcement agents. None involved testimony that, by the time of the motion, had already come to light as a result of trial testimony by percipient witnesses on the indictment returned by the grand jury.

The Government has not cited any case finding such materials to present a "special circumstance" that justifies the exceptional step of unsealing grand jury materials. There is none.

The one colorable argument under that doctrine for unsealing in this case, in fact, is that doing so would expose as disingenuous the Government's public explanations for moving to unseal. A member of the public, appreciating that the Maxwell grand jury materials do not contribute anything to public knowledge, might conclude that the Government's motion for their unsealing was aimed not at "transparency" but at diversion—aimed not at full disclosure but at the illusion of such. And there is precedent—*In re Biaggi*, the fountainhead of the Second Circuit's "special circumstances" doctrine—permitting a court to order the release of grand jury testimony to correct a movant's misleading public characterization of it.

*In re Biaggi* arose from a motion by a mayoral candidate, Mario Biaggi, to reveal his earlier grand jury testimony, ostensibly to rebut a news report that he had invoked the Fifth Amendment. 478 F.2d at 490–91. Denying he had done so, Biaggi asked, on television and later in a motion, that the court examine his testimony and publicly confirm that he had claimed no constitutional privileges. *Id.* at 491. The Government moved for disclosure of Biaggi's testimony, redacted to protect others' names, and the district court granted that motion; Biaggi appealed, seeking disclosure of his testimony without redactions. *Id.* The Second Circuit, per Chief Judge Friendly, authorized disclosure of the testimony, emphasizing that Biaggi and the Government had waived objections to disclosure, and that others' interests could be protected by

redactions.  *Id*. at 492–93.  And once Biaggi's testimony had been released, the Circuit

elaborated in a supplemental opinion:  In demanding that a court review his testimony, Biaggi

had misleadingly implied to the public that he had answered every question before the grand

jury.  In fact, Biaggi had refused to answer 17 questions.  *Id.* at 494.  In these "special

circumstances," the Circuit stated, "the public interest required" disclosure of Biaggi's

testimony—in other words, to put the lie to Biaggi's false account.  *Id.*

This Court gave careful consideration to unsealing the Maxwell grand jury materials on a

similar rationale.  But with the Government having now conceded that the information it

proposes to release is redundant of the public record—that this information was "made publicly

available at [Maxwell's] trial or has otherwise been publicly reported"—the public interest in

testing the Government's bona fides does not require the extraordinary step of unsealing grand

jury records.  Dkt. 800 at 3.  Without any need to review the grand jury materials, the public can

evaluate for itself the Government's asserted bases for making this motion.

The Court therefore denies the Government's motion to unseal at the threshold.  Contrary

to the Government's depiction, the Maxwell grand jury testimony is *not* a matter of significant

historical or public interest.  Far from it.  It consists of garden-variety summary testimony by two

law enforcement agents.  And the information it contains is already almost entirely a matter of

longstanding public record, principally as a result of live testimony by percipient witnesses at the

2021 Maxwell trial.

### B.    Application of the *In re Craig* Factors

In cases involving grand jury testimony of significant historical or public interest, *In re*

*Craig* supplies a framework for evaluating whether disclosure, on balance, is warranted.  It

identifies non-exclusive factors that may weigh against disclosure, including the interests of the

defendant and witnesses.  Because the secondhand testimony at issue here is redundant of the

public-record trial testimony of firsthand witnesses, and thus is not of significant historical or public interest, there is arguably no charter for even undertaking the *In re Craig* inquiry. After all, the "special circumstances" exception to Rule 6(e) only applies in "exceptional circumstances," not to "garden variety" grand jury testimony. *In re Craig*, 131 F.3d at 103 (citation omitted); *see also* Gov't Mem. at 3–4 ("acknowledg[ing] the extraordinary nature of [its] request").

Nonetheless, for completeness, the Court evaluates the Government's motion in light of the non-exhaustive factors listed in *In re Craig*. The Court also addresses two other factors implicated by the motion: the perspectives of Epstein's and Maxwell's victims, as expressed in letters to the Court; and the systemic interest in grand jury secrecy.

As this assessment shows, the Government has failed, by a wide margin, to carry its burden. These factors, considered together, favor denial of its motion to unseal.

### 1.    Identity of the Party Seeking Disclosure

This factor ordinarily carries "great weight," and "the government's position should be paid considerable heed." *In re Craig*, 131 F.3d at 106. But the Government's position is "not dispositive." *Id.* "Government support cannot 'confer' disclosure, nor can government opposition preclude it." *Id.* And courts in this District, applying the *In re Craig* factors, have ruled against the Government's position. *See In re National Security Archive*, 104 F. Supp. 3d at 628–29 (ordering, over Government's objection, disclosure of testimony of two witnesses before grand jury that indicted Julius and Ethel Rosenberg for espionage); *In re AHA*, 49 F. Supp. 2d at 278, 297–98 (ordering, over Government's objection, disclosure of testimony before grand juries that investigated and/or indicted Alger Hiss for espionage).

