UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

GHISLAINE MAXWELL,

Defendant.

---

20 Cr. 330 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion pursuant to the Epstein Files Transparency Act (the "Act"), H.R. 4405, signed into law on November 19, 2025. The Department of Justice ("DOJ") moves for an order that would enable it to publicly release two categories of records from this case that it contends are within the scope of the Act.

First, DOJ asks the Court to rule that the Act covers the grand jury transcripts and exhibits in this case (the "grand jury materials") and, as to these, overrides Federal Rule of Criminal Procedure 6(e). That ruling would authorize DOJ to publicly release the grand jury materials pursuant to the Act. Second, DOJ asks the Court to rule that the Act covers the extensive discovery the prosecution provided to counsel for defendant Ghislaine Maxwell in connection with her 2021 trial (the "discovery materials") and to modify the protective order that governs such discovery. That modification would permit DOJ to publicly release the discovery materials pursuant to the Act. Consistent with a provision of the Act, DOJ has pledged—with respect to both categories of materials—to withhold or redact segregable portions that contain personally identifiable and other victim-related information.

For the following reasons, the Court grants DOJ's motion. In modifying the protective order, the Court, consistent with the Act, puts in place a mechanism to protect victims from the

inadvertent release of materials within the discovery in this case that would identify them or otherwise invade their privacy.

I.    **Background**

A.    **Maxwell's Indictment, Trial, Sentencing, and Appeal**

The history of this case spanning indictment through direct appeal is set out in the Court's August 11, 2025 decision denying DOJ's motion to release grand jury transcripts and exhibits. *See United States v. Maxwell*, 794 F. Supp. 3d 215, 216–19 (S.D.N.Y. 2025) ("*GJ Decision*").  In brief:

On June 29, 2020, a grand jury indicted Maxwell on charges arising from her facilitation of and participation in a scheme by the notorious pedophile Jeffrey Epstein to abuse multiple minor girls.  On March 29, 2021, a different grand jury returned a superseding indictment that added related charges.

Maxwell's jury trial commenced on November 29, 2021.  It entailed testimony from four women who described the sexual abuse they had suffered, as girls, at the hands of Epstein and Maxwell; testimony of individuals who had worked for Epstein and/or Maxwell; testimony of law enforcement officials; and corroborating physical and documentary evidence, including Epstein and Maxwell's black address book, flight logs of Epstein's private planes, and FedEx records.  Trial ended on December 29, 2021 with Maxwell's conviction on five felony counts: conspiracy to entice minors to travel to engage in illegal sex acts; conspiracy to transport minors with intent to engage in illegal sexual activity; transportation of a minor with intent to engage in illegal sexual activity; participation in a sex-trafficking conspiracy; and the sex trafficking of a minor.

On June 28, 2022, after resolving post-trial motions, the Honorable Alison J. Nathan, to whom this case was then assigned, sentenced Maxwell to a term of 240 months' imprisonment.

Maxwell appealed.  On September 17, 2024, the United States Court of Appeals for the Second Circuit affirmed Maxwell's conviction.  *United States v. Maxwell*, 118 F.4th 256, 261 (2d Cir. 2024).  On November 25, 2024, the Second Circuit denied Maxwell's petition for rehearing. *United States v. Maxwell*, No. 22-1426 (2d Cir. Nov. 25, 2024), Dkt. 120.  On October 6, 2025, the Supreme Court denied Maxwell's petition for certiorari.  *Maxwell v. United States*, No. 24-1073, 2025 WL 2823724 (U.S. Oct. 6, 2025).

**B.      DOJ's First Motion to Unseal Grand Jury Materials**

On July 18, 2025, DOJ moved to unseal the grand jury transcripts and exhibits in Maxwell's case.  Citing the "extensive public interest" in Epstein's and Maxwell's crimes, it argued that unsealing these materials would serve the goal of "transparency to the American public," because the materials were "critical pieces of an important moment in our nation's history."  *GJ Decision*, 794 F. Supp. 3d at 221, 225 (citation omitted).

The case was then reassigned to this judge.  Between July 29 and August 8, 2025, the Court received submissions bearing on the motion.  These included the grand jury transcripts and exhibits themselves, which the Court reviewed *in camera*; a DOJ letter identifying the limited portions of the grand jury materials that were not already matters of public record; a brief from Maxwell opposing unsealing; and letters from representatives of victims and other witnesses.  *Id.* at 222.

On August 11, 2025, the Court denied the motion to unseal.  The Court held that the narrow exceptions to Rule 6(e), which requires that grand jury proceedings generally remain secret, did not apply.  *Id.* at 222–25.  And although the "special circumstances" doctrine recognized in the Second Circuit gives a district court discretion in limited circumstances to authorize the disclosure of grand jury materials of historical or public significance, *see In re*

*Petition of Craig*, 131 F.3d 99, 101–02 (2d Cir. 1997) ("*Craig*"), that exception, the Court held, did not apply either, for two reasons.

First, contrary to DOJ's depiction, the grand jury materials would *not* reveal new information of any consequence. *GJ Decision*, 794 F. Supp. 3d at 226 (DOJ's "entire premise— that the Maxwell grand jury materials would bring to light meaningful new information about Epstein's and Maxwell's crimes, or the Government's investigation into them—is demonstrably false."). On the contrary, the grand juries had met briefly, each receiving evidence on a single day; they had not met to investigate, but solely to return an indictment; the only testimony they had heard was summary testimony from two law enforcement officials; and, with minor exceptions, the evidence before the grand juries was already a matter of public record, largely as a result of Maxwell's 2021 trial. *Id.* at 226–27. The premise of DOJ's invocation of the special circumstances doctrine—that the materials at issue were of historical or public interest—was thus false. *Id.* at 227–28 (noting that the only arguable public interest served by disclosure would be to "expose as disingenuous the Government's public explanations for moving to unseal").

Second, even if the doctrine did apply, *Craig*'s multi-factor test weighed overwhelmingly against disclosure. Among the factors opposing disclosure: the grand jury materials were quotidian, not significant; DOJ's position in support of disclosure deserved limited weight, given its false premise and irregularities with respect to the motion; DOJ did not seek tailored disclosure but instead release of effectively the entire grand jury record; and the systemic interest in grand jury secrecy would be harmed by the casual release of records in the unexceptional circumstances here. *Id.* at 229–34.

DOJ did not appeal.[1]

## II.    DOJ's Motion Based on the Epstein Files Transparency Act

### A.    The Act

On November 19, 2025, Congress nearly unanimously passed, and the President signed, the Epstein Files Transparency Act.[2]

The Act's operative section—Section 2, entitled "Release of Documents Relating to Jeffrey Epstein"—requires the Attorney General, within 30 days of enactment and subject to enumerated exceptions, to "make publicly available in a searchable and downloadable format all unclassified records, documents, communications, and investigative materials in the possession of [DOJ], including the Federal Bureau of Investigation and United States Attorneys' Offices, that relate to":

(1)    Jeffrey Epstein including all investigations, prosecutions, or custodial matters.

(2)    Ghislaine Maxwell.

(3)    Flight logs or travel records, including but not limited to manifests, itineraries, pilot records, and customs or immigration documentation, for any aircraft, vessel, or vehicle owned, operated, or used by Jeffrey Epstein or any related entity.

(4)    Individuals, including government officials, named or referenced in connection with Epstein's criminal activities, civil settlements, immunity or plea agreements, or investigatory proceedings.

(5)    Entities (corporate, nonprofit, academic, or governmental) with known or alleged ties to Epstein's trafficking or financial networks.

(6)    Any immunity deals, non-prosecution agreements, plea bargains, or sealed settlements involving Epstein or his associates.

---

[1] DOJ made a parallel motion to unseal the grand jury transcripts and exhibits in Epstein's case. On August 20, 2025, the Honorable Richard M. Berman denied that motion. *See United States v. Epstein*, 795 F. Supp. 3d 499, 502–03 (S.D.N.Y. 2025).

[2] The Act passed the House by a vote of 427-1 and passed the Senate unanimously.

(7)   Internal DOJ communications, including emails, memos, [and] meeting notes, concerning decisions to charge, not charge, investigate, or decline to investigate Epstein or his associates.

(8)   All communications, memoranda, directives, logs, or metadata concerning the destruction, deletion, alteration, misplacement, or concealment of documents, recordings, or electronic data related to Epstein, his associates, his detention and death, or any investigative files.

(9)   Documentation of Epstein's detention or death, including incident reports, witness interviews, medical examiner files, autopsy reports, and written records detailing the circumstances and cause of death.

Act § 2(a).  Subsection 2(b), entitled "Prohibited Grounds for Withholding," provides:

No record shall be withheld, delayed, or redacted on the basis of embarrassment, reputational harm, or political sensitivity, including to any government official, public figure, or foreign dignitary.

*Id*. § 2(b)(1).

Subsection 2(c), titled "Permitted Withholdings," identifies five categories of records as to which the Attorney General "may withhold or redact the segregable portions."  *Id*. § 2(c)(1).  The only one directly relevant to this motion is the first category.  It covers records that "contain personally identifiable information of victims or victims' personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  *Id.* § 2(c)(1)(A).[3]  "All redactions must be accompanied by a written justification published in the Federal Register and submitted to Congress."  *Id.* § 2(c)(2).

Under Section 3, within 15 days of completing the public release of materials pursuant to the Act, the Attorney General must submit to the House and Senate Committees on the Judiciary a report listing:

---

[3] The other four categories as to which the Attorney General is empowered to withhold or redact records are those that (1) contain child sexual abuse materials; (2) would jeopardize active federal investigations or prosecutions, provided such withholding is narrowly tailored and temporary; (3) depict images of death, physical abuse, or injury of any person; or (4) contain properly classified information.  Act § 2(c)(1)(B)–(E).

(1)    All categories of records released and withheld.

(2)    A summary of redactions made, including legal basis.

(3)    A list of all government officials and politically exposed persons named or referenced in the released materials, with no redactions permitted under subsection (b)(1).

*Id.* § 3(1)–(3).

### B.    The Present Motion

On November 24, 2025, DOJ moved for an expedited ruling authorizing it to (1) unseal the grand jury transcripts and exhibits in Maxwell's case, and (2) modify the protective order in this case, to the extent that that order would otherwise prohibit DOJ from publicly disclosing materials as required by the Act.  Dkt. 810 ("Mot.") at 1.  As to the latter, DOJ's motion cited the protective order issued by Judge Nathan on July 30, 2020.  *Id*. at 3 (citing Dkt. 36).

DOJ stated that it interprets the Act to reach, and to require DOJ to publish, the grand jury and discovery materials in this case, unless a statutory basis for withholding applies.  *Id*. at 2.  As to such withholdings, DOJ stated that it would "make appropriate redactions of victim-related and other personal identifying information."  *Id*. at 8.  DOJ did not indicate an intention to withhold or redact materials on any other statutory basis.[4]

### C.    Ensuing Orders and Submissions

On November 24, 2025, upon receiving DOJ's motion, the Court, mindful of the Act's 30-day disclosure deadline, set an expedited schedule for responses by affected persons. Dkt. 811.  The Court gave Maxwell until December 3, 2025 to respond.  It set the same deadline

---

[4] DOJ filed a parallel motion in Epstein's case.  *See United States v. Epstein*, No. 19 Cr. 490 (RMB) (S.D.N.Y. Nov. 24, 2025), Dkt. 85.

for responses by victims and/or their representatives, and directed DOJ immediately to notify the victims of its motion. It gave DOJ until December 10, 2025 to file any response. *Id*. at 2.[5]

On November 25, 2025, the Court issued a second order, seeking clarifications from DOJ. Dkt. 812. The Court's review of the docket had revealed that *two* protective orders had issued in Maxwell's case. The first, issued July 30, 2020, shortly after Maxwell's arraignment, governed the discovery the prosecution would thereafter produce to the defense, pursuant to Federal Rule of Criminal Procedure 16 and the prosecution's other discovery obligations. *See* Dkt. 36 ("Protective Order"). The second, issued November 24, 2021, five days before trial, covered discovery produced to the defense and the Government pursuant to Federal Rule of Criminal Procedure 17(c), which governs trial subpoenas. *See* Dkt. 505 ("Rule 17(c) Protective Order"). To assure that the victims and Maxwell had fair notice of the materials covered by DOJ's motion, the Court directed DOJ to file a letter (1) stating whether it sought modification of both protective orders or just one, and (2) enumerating the categories of materials covered by each protective order that it sought to make public. Dkt. 812 at 2. The Court directed DOJ to state whether these included—in addition to materials produced pursuant to Rules 16 and 17(c)—materials produced pursuant to the Jencks Act, 18 U.S.C. § 3500 (*i.e.*, witness statements). *Id*.

On November 26, 2025, DOJ responded. Dkt. 813. It stated that its motion covered both protective orders and that the first subsumed the second; that the motion covered materials produced pursuant to the Jencks Act as well as Rules 16 and 17(c); and that DOJ intended to withhold victim information "to the fullest extent permitted by the Act." *Id*. at 1.

---

[5] The Court later moved DOJ's response deadline two days earlier—to December 8, 2025—to align its briefing schedule with that in Epstein's case. Dkt. 814.

As to the categories of materials to be publicly released subject to such withholding, DOJ listed the following, based on its initial review:

- Judicial process obtained during the course of the investigations (*e.g.*, search warrants and related applications, pen register orders and related applications);

- Financial records (*e.g.*, bank records, credit checks and credit reports, credit card records, money transmitter records, brokerage or other investment account records);

- Travel records (*e.g.*, commercial airline records, private airline passenger logs, online booking records, flight manifests);

- Grand jury subpoena returns from Internet service providers (*e.g.*, Instagram, Microsoft, Google, other email providers);

- Records obtained from various government agencies (*e.g.*, New York State Department of State, Bureau of Prisons, U.S. Virgin Islands Division of Corporations, NYPD computer checks, Delaware Division of Corporation records, police reports from various law enforcement agencies, SORNA records, FAA records);

- School records;

- Search warrant returns (*e.g.*, email, cloud, and other ISP searches; photographs, scans, and copies of materials obtained during physical searches; electronic searches of computers, telephones, and other electronic devices);

- Materials produced by law firms, including firms representing victims;

- Arrest reports, booking records, post-arrest statements, and photographs and/or copies of materials seized incident to arrest;

- Materials from related civil litigations (*e.g.*, recordings from depositions, transcripts of depositions);

- Photographs and videos of relevant properties and locations (*e.g.*, Epstein properties, Maxwell residence, Interlochen);

- Immigration records;

- Records related to online purchases from various online retailers;

- Materials obtained from the Palm Beach Police Department and the United States Attorney's Office for the Southern District of Florida, including reports, photographs, and videos;

- Forensic examination reports related to electronic extractions of various media;

- Copies of photographs and other materials voluntarily produced by third parties, including victims;

- Postal and courier records (*e.g.*, FedEx);

- Materials produced by the estate of Jeffrey Epstein;

- Driver's licenses and DMV records; and

- Reports and notes of interviews of third parties and victims, and certain communications relating to the same.

*Id*. at 2–3 (cleaned up).

On December 3, 2025, Maxwell, through counsel, responded.  Dkt. 815.  Her one-page letter stated that she did not take a position on DOJ's requests to unseal the grand jury materials and modify the Protective Order pursuant to the Act.  *Id.* at 1.

On December 2, 2025, Annie Farmer, a victim who testified under her full name at Maxwell's trial, filed a letter through counsel.  Dkt. 816 ("Farmer Letter").  Ms. Farmer's letter stated that she supports—subject to redactions for victims' personal information—the unsealing and release of grand jury and discovery materials in this case, as well as of investigative materials held by DOJ outside the discovery in this case.  She expressed concern that DOJ might not fully comply with the Act, and disappointment that, to date, DOJ has not taken action against "other critical inner circle Epstein accomplices."  *Id.* at 1–2.

On December 5, 2025, the Court docketed three additional letters that victims and others had submitted to DOJ for transmittal to the Court.  Dkt. 818.

10

In the first letter, dated November 25, 2025, counsel for a consortium of victims of Epstein and Maxwell faulted DOJ for having failed to redact victims' names in documents DOJ provided to the House of Representatives Oversight Committee and which that Committee later published. *Id.* at 4–10 ("Victim Consortium Letter"). These victims asked the Court to assure that DOJ adequately redact victims' personal information in any materials that the Court authorizes DOJ to release pursuant to the Act. *Id.* at 10.

In the second letter, dated December 3, 2025, counsel for a victim's family member ("John Doe")—who had been designated to testify at Maxwell's trial but ultimately did not do so—asked that all personally identifiable information regarding the family member be redacted in any materials made public pursuant to the Act. *Id.* at 11–12 ("John Doe Letter"). Revelation of the family member's name, the letter stated, would tend to identify the victim. *Id.*

In the third letter, dated December 3, 2025, Neil S. Binder, counsel for several non-party individuals, opposed DOJ's request to release grand jury and discovery materials under the Act. *Id.* at 14–17 ("Binder Letter"). The letter argued that the Act does not authorize the disclosure of either set of records. The letter separately asked the Court, were it to grant DOJ's motion to modify the Protective Order in this case, not to modify, *sua sponte*, a protective order governing discovery in a separate civil action against Maxwell in this District. *Id.* (citing *Giuffre v. Maxwell*, No. 15 Civ. 7433 (LAP), 2023 WL 8715697 (S.D.N.Y. Dec. 18, 2023)).

On December 8, 2025, DOJ filed a response. Dkt. 819. DOJ stated that the consortium of victims had unfairly accused it of releasing personally identifiable information about victims; that information, DOJ stated, had earlier been publicly released. *Id.* at 1 n.1, 3; Dkt. 819-1 at 1. DOJ stated that it will nonetheless henceforth redact victim names even where earlier publicly identified. Dkt. 819 at 3. DOJ stated that it is committed to respecting victims' privacy, is

collecting victim identities, and has put in place a mechanism for victims or their counsel to contact DOJ. *Id.* at 2–4 ("Any victims seeking redaction are able to reach the Department directly (via USANYS.EpsteinMaxwellVictims@usdoj.gov).").

### III.    Discussion

DOJ's motion raises two questions.

First, does the Act reach the discovery materials covered by the Protective Order, and the grand jury materials in this case? And, as to the grand jury materials, does the Act override Rule 6(e)'s prohibition on disclosure?

Second, given the Court's below holding that the Act covers such records, how should the Protective Order be modified? In particular, insofar as discovery in this case will be released subject to the withholding of victim-related information as permitted by the Act, what mechanism should the Protective Order include to assure that the privacy interests of victims are protected?

### A.    Scope of the Act

#### 1.    Application to the Discovery Materials

The Protective Order in this case, issued by Judge Nathan on an application from the Government, covers all "documents and materials" produced by the Government to Maxwell's counsel pursuant to Rule 16 and any other discovery obligations. *See* Protective Order at 1 (defining such materials as the "Discovery"). DOJ has clarified that the Protective Order also covers discovery produced pursuant to the Jencks Act and Rule 17(c). Dkt. 813 at 2 & n.3.[6] In other words, the Protective Order covers all discovery the prosecution made to the defense.

---

[6] For this reason, the Government explains, the Protective Order subsumes the material covered by the later Rule 17(c) Protective Order. Dkt. 813 at 2 n.3. This decision therefore solely refers to the Protective Order.

The Protective Order mainly restricts the defense.  It prohibits Maxwell's counsel from disseminating or copying the discovery materials, subject to limited exceptions (*e.g.*, for defense experts).  Protective Order at 2–6.  But it also limits the Government's dissemination of discovery.  In the provisions relevant to the present motion, the Protective Order prohibits the Government from "posting or causing to be posted any of the Discovery or information contained in the Discovery on the Internet, including any social media website or other publicly available medium," and, except as required to discharge professional obligations in the case, "from publicly disclosing or disseminating the identity of any victims or witnesses referenced in the Discovery."  *Id*. at 4–5.

The Act unambiguously applies to the discovery in this case.  It governs "*all* unclassified records, documents, communications, and investigative materials in the possession of [DOJ], including the Federal Bureau of Investigation and United States Attorneys' Offices" related to Maxwell, Epstein, and other enumerated subjects.  Act § 2(a) (emphasis added).  That broad formulation embraces the voluminous discovery subject to the Protective Order in this case.  Such, by definition, was, and is, possessed by DOJ, and specifically by the United States Attorney's Office in this District (the "USAO").[7]

The Court thus finds that modification of the Protective Order is necessary to enable DOJ to carry out its legal obligations under the Act.  Such relief is authorized by the Protective Order, which expressly provides for its modification by the Court.  *See* Protective Order at 11–12.

---

[7] The Court, of course, cannot foreclose the possibility that the discovery furnished by the Government to the defense in this case included extraneous items outside the scope of Section 2(a) of the Act.  The Act would not require the Government to publicly release such items.

### 2.    Application to Grand Jury Materials

#### a.    Scope of the Act

The Act does not explicitly refer to grand jury materials.  The Court nonetheless holds—again in agreement with DOJ—that the Act textually covers the grand jury materials in this case.  That is for three reasons.

First, the Act references Ghislaine Maxwell by name.  Act § 2(a)(2).  Indeed, in the provision of the Act describing materials required to be publicly disclosed, one subsection is devoted entirely to materials "that relate to . . . Ghislaine Maxwell."  *Id.*; *see Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (collecting cases holding that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms" (citation omitted)).

Second, the Act covers "all unclassified records, documents, communications, and investigative materials in the possession of [DOJ], including . . . United States Attorneys' Offices, that relate to . . . Maxwell," as well as Epstein and other topics.  *Id.* § 2(a).  That language is strikingly broad.  It thus applies to the grand jury materials in this case, which, like the discovery subject to the Protective Order, are held by the USAO.  *See United States v. McCue*, 301 F.2d 452, 455 (2d Cir. 1962) ("very broad language" of a statute indicated that the statute's mentions of specific examples were non-exhaustive).

Third, the Act does not exempt grand jury materials from disclosure, in contrast to its exceptions permitting the withholding or redaction of five other categories of materials.  For instance, it specifically exempted properly classified information from public release.  Act § 2(c)(1)(E).  Congress undeniably was aware—including from DOJ's recent unsuccessful motion to unseal the grand jury records—that the prosecution of Maxwell entailed grand jury

materials held by the USAO.[8]  Its decision not to exclude grand jury materials despite knowledge

as to their existence, while expressly excluding other categories of materials (such as classified

information), indicates that the Act covers grand jury materials.  *See Ruiz-Almanzar v. Ridge*,

485 F.3d 193, 197 (2d Cir. 2007) (fact that Congress was "likely aware" of a category of

individuals but chose not to exclude them explicitly from a statute's coverage suggested the

statute covered that category); *Bd. of Trs. of Bakery Drivers Loc. 550 & Indus. Pension Fund v.

Pension Benefit Guar. Corp.*, 136 F.4th 26, 31 (2d Cir. 2025) (that one statutory provision did

not exclude certain items that were expressly excluded in other provisions supported that first

provision covered those items).

### b.    Interplay with Rule 6(e)

A separate issue arises from the interplay between the Act and Rule 6(e).  The two

authorities squarely conflict: the Act, subject to permitted withholdings, mandates publication of

grand jury records, but Rule 6(e)—as this Court recently held—forbids such disclosure.

DOJ is correct that, as between the two, the Act controls.  As a general rule, "later

statutes receive precedence over earlier statutes and specific statutes receive precedence over

more general statutes."  *United States v. Mohammed*, 27 F.3d 815, 820 (2d Cir. 1994).  Both

canons apply here with force.  The Act is specific, focused on evidence about Epstein and

Maxwell, where Rule 6(e) prescribes a general rule.  *See, e.g.*, *Busic v. United States*, 446

---

[8] The Act's limited legislative history contains statements reflecting representatives' awareness of the existence of grand jury materials and their understanding that the Act could abrogate grand jury secrecy.  *See, e.g.*, 171 Cong. Rec. H4729 (daily ed. Nov. 18, 2025) (statement of Rep. Issa) (urging amendment of the Act "so that it properly protects both the tradition of the grand jury and . . . innocent people that would otherwise be swept up"); *id.* at H4731 (statement of Rep. Johnson) (citing Judge Berman's denial of DOJ's request to release the Epstein grand jury materials, and expressing concern that the Act, if not amended, "potentially jeopardizes grand jury secrecy" in that it "raises a risk that the grand jury process will become politicized in the future").

U.S. 398, 406 (1980) ("a more specific statute will be given precedence over a more general one"); *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) (absent "clear intention otherwise, a specific statute will not be controlled or nullified by a general one").  And the Act was passed last month, whereas Rule 6(e) dates to 1946 with occasional amendments, the most consequential in 1977.  *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 193 (2d Cir. 2021) (holding later statute to govern over earlier statute because, "'when the scope of the earlier statute is broad but the subsequent statute more specifically addresses the topic at hand,' there is even greater reason to assume the later statute controls" (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000)) (cleaned up)); *Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 984 F.3d 30, 37 (2d Cir. 2020) (similar).

Furthermore, Section 2(b)(1) of the Act implicitly reflects Congress's intent to overcome grand jury secrecy.  A central purpose for the rule of secrecy, and one that continues to apply after a grand jury's investigation has concluded, is "to protect . . . unindicted individuals from the anxiety and public castigation that may result from disclosure."  *In re Am. Hist. Ass'n*, 62 F. Supp. 2d 1100, 1103 (S.D.N.Y. 1999); *see also Craig*, 131 F.3d at 102 (grand jury secrecy protects the "interests of other persons who may have been unfavorably mentioned by grand jury witnesses or in questions of the prosecutor" (citation omitted)).  But Section 2(b)(1) of the Act expressly provides that the reputational interests of unindicted persons—including public figures who associated with Epstein and/or Maxwell—will *not* justify the withholding or redacting of records required to be made public by the Act.  *See* Act § 2(b)(1) ("No record shall be withheld, delayed, or redacted on the basis of embarrassment, reputational harm, or political sensitivity, including to any governmental official, public figure, or foreign dignitary.").  By repudiating that

central purpose for grand jury secrecy, Congress signaled its expectation that the Act would overcome grand jury secrecy. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 664 n.8 (2007) (repeal can occur where new statute "displaces earlier, inconsistent [statutory] commands"); *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 134 (1974) (same where "positive repugnancy" exists between earlier and later statutes "that cannot be reconciled"). This outcome accords with the limited case law resolving claims that a federal statute has overridden Rule 6(e).[9]

The Court thus holds that, in passing the Act, Congress overrode Rule 6(e), in the very limited context of the Maxwell and Epstein grand jury materials. As to other grand juries, the secrecy of testimony, exhibits, and any other materials remains the rule, subject to the limited exceptions set out in Rule 6(e). But, in the case of the Maxwell and Epstein grand juries, under the Act, public disclosure of such materials is the rule, subject to the limited exceptions set out in

---

[9] *Illinois v. Abbott & Associates, Inc.*, the central case on whether a federal statute partly abrogates Rule 6(e), addressed a quite different situation. 460 U.S. 557 (1983). There, a state attorney general sought to obtain federal grand jury records under the Clayton Act, 15 U.S.C. § 15f(b), despite Rule 6(e)'s prohibition on such disclosure absent a showing of "particularized need." *Id.* at 560, 566. The Clayton Act required federal investigative materials to be provided to state attorneys general "to the extent permitted by law." 15 U.S.C. § 15f(b). The Supreme Court held that the Clayton Act did not override Rule 6(e) with respect to grand jury materials. *Abbott*, 460 U.S. at 568. It held that the disclosure sought by the state attorney general "would have been denied [under Rule 6(e)] because it was not permitted by law." *Id.* Thus, the "plain language" of the Clayton Act—with its caveat that investigative materials be disclosed only "to the extent permitted by law"—did not disturb Rule 6(e). *Id.* Rule 6(e)'s legislative history strongly reinforced this conclusion, because Congress had specifically rejected a proposal for Rule 6(e) to create a right of access similar to that which the state attorney general urged. *Id.* at 568–70. In contrast to the Clayton Act, the Epstein Files Transparency Act does not contain any caveat, even implicit, that the release of materials related to Epstein and Maxwell must be consistent with Rule 6(e).

the Act.  The Act thus requires the Attorney General to make public the Maxwell grand jury materials, subject to the withholdings and redactions that the Act permits.[10]

### B.    Modifications of the Protective Order

#### 1.    Authorization to Release Records Pursuant to the Act

In light of the above, the Court modifies the Protective Order, governing discovery in this case, to add the following paragraph:

> "20.  Nothing in this Protective Order shall prohibit the Government from publicly releasing materials whose disclosure is required by the Epstein Files Transparency Act.  The restrictions of this Protective Order, however, remain in place with respect to the segregable portions of records that 'contain personally identifiable information of victims or victims' personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.'  Epstein Files Transparency Act § 2(c)(1)(A)."

#### 2.    Mechanism to Protect Victims' Privacy and Confidentiality

An additional modification of the Protective Order is necessary to assure that, in the process of reviewing the extensive discovery in this case for release pursuant to the Act, DOJ rigorously guards against releasing protected victim information.

A paramount goal of the Protective Order entered by Judge Nathan at the start of this case was to protect the privacy interests of Maxwell's and Epstein's victims.  The Protective Order lists the "privacy and confidentiality of individuals" as a basis—along with not impeding the then-ongoing investigation and avoiding prejudicial pretrial publicity—for limiting the dissemination of discovery.  Protective Order at 1.  It recognizes that the discovery would contain "personal identification information of victims, witnesses, or other specific individuals who are not parties to this action, and other confidential information."  *Id*. at 6.  It prohibits the

---

[10] In light of this holding, the Court does not have occasion to consider the Government's alternative argument: that, in light of the Act, the "special circumstances" exception to Rule 6(e) recognized in the Second Circuit now supports disclosure of the Maxwell grand jury records.

defense from making public filings that identify victims or witnesses "who have not spoken by name on the public record in this case, unless authorized by the Government in writing or by Order of the Court." *Id.* at 5. It authorizes the Government to designate individual records as "Confidential" or "Highly Confidential," and imposes heightened restrictions on the use and disclosure of such discovery. *Id.* at 6–10. The Act recognizes these same privacy interests of Maxwell's and Epstein's victims, in permitting the Attorney General to withhold release of segregable portions of records that would personally identify or otherwise invade the privacy of these victims if made public. Act § 2(c)(1)(A).[11]

In moving to modify the Protective Order, DOJ has stated that it will "work with the relevant United States Attorney's Offices to make appropriate redactions of victim-related and other personal identifying information." Mot. at 8. The victims of Epstein and Maxwell who have written the Court are largely supportive of the Act's command that DOJ's investigative records relating to Epstein's and Maxwell's crimes be made public. *See, e.g.*, Farmer Letter at 1 ("Only transparency is likely to lead to justice, and for this reason the victims fought tirelessly to achieve the [Act's] passage."). But they have voiced concern that their identities and privacy will be compromised in the course of the release of records pursuant to the Act. *See, e.g.*, Victim Consortium Letter at 5–7. These victims therefore "seek the Court's assistance in ensuring that [their] names and identifying information are protected from public disclosure." *Id.* at 9. The Court construes these victims to request that, in modifying the Protective Order, the Court put in place a reliable mechanism to guard against disclosure of their names and other identifying information in any discovery subject to that order.

---

[11] With respect to the privacy interests of persons other than victims, however, the Act, departing from the Protective Order, prohibits withholding "on the basis of embarrassment, reputational harm, or political sensitivity." Act § 2(b)(1).

The victims' concerns, regrettably, have a basis in fact.  In its two rounds of applications to this Court to disclose records, DOJ, although paying lip service to Maxwell's and Epstein's victims, has not treated them with the solicitude they deserve.  DOJ made its July 18, 2025 motions to unseal the grand jury materials in this case and Epstein's without giving notice to Maxwell's and Epstein's victims.  Only after this Court (and Judge Berman, in Epstein's case) inquired on this point and, *sua sponte*, set a schedule for victims' input on the motion, directly or through counsel, *see* Dkt. 789, did DOJ give such notice, *see* Dkt. 796 at 9.  The letters the Court thereupon received from victims widely expressed distress at the lack of notice given to them by DOJ, *see* Dkt. 804 at 8, 16, and alarm that the grand jury records DOJ would release, if authorized to do so, would invade their privacy, *see id.* at 11–12, 17; *see also GJ Decision*, 794 F. Supp. 3d at 233 n.18 (summarizing victims' concerns).  And, as the Court chronicled in denying DOJ's motion, the motion itself misled victims—and the public at large—in holding out the Maxwell grand jury materials as essential to the goal of "transparency to the American public," when in fact the grand jury materials would not add to public knowledge.[12]

---

[12] As the Court put the point in denying that motion:

> A member of the public familiar with the Maxwell trial record who reviewed the grand jury materials that the Government proposes to unseal would thus learn next to nothing new.  The materials do not identify any person other than Epstein and Maxwell as having had sexual contact with a minor.  They do not discuss or identify any client of Epstein's or Maxwell's.  They do not reveal any heretofore unknown means or methods of Epstein's or Maxwell's crimes.  They do not reveal new venues at which their crimes occurred.  They do not reveal new sources of their wealth.  They do not explore the circumstances of Epstein's death.  They do not reveal the path of the Government's investigation. . . .

> A "public official," "lawmaker," "pundit," or "ordinary citizen" "deeply interested and concerned about the Epstein matter," Motion to Unseal at 3, and who reviewed these materials expecting, based on the Government's representations, to learn new

In applying on November 24, 2025 for leave to release records pursuant to the Act, DOJ again acted without notice to Maxwell's and Epstein's victims. *See* Mot.; Dkt. 813 at 1. The Court (and Judge Berman) were compelled again to direct DOJ forthwith to notify these victims of its latest motion, and to set a deadline for victims' submissions. Dkt. 811.

The Court accordingly, in modifying the Protective Order, will require that, before any material subject to it is publicly released, the United States Attorney for this District personally certify that such material has been rigorously reviewed for—and found to be in—compliance with Section 2(c)(1)(A) of the Act, which protects victims against revelations of their identities and invasions of their privacy. Congress's inclusion of that provision reflected its respect for the privacy rights of Maxwell's and Epstein's victims. DOJ has pledged to honor that provision. *See* Mot. at 8; Dkt. 813 at 3–4; Dkt. 819 at 1–4. And the Court has kept in place the Protective Order's prohibition on the disclosure of discovery in this case to the extent that such would breach that provision. The certification requirement that the Court is adding to the Protective Order assures that an identifiable official within DOJ takes ownership of the sensitive and vitally important process of reviewing discovery to be publicly released. It will help assure that victims' statutory privacy rights are protected.

The United States Attorney for this District is the right person to make such a certification with respect to the release of discovery subject to the Protective Order in this case, for several reasons. He signed DOJ's motion seeking modification of the Protective Order while pledging to heed Section 2(c)(1)(A). The USAO he heads, having led the successful

---

information about Epstein's and Maxwell's crimes and the investigation into them, would come away feeling disappointed and misled.

*GJ Decision*, 794 F. Supp. 3d at 227.

investigation and prosecution of Maxwell, and having amassed the discovery in this case and furnished it to the defense, is best situated to identify, and properly redact or withhold, victim-related information within that discovery. And this Court has great confidence that the professionals in the USAO will ably discharge this important and urgent duty. Designating the United States Attorney as the person responsible for certifying compliance with Section 2(c)(1)(A) with respect to the discovery in this case will also give victims an identifiable forum—the USAO in this District—in which to raise concerns particular to them (*e.g.*, that a particular record, notation, or type thereof within that discovery may identify a victim).

In light of the above, the Court will further modify the Protective Order by adding the following paragraph:

> "21. Prior to the release of any records covered by this Protective Order, the United States Attorney for the Southern District of New York shall personally certify, in a sworn declaration filed on the docket of this case, that such records have been rigorously reviewed for compliance with Section 2(c)(1)(A) of the Epstein Files Transparency Act, and that none of the records to be released 'contain personally identifiable information of victims or victims' personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.' This review is to be done by persons including attorney(s) at the United States Attorney's Office for the Southern District of New York."[13]

---

[13] For avoidance of doubt, the requirement of a pre-disclosure certification by the United States Attorney for this District applies only to the discovery covered by the Protective Order. DOJ undoubtedly possesses substantial records related to Maxwell and Epstein that were not produced in discovery in this case, including records it may have obtained after Maxwell's trial or records outside the scope of Rule 16, Rule 17(c), and Jencks Act discovery in this case. The Protective Order, including the requirement the Court has added to it that the United States Attorney certify compliance with Section 2(c)(1)(A) of the Act, does not apply to records covered by the Act that are outside the discovery in this case, and this Court does not have any authority with respect to such records. DOJ's reply letter of December 8 states that, to respect victims' interests, it has now developed a process for reviewing records covered by the Act before their release. Dkt. 819 at 2–4.

### 3.  Letter-Specific Issues

Finally, two letters received by the Court—in addition to addressing the construction of the Act—raise issues specific to particular records that may be within the discovery or grand jury materials in this case.

The letter on behalf of "John Doe" argues that his identity should be redacted from any such records because it would likely lead the public to identify his relative, an Epstein victim. John Doe Letter at 11–12.  This letter raises the issue of whether Section 2(c)(1)(A) of the Act, permitting victim-related withholdings or redactions, applies to records that could identify "John Doe."  The other letter, from counsel Neil Binder, seeks redaction of his clients' names.  Binder Letter at 15–16.  This letter does not appear to seek relief under Section 2(c)(1)(A), but it may raise the issue of whether particular records fall within the scope of the Act (*i.e.*, Section 2(a)).

These record-specific issues are properly taken up, in the first instance, with the USAO.[14]

### CONCLUSION

For the reasons above, the Court grants DOJ's motion to unseal—subject to Section 2(c)(1)(A) of the Act—the grand jury materials in this case.  The Court also grants DOJ's motion to modify the Protective Order issued on July 30, 2020.[15]  The Court modifies the Protective Order by adding to it the following two provisions as final paragraphs:

---

[14] Mr. Binder's letter separately asks the Court not to modify a protective order in a separate civil lawsuit brought against Maxwell.  Binder Letter at 16 (citing *Giuffre*, 2023 WL 8715697, *supra*). There is no need for such relief.  The *Giuffre* lawsuit is assigned to a different judge, Judge Preska; this Court does not have any authority to modify it; DOJ has not asked this Court to do so; and DOJ is not a party to that lawsuit.  *See also* Dkt. 819 at 3 (DOJ letter of December 8, clarifying that it does not seek to modify civil-case protective orders).

[15] For clarity for the public and the Court, the Court directs that, in making materials from this case publicly available pursuant to the Act, DOJ clearly designate those that are (1) Maxwell grand jury materials and (2) discovery materials covered by the Protective Order.

"20.  Nothing in this Protective Order shall prohibit the Government from publicly releasing materials whose disclosure is required by the Epstein Files Transparency Act.  The restrictions of this Protective Order, however, remain in place with respect to the segregable portions of records that 'contain personally identifiable information of victims or victims' personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.'  Epstein Files Transparency Act § 2(c)(1)(A).

21.  Prior to the release of any records covered by this Protective Order, the United States Attorney for the Southern District of New York shall personally certify, in a sworn declaration filed on the docket of this case, that such records have been rigorously reviewed for compliance with Section 2(c)(1)(A) of the Epstein Files Transparency Act, and that none of the records to be released 'contain personally identifiable information of victims or victims' personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.'  This review is to be done by persons including attorney(s) at the United States Attorney's Office for the Southern District of New York."

The Clerk of Court is respectfully directed to terminate the motion pending at docket 810.

SO ORDERED.

*Paul A. Engelmayer*

—————————————————
PAUL A. ENGELMAYER
United States District Judge

Dated: December 9, 2025
       New York, New York