Because the jury instructions, and the judge's failure to address the juror confusion, evident with their note, the jurors in their confusion broadened the indictment's scope, the convictions on Counts 3 and 4 must be vacated.

POINT EIGHT

Pre-Indictment Delay and Tactical Advantage

A.   Overview

The Government's 25-year delay between alleged conduct and indictment violated due process by impairing Petitioner's ability to present a defense and is revealed by trial testimony and new evidence. The Government had multiple opportunities to indict Petitioner in a timely manner years sooner. Pre indictment delay was raised pretrial – the court denied the dismissal of the charges but stated the issue could be re litigated post-trial (Dkt.317 at 10) EXHIBIT 101).

1. The House Judicial Committee on Oversight reveals the Government had notice of Petitioner in 1997 (Acosta Tr. 31:1-2) (EXHIBIT 54).
2. Epstein was investigated from 2005. Complainant Farmer gave a detailed 302 interview in 2006 which was used at trial (Tr 2209:19-25, 2210:1-12) EXHIBIT 73
3. Non-Testifying Witness Giuffre was contacted by the Government in 2007, noticed as a victim under the NPA and paid restitution. (OPR 147 n 217).EXHIBIT 35
4. 2008 the SDNY independently investigated Epstein and co-conspirators (3501.018-017) (EXHIBIT 128) AUSA Villafana used Edwards as a proxy and conspired with him to overturn the NPA by instructing him to file the CVRA-before the ink was dry on the NPA. This demonstrates that the Government negotiated the NPA plea deal in bad faith (Uustal at 40.13) EXHIBIT 26.
5. 2011 GIUFFRE gave detailed allegations to the Government that included allegations against the Petitioner which were used for the CVRA. EXHIBIT 126)3501.226.030
6. 2013 SDFL invited other Districts to investigate offering to provide evidence from SDFL investigation Jane Doe 1 and Jane Doe 2 v US 08-cv-80736 (S.D. FL) July 5 2013 Dkt 205-2 at 9.10. 10.9) bail hearing doc page 10 note 9-10 CVRA Dkt 205-2 at 9 EXHIBIT 143 Steptoe Letter document 6 page 7-8 EXHIBIT 142
7. In 2016 Plaintiff's Lawyers met with SDNY to instigate an investigation into Epstein (see fn 9). Plaintiffs Lawyers tried to incite the Government to re-open its criminal investigation on multiple occasions (JKB at 282 . EXHIBIT 15. In 2015 Giuffre filed detailed allegations against the Petitioner and filed a defamation case and went to the SDNY to incite criminal investigation.

8. The intervening years were used to exploit the civil litigation process to gain a tactical advantage, using plaintiffs' lawyers in the front and behind the scenes to defame Petitioner in pleadings working the media promoting "fake news" falsely portraying her and Epstein as one person whilst working to invalidate/overturn the NPA using the CVRA as litigated in POINTS THREE and FOUR set forth above. Edwards acted as the proxy for AUSA Villafana both conspiring to overturn the NPA thru the CVRA litigation. (Uustal at 40.13 ) EXHIBIT 26. Obtaining police records and victims' names from law enforcement and USAO Florida AUSA Villafana sharing information with potential claimants, using the information for "secret" settlements with men with deep pockets in exchange for keeping the identity of those men out of the public arena to benefit the personal pocketbooks of plaintiff's lawyers. In 2008 AUSA Villafana directed Edwards to file the CVRA case, its sole aim to overturn the NPA (Uustal 40.13), EXHIBIT 26. The CVRA became a tactical tool that allowed the Government to keep investigating Epstein and the co-conspirators through civil litigation and discovery. The ongoing litigation allowed continued press collusion to push a false narrative through friendly journalists like Sharon Churcher and JKB see footnotes 8 and 9 and 11 above turning Petitioner into an object of 'rage bait'[20].
9. AG Barr admitted that post Epstein's death they were looking for someone to indict for trafficking (Barr Tr. 58:18-19 EXHIBIT 25. The Petitioner was not named in Epstein's first or second indictment, 4 other women were named as co-conspirators but none of the four were ever charged. The Government could have indicted the 4 named co-conspirators, or any of the 25 men that settled secretly with the Plaintiff's lawyers for the complainants (see footnote 10) but did not.
10. In 2016 the plaintiff's lawyers met to instigate an investigation into the Petitioner (see fn 9)

DOCUMENTS LOST OR DESTROYED BY THE GOVERNMENT

1.AUSA Villafana ordered lists of victims and their statements to be destroyed (OPR p. 233) EXHIBIT 35 .

2.Acosta emails were 'lost' (OPR p.323) EXHIBIT 35 The emails would have revealed that emails between Acosta and Epstein's defense regarding the negotiation of the clauses of the NPA and that the co-conspirators clause was intentionally intended to be global, thus precluding the SDNY from indicting the Petitioner

3. Interview notes with victims are missing and incomplete (OPR at 222 n.338) EXHIBIT 35

---

[20] Oxford English Dictionary 2025 Word of the Year, 'rage bait' – 'online content designed to provoke anger or outrage to increase engagement on social media and the internet'

4. JKB quotes Det. Recarey who was in charge of the Palm Beach investigation stating that evidence was lost and destroyed (JKB at 137) EXHIBIT 15.

DEAD WITNESSES

1. Epstein. His Death denied Petitioner critical documents to defend herself to include for example full flight manifests. EXHIBIT 70

2. Epstein had access to the negotiation history of the NPA which was conducted by his lawyers on his behalf. Acosta Tr p87 lines 23-24 EXHIBIT 54 ; OPR p55 at fn 90 EXHIBIT 35. Epstein was arguing the intent and his understanding of the NPA at bail and in limine which would have precluded the indictment of Petitioner after Epstein's death. As an example in the Epstein proceedings, the following exchange between Weingarten, Counsel for Epstein and the Court gives insight into what Epstein had in relation to the NPA that was never disclosed to Petitioner (Transcript August 29, 2019 page 15 et seq EXHIBIT 148

> "MR. WEINGARTEN: We interviewed all of the relevant lawyers on the defense side who participated in the NPA, and we were satisfied that we had a very strong argument that every one of those lawyers believed with an objective basis that the deal was global. That is, at the time
> THE COURT: I'm sorry, that?
> MR. WEINGARTEN: The deal of the NPA was global. That is, more specifically, at the time, the Florida prosecutors and agents knew of conduct in New York, and that no competent defense counsel negotiating in good faith with the prosecutors would have ever agreed to a deal back then that allowed New York prosecutors to indict for precisely the same conduct in the future, which, of course, is what happened. In addition we have come up with very powerful evidence we believe, that Florida prosecutors, who participated in the deal, steered the victims and the alleged victims to new ork on more than one occasion because they did not want to suffer the sleights of attacks against them. So we have advanced the ball on this very subject and we are prepared to completely report to the court as to where we are and what we've done."

3. Epstein would have given evidence that Petitioner was not involved in criminal behavior (Netflix. at 56.09 m) EXHIBIT 27. Confirming that he had wanted to be the sole person to take responsibility for his criminal behavior ( OPR p 167. EXHIBIT 35).

4. Epstein would have presented documentary evidence and testified that he did not live in or have guests in 71st St, New York House until after renovations were completed 1996 (TR 2710-2719) EXHIBIT 80 as stated in a civil deposition of Epstein's not admitted at trial. Government witness' Dave Rogers, and Annie Farmer stated that J Epstein moved into 71st St in 1996 and that the house of under renovation until 1996(Tr 1948:2). EXHIBIT 71. This would have undercut Jane's credibility as she could not have been abused in a house, when she stated, at the age she stated, that Epstein had under renovation and neither owned nor lived in between 1994-1996.

5. Epstein would say that the New Mexico 'Huge' house as described by Jane where she testified she was abused, at age 15 years of age, did not exist until 4 years later when she would have been at least 19 years of age. (TR 518:10-13) EXHIBIT 107. New Mexico was finished approximately at the end of 1999 to beginning of 2000 (TR 238: 8-11) EXHIBIT 124.

6. That Palm Beach was under major renovation and, JE rented and lived in a separate house during the duration of the renovations and construction. Janes' specific testimony of abuse at his Palm Beach house in 1994-1995 could not have occurred as described as the house was under renovation and had no utilities, and no water, during that period. (TR 1945:18-21, 1946: 1-3) EXHIBIT 71. The pilots gave evidence as to the renovation in the time period. (TR. 254:12-13, 255:1-6)

7. Albert Pinto was the decorator of Epstein's properties and would have corroborated the status of the properties on particular dates making the evidence and the alleged ages of the complainants not possible but Mr Pinto was deceased by the time of trial.

8. Recarey- Det Recarey served as lead detective in charge of the first investigation of Epstein. Recarey would have evidence that the Petitioner was not involved, did not sleep in the master Bedroom (P.GJ 112:19-23) EXHIBIT 11; that sex toys were purchased by named co-conspirator Nadia M.(R GJ 70:19-21 EXHIBIT 129 that Petitioner had her own room in Epstein's Palm Beach House undermining the Governments main argument that the Petitioner and Epstein were living together as a couple as late as 2005. Recarey was deceased by the time of trial. Recarey would have contradicted the governments closing stating that Petitioner was Epstein's girlfriend in 2005 and co-habitating with Epstein. Petitioner was not.

Witness Tampering and influencing/poisoning memories of witness-

The time delay allowed witnesses to compare and then align their evidence through joint meetings with each other and their therapists[21].

Government witnesses were not clear on timelines of events or dates (TR 999:18-21) EXHIBIT 106

1. Alessi: Giuffre visited Alessi at his home pre trial to 'get him to testify' . Giuffre discussed witness Jane with him (See Footnote 12) contaminating the timelines and age of Jane at the relevant times. Giuffre's interference with Allessi's evidence is evident in the following descriptions of Jane. Jane described herself as small and flat chested until she turned 16. (TR 325:4-5) EXHIBIT 124 Alessi remembered her as tall (TR 835:16) EXHIBIT 93. Visoski recalled that she was

---

[21] "I began working with survivors of Jeffrey Epstein in 2007. I had two survivors referred to me by the FBI. And then I had the opportunity of getting to know some of the attorneys in the area who were working with victims, who referred more victims to me. I have treated survivors who have been manipulated by Ghislaine." (Netflix at 42.36) Randee Kogan

mature, well developed (TR 218:7-10) EXHIBIT 124. Alessi testified he met Jane when she was 14 in 1994 (Tr 839:3-4 ) EXHIBIT 93. The evidence of Alessi does not comport with the evidence of the pilot Visoski or Jane herself. Prior to Giuffre interfering Allessi said only that he met Jane in 1998 or 2000 in deposition when Jane would have been 18/19 years of age. Giuffre's interference with Alessi unnecessarily confused critical evidence. The Court did not permit Alessi's deposition evidence to be heard. TR 952-967 EXHIBIT 110.

2. JANE : Jane reported she was blackmailed (TR 607) EXHIBIT 107 her story was used against her will to bolster Giuffre's CVRA case. (See footnote 12) The delay in charging Petitioner allowing witness interference and coercion and use of threats. That allowed Giuffre to interfere with Jane's evidence.

3. Jane stated in evidence that the FBI wrote everything down wrong and that the timeline of events was wrong (Trial Tr 506:16-20) EXHIBIT 62. She could not recall the house she lived in (Trial Tr 380:16-25, 381:1-7) EXHIBIT 124. This would have revealed that she had moved before she met Epstein and that therefore she was in fact older and was living in a house in a gated community which reflected the degree to which her memory had deteriorated with the passage of time due to the Government's delay in prosecuting Petitioner and the interference in her evidence.

4. Jane Doe 84 stated that victims attended therapy in a group  ABC Interview with Jane Doe 84  EXHIBIT 84 (see fn 21).

5. Anouska De Georgiou ("ADG") Testified she was approximately 17 years of age when she met Petitioner (TR 1172) EXHIBIT 98 and testified with specificity that she met Epstein at Petitioners Home in London. (TR 1235:11-13) EXHIBIT 98  The attached property record EXHIBIT 111 shows that Petitioner neither rented nor owned the property until 1996 and renovated it through 1997 when she moved in. ADG was 20 years of age in 1997. The Court ruled that even during COVID she would not permit time for the final witness Kevin Moran to travel from London which required a minimum of 72 hours. The Court expressed her belief that the testimony of Kevin Moran had minimal value EXHIBIT 51. His testimony would have established that ADG did not meet Petitioner or Epstein at Petitioner's home in London in 1994, 1995, 1996 but rather in 1997, at the earliest, when renovation was complete at which point she was 19 or 20 years of age. The judges conclusion deprived the defense the ability to challenge the credibility of the ADG witnesses memory and credibility because she was so adamant as to the details of the circumstances and timings of events which were not possible at the time and the age she stated.

MEMORIES CORRUPTED

Memory of events decades ago was "2 steps removed" per Court (TR 2172:20-24) EXHIBIT 73. The Court held that Timeline was a collateral matter. The Petitioner was repeatedly denied the right to cross examine to impeach memory and yet on sentence the alleged age of the complainants was considered as an aggravating feature and never challenged by Petitioner because of the judge's prohibition on introducing that evidence in cross. (TR 2566:25-25) EXHIBIT 80 (2567: 1-2) EXHIBIT 80 (TR 2584:17-25) EXHIBIT 80, (TR 2585:1-15) EXHIBIT 80

Anouska de Giorgio and Annie Farmer spoke of the "sisterhood" communicating in a "group chat" with every one of the complainants (Transcript TR 1248:2-16, 1249:1-14; 2204-5;lines 10 et seq) EXHIBIT 103 This contributes to transference, poisoning and contamination of memory.

## MALICIOUS PROSECUTION

New evidence reveals the reason why the Petitioner was indicted after having not been named and included in any of the earlier criminal indictments against Epstein or the Palm Beach Police Investigation, simply put it was for expediency and purely political motives following the death of Jeffrey Epstein in the care custody and control of the US Government.

AG Barr admitted that post Epstein's death they were looking for someone to indict for trafficking (Barr Tr. 58:18-19 EXHIBIT 25). The Petitioner was not named in Epstein's first or second indictment, 4 other women were named as co-conspirators but none of the four were ever charged and Petitioner was not named in the PBPD reports which were the earliest statements taken when the memories were fresh. Memory does not improve with the passage of time. The Government could have indicted the 4 named co-conspirators, or any of the 25 men that settled secretly with the lawyers for the plaintiff complainants (see footnote 10) but they did not.

AG Barr stated that the initial investigation was not led by FBI (Barr Tr 55 at pg. 17) EXHIBIT 25. The investigation in other words was not a typical evidence-based, follow the leads type of investigation. Further Petitioner was prosecuted by the Office of Public Corruption at the SDNY which was at the time headed by Maurene Comey, not human trafficking nor sex crimes. EXHIBIT 131 p 2. The Petitioner was not a public figure nor in an elected office.

The fact that investigation was led by others was revealed in "Radar OnLine by the extensive material withheld under client attorney privilege, executive privilege and privacy act – on information and belief the evidence was supplied and created by the Plaintiff's Lawyers (see fn 18) and not disclosed to Petitioner.

In 2008 AUSA Villafana directed Edwards to file the CVRA case, its sole aim to overturn the NPA (Uustal 40.13, EXHIBIT 26). The CVRA became a tactical tool that