This factor favors disclosure. But for two reasons, the Court accords this factor limited weight.

First, as the Second Circuit has explained, the Government's position is mainly relevant because it reflects whether there is an ongoing need for grand jury secrecy. *See In re Craig*, 131 F.3d at 106 (where "the government supports a motion for disclosure, that should serve as a preliminary indication that the need for secrecy is not especially strong"). But the central infirmity of this motion to unseal does not concern an ongoing need for secrecy in this case. The infirmity is that, as the Government has conceded, the Maxwell grand jury materials do not reveal information outside the public domain.

Second, any argument that the Government's motion to unseal merits substantial deference is weakened by a host of irregularities with respect to that motion. That motion was not made, nor has it been joined in, by any member of the Government's trial team—the DOJ lawyers presumably most familiar with the Maxwell case and the broader Epstein-Maxwell investigation. The motion was filed by the DAG alone, without any signatory from the U.S. Attorney's Office in this District. And it was made under circumstances suggestive of haste rather than reflective deliberation. The motion was three-and-a-half pages in length; there were no supporting materials filed, under seal or otherwise; the motion did not disclose (or reflect awareness of) the summary-witness nature of the Maxwell grand jury testimony; and the motion was made without advance notice to Epstein's and Maxwell's victims, a fact which, as reviewed below, has alarmed numerous victims. Only after the Court inquired on that point was notice to victims given. *See* Dkt. 789; Dkt. 796 at 9. Finally, the Government's highlighting of the grand jury transcripts did not suggest close familiarity with the Maxwell trial record, because a number of details that it identified as non-public in fact had been testified to during the trial. *See* note 16, *supra*.

### 2.    Whether the Defendant to the Grand Jury Proceedings or the Government Opposes Disclosure

Maxwell opposes disclosure because, among other reasons, her case remains on direct appeal.  Dkt. 803 at 2 ("Because this is ongoing litigation in a criminal case involving a living defendant with existing legal remedies, the government's motion should be denied.")

This factor thus weighs against unsealing.  The Court, however, assigns limited weight to this factor because Maxwell, who does not have a legal right to access the grand jury materials, has not seen it.  Her opposition is therefore fairly viewed as precautionary.  Had Maxwell been aware that the grand jury materials are duplicative of information in the public record, her position might have been different.

### 3.    Why Disclosure Is Being Sought in the Particular Case

This factor addresses the present-day significance of the grand jury materials at issue and whether their disclosure would advance the public interest.  This factor so decisively weighs against unsealing that it alone would require denying the Government's motion.

Arguments to disclose grand jury testimony on account of historical or public interest are "totally appropriate" and sometimes may even be weighty.  *In re Craig*, 131 F.3d at 106.  But for the reasons reviewed above, the grand jury materials here are neither of historical nor public-interest importance.  This evidence was put before the grand juries in June 2020 and March 2021, in a case that remains on direct appeal.  *Cf. In re National Security Archive*, 104 F. Supp. 3d at 628–29 (1950 grand jury testimony regarding Julius and Ethel Rosenberg); *In re AHA*, 49 F. Supp. at 278, 297–98 (1947–1950 grand jury testimony regarding Alger Hiss).  And it is not of present-day public importance because it consists of summary testimony by law enforcement agents recounting information that today is a matter of public record, on account of the month-long trial on the charges returned by the grand jury.  *Cf. In re Biaggi*, 478 F.2d at 494 (grand jury

testimony of mayoral candidate exposing as false his representation to the public that he had answered all questions before grand jury). And the Government's stated rationale for its motion bears no resemblance to any "grounds that justify disclosure under the existing exceptions listed in Rule 6(e)." *In re Craig*, 131 F.3d at 106.

In arguing that this factor favors disclosure, the Government makes broad proclamations about the public's interest in learning more about the Epstein-Maxwell investigation. *See* Gov't Mem. at 5 ("Many questions remain unanswered, and the public's interest remains." (quoting *In re AHA*, 49 F. Supp. 2d at 294)). That interest is undeniable. But the Government has failed to connect it to the materials at issue, which would not answer any of the public's questions.

This factor decisively weighs against unsealing.

### 4.    What Specific Information Is Being Sought for Disclosure

"The specificity of the data sought is significant in at least two ways." *In re Craig*, 131 F.3d at 106.

> First, there are obvious differences between releasing one witness'[s] testimony, the full transcript, or merely the minutes of the proceeding. And, second, it is highly relevant whether the disclosure is general or limited to a specified number of people under special circumstances.

*Id*. at 106–107 (citation omitted).

Here, the Government does not seek tailored disclosure of discrete items within a grand jury record. Nor does it seek leave to disseminate grand jury materials to a specified audience. It seeks disclosure to the public at large of the entire proceedings before the Maxwell grand jury, subject only to redactions aimed at protecting privacy.

This factor weighs against unsealing. The Government has identified no information of consequence within the grand jury record that is not already public. And, under *In re Craig*, the blanket quality of the motion to unseal weighs against unsealing.

### 5.    How Long Ago the Grand Jury Proceedings Took Place

The Second Circuit has instructed:

> The timing of the request remains one of the most crucial elements.  Time matters in several ways.  First, if historical interest in a specific case has persisted over a number of years, that serves as an important indication that the public's interest in release of the information is substantial.  (Hence the hypotheticals involving John Wilkes Booth and Aaron Burr.)[17]  Second, the passage of time erodes many of the justifications for continued secrecy.  *See Douglas Oil* [*Co. v. Petrol Stops Northwest*, 441 U.S. 221, 222 (1979)] (noting that the interests in grand jury secrecy are reduced after the grand jury has ended its activities).  Third, the passage of time eventually, and inevitably, brings about the death of the principal parties involved in the investigations, as well as that of their immediate families.  And the continued existence and vulnerability of such parties is, of itself, a factor that a court should consider.

*Id.* at 107 (footnote added).

 This factor presents countervailing considerations.  On the one hand, 20–30 years have passed since Maxwell (and Epstein) committed the crimes for which they were charged.  (The conduct for which Maxwell was convicted spanned 1994 to 2004.)

On the other hand, the grand juries that indicted Maxwell met approximately five years ago.  Maxwell's trial occurred under four years ago.  Her conviction remains on direct appeal.  And numerous victims of Epstein and Maxwell are still alive.  These circumstances starkly contrast with most precedents in this line of cases, which involved testimony decades earlier.  *See, e.g.*, *id.* at 100 (1948 testimony); *In re National Security Archive*, 104 F. Supp. 3d at 626 (1950 testimony); *In re AHA*, 49 F. Supp. 2d at 277–78 (1947–1950 testimony); *see also* note 12, *supra* (citing similar D.D.C. cases).  *But see In re Biaggi*, 478 F.2d at 492–93 (testimony less than two years earlier).

---

[17] The Circuit, in illustrating earlier in its opinion why historical or public interest considerations could justify the release of grand jury information, stated:  "To the extent that the John Wilkes Booth or Aaron Burr conspiracies, for example, led to grand jury investigations, historical interest might by now overwhelm any continued need for secrecy."  *Id.* at 105.

This factor, on balance, weighs against unsealing.

### 6.    Current Status of the Principals of the Grand Jury and That of Their Families

This factor is aimed primarily at protecting the reputations and interests of unindicted individuals, about whom unsealed grand jury testimony would reveal damaging information not previously disclosed. *See In re Craig*, 131 F.3d at 107. There is no such person or information here. Insofar as Maxwell was the subject of the grand jury testimony, this factor suggests considering here "the continued existence and vulnerability" of her and her family. *Id*. Maxwell is alive and so theoretically could be harmed by the disclosure of adverse testimony. But here, the grand jury materials, being cumulative of the public trial evidence, do not add anything to the formidable public record inculpating her. And no family member of hers has expressed a position on the motion to unseal. Gov't Mem. at 6. This factor is neutral.

### 7.    Extent to Which the Desired Material Has Previously Been Made Public

"[T]he extent to which the grand jury material in a particular case has been made public is clearly relevant because even partial previous disclosure often undercuts many of the reasons for secrecy." *See In re Craig*, 131 F.3d at 107. Here, as explained, substantially all the information testified to by the summary witnesses in the grand juries has been revealed at Maxwell's trial. And the Government proposes to redact victim identities, consistent with the approach that it took at trial. This factor is consistent with unsealing.

### 8.    Whether Witnesses to the Grand Jury Proceedings Who Might be Affected by Disclosure Are Still Alive

Both law enforcement agents who testified are still alive. Gov't Mem. at 7. The Government, however, proposes to redact their names. This factor is neutral.

### 9.    Additional Need for Maintaining Secrecy in the Case in Question

The Government identifies under this factor the privacy interests of victims and third parties referenced in the grand jury materials. *Id.* The Government proposes to redact their names and other personally identifying information. On the Court's review, the proposed redactions would satisfactorily do so. This factor is neutral.

### 10.    Perspectives of Epstein's and Maxwell's Victims

The Court has received, and reviewed with care and great respect, letters on behalf of numerous victims of Epstein and Maxwell. *See* Dkts. 804, 806. Their letters address whether the Maxwell grand jury materials should be disclosed. They also express broader concerns about recent Government actions with respect to Maxwell and the Epstein-Maxwell investigation.

The letters, in the main, urge broad disclosure of the Government's investigative records regarding Epstein and Maxwell. Consistent with this view, they generally support release of the Maxwell grand jury materials, provided that, before release, any records be rigorously redacted to protect identities and privacy. *See, e.g.*, Dkt. 804 at 6 ("We are in full agreement with the public disclosure of the grand jury transcripts, and further state that all Epstein-related information and documents in the possession and control of law enforcement, prosecutorial[,] and other government agents and entities should be fully disclosed.").

This factor therefore favors unsealing. But there is an important qualification. The victims' interest in reviewing the grand jury materials appears to be premised on the understandable but mistaken belief that these materials would reveal new information. *See, e.g.*, *id.* at 10 ("Unsealing the grand jury transcripts would allow additional important information to emerge . . . ."); *id.* at 9 ("[T]he instant motion for unsealing will help expose the magnitude and abhorrence of Epstein's and Maxwell's crimes."). The Government had, after all, publicly portrayed these as "critical pieces of an important moment in our nation's history." Motion to

Unseal at 3.  Had the Government's motion made clear that these records are redundant of the evidence at Maxwell's public trial, the victims' responses to the motion to unseal might well have been different.

Various letters also express alarm or dismay at other recently reported, or anticipated, Government actions regarding Maxwell.[18]  These concerns, however, are properly directed to the political branches.  The Court has not considered them in resolving the motion to unseal.

### 11.    The Systemic Interest in Grand Jury Secrecy

A final consideration is systemic.  "[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."  *Douglas Oil Co.*, 441 U.S. at 218.  For that reason, the Supreme Court has instructed lower courts "considering the effects of disclosure on grand jury proceedings" to assess "the possible effect upon the functioning of future grand juries," mindful that "[p]ersons called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties."  *Id.* at 222; *see also Procter & Gamble Co.*, 356 U.S. at 682 ("The grand jury as a public institution serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow."); *Baker v. U.S. Steel Corp.*, 492 F.2d 1074, 1076 n.2 (2d Cir. 1974) (similar).

---

[18] These include the Government's decision, while pursuing release of the grand jury materials, to not publicly release further records from its investigation of Epstein and Maxwell, *see, e.g.*, Dkt. 804 at 9 (noting "the much larger volume of information available in the 'more than 300 gigabytes of data and physical evidence' in the Government's possession that should be disclosed as well"); its "suggestion that no further criminal investigations are forthcoming," *id.* at 8; its not having given notice to victims before it filed the instant motion to unseal, *id.* at 8, 16, 21; its transfer of Maxwell to a lower security prison, which, a letter states, "has further eroded the victims' confidence that their safety and dignity are priorities," *id.* at 15; the possibility that Maxwell might receive clemency, *id.* at 15–16; and the DAG's decision to meet with Maxwell "as though she were a credible authority," which, one letter states, has publicly "legitimiz[ed] her," *id.* at 15; *see also id.* at 20.

That admonition requires courts applying the Second Circuit's "special circumstances" exception to grand jury secrecy to invoke it only in rare, "exceptional circumstances," mindful of the precedent that unsealing would set. *In re Craig*, 131 F.3d at 103. The exception, after all, derives from a district court's supervisory authority over grand juries, *id*. at 102 & n.2, which carries with it the duty to safeguard "the traditional functioning of the institution," *United States v. Williams*, 504 U.S. 36, 51 (1992). Applying the exception casually or promiscuously, as the Government's motion to unseal the summary-witness grand jury testimony here invites, would risk "unravel[ing] the foundations of secrecy upon which the grand jury is premised," *In re Craig*, 131 F.3d at 103, and eroding confidence by persons called to testify before "future grand juries," *Douglas Oil Co.*, 441 U.S. at 222, that the general rule of secrecy still holds.

This factor weighs heavily against unsealing. Granting the Government's motion would bloat the "special circumstances" doctrine, which to date has warranted disclosure in only a tiny number of cases, all involving unique testimony by firsthand witnesses to events of obvious public or historical moment. And it is no answer to argue that releasing the grand jury materials, because they are redundant of the evidence at Maxwell's trial, would be innocuous. The same could be said for almost any grand jury testimony, by summary witnesses or others, given in support of charges that later proceeded to trial.

## CONCLUSION

For the reasons above, the Court denies the Government's motion to unseal the grand jury materials in this case. The Clerk of Court is respectfully directed to terminate the motion at docket 785.

SO ORDERED.

_Paul A. Engelmayer_
PAUL A. ENGELMAYER
United States District Judge

Dated: August 11, 2025
       New York, New